**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER ANDRÉ VIALVA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No.** |
| | ) | |
| **WARDEN, USP-TERRE HAUTE,** | ) | **CAPITAL CASE** |
| **UNITED STATES OF AMERICA,** | ) | **EXECUTION SCHEDULED FOR** |
| | ) | **SEPTEMBER 24, 2020** |
| **Respondents.** | ) | |

---

**PETITION FOR WRIT OF HABEAS CORPUS**
**PURSUANT 28 U.S.C. § 2241**

---

SUSAN M. OTTO
OBA# 6818
Federal Public Defender
  Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
(405) 609-5930     Telefacsimile 405 609-5932
Susan_Otto@fd.org

EMMA V. ROLLS
OBA# 18820
Assistant Federal Public Defender
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405) 609-5975
Emma_Rolls@fd.org

Counsel for Petitioner Christopher André Vialva

Dated: August 10, 2020

# TABLE OF CONTENTS

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Citations to the Record  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  BECAUSE § 2255 HAS BEEN FOUND TO BE AN INADEQUATE AND
    INEFFECTIVE REMEDY UNDER THE CIRCUMSTANCES OF HIS CASE,
    MR. VIALVA IS ENTITLED UNDER § 2255'S SAVINGS CLAUSE TO TURN
    TO § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Seventh Circuit Has Found § 2241 Jurisdiction in a Range of
        Circumstances Where 28 U.S.C. § 2255 Has Proved Ineffective to
        Vindicate the Denial of a Constitutional Right. . . . . . . . . . . . . . . . . . . . . 3

    B.  Because It Has, Under the Circumstances, Denied Mr. Vialva His
        "One Meaningful Opportunity" to Litigate His Constitutional
        Claims, the § 2255 Remedy Has Proved Inadequate in This Case. . . . . . . . . . . . 5

II.  ANY INTERPRETATION OF §§ 2255(e) AND 2241 THAT WOULD PRESENT
     AN ABSOLUTE BAR TO MR. VIALVA'S CLAIMS WOULD RESULT IN AN
     UNCONSTITUTIONAL SUSPENSION OF THE WRIT. . . . . . . . . . . . . . . . . . . . . . . 11

III.  MR. VIALVA IS ENTITLED TO § 2241 RELIEF BECAUSE HIS DEATH
      SENTENCE WAS BASED UPON CONSTITUTIONAL VIOLATIONS WHICH
      EVADED MEANINGFUL § 2255 REVIEW.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  The District Court Failed to Comply with the Statutory Procedure
        for Appointment of Counsel in Death-Eligible Prosecutions,
        Denying Mr. Vialva Access to Counsel Qualified to Defend Him in
        a Federal Capital Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.  Mr. Vialva's Sixth Amendment Right to Effective Assistance of
        Counsel Was Abridged When His Trial Counsel Applied for
        Employment with the United States Attorney's Office During the
        Pendency of His Trial Without Securing Consent Before the
        Conflict Arose or an Effective Waiver After the Conflict Had
        Occurred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.  How the Conflict Unfolded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        2.  The Law of Conflicts and the Constitutional Right to
            Effective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

3.   Mr. Goains's Application for Employment with the
Government Created a Conflict of Interest. . . . . . . . . . . . . . . . . . . . . . .   28

4.   This Conflict Was Unwaivable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

5.   This Conflict Was Not Waived. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

6.   The Trial Court Failed to Make an Adequate Inquiry
into the Conflict or Inform Mr. Vialva of His Rights
to Unconflicted Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

7.   Under Any Standard of Review, Reversal Is
Required to Cure the Harm Arising from This
Conflict of Interest.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

C.   Mr. Vialva Was Denied the Effective Assistance of Counsel Guaranteed to
Him by the Sixth and Eighth Amendments During the Penalty Phase of His
Trial. Trial Counsel's Failure to Obtain Adequate Funding Resulted in a
Complete Failure to Develop and Present Readily Available Mitigating
Evidence. Counsel Failed to Develop Information About Mr. Vialva's
Mental State, Upbringing, Character, and Potential. Counsel Failed to
Address the Government's Allegations About Mr. Vialva's "Future
Dangerousness" and Failed to Preserve Error Arising from the
Government's Presentation of This and Non-Statutory Aggravating
Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

1.   Specific Instances of Ineffective Assistance of Counsel.  . . . . . . . . . . .   50

D.   The Enforcement of the Death Penalty on a Person Who, Because
of His Mental Age, Lacks Adult Moral Culpability, Violates the
Eighth Amendment's Prohibition Against the Imposition of Cruel
and Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   101

Request for Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   102

Statement Pursuant to Local Criminal Rule 38-2(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   103

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   105

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Abrogated by Flanagan v. United States,*
465 U.S. 259 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Alleyne v. United States,*
570 U.S. 99 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Andrus v. Texas,*
140 S.Ct. 1875 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 62, 72, 76, 77

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 89, 90, 94

*Atkins v. Virginia,*
536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 98

*Brady v. United States,*
397 U.S. 742 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Buck v. Davis,*
137 S.Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Burger v. Kemp,*
483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*California v. Ramos,*
463 U.S. 992 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Cuyler v. Sullivan,*
446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 44

*Eddings v. Oklahoma,*
455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 62, 97

*Furman v. Georgia,*
408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Glasser v. United States,*
315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 33, 36, 41, 42, 43, 46

iii

*Gonzalez v. Crosby,*
    545 U.S. 524 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Graham v. Florida,*
    560 U.S. 48 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Harrington v. Richter,*
    562 U.S. 86 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Harris v. United States,*
    536 U.S. 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Hinton v. Alabama,*
    571 U.S. 263 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 66, 67, 71, 76

*Holland v. Florida,*
    560 U.S. (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Holloway v. Arkansas,*
    435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 28, 35, 40, 41, 42, 43

*Hurtado v. California,*
    110 U.S. 516 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Johnson v. Texas,*
    509 U.S. 350 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Johnson v. Zerbst,*
    304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Jones v. United States,*
    526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87, 88, 89

*Jurek v. Texas,*
    428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Lockett v. Ohio,*
    438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 62

*Lockhart v. McCree,*
    476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Mathis v. United States*,
    136 S.Ct. 2243 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Mickens v. Taylor*,
    535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 35, 36, 39, 42

*Miller v. Alabama*,
    567 U.S. 460 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Neder v. United States*,
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 93

*Penry v. Lynaugh*,
    492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Porter v. McCollum*,
    558 U.S. 30 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 55, 59

*Ring v. Arizona*,
    536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83, 86, 89, 90, 91, 93

*Rompilla v. Beard*,
    545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Roper v. Simmons*,
    543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 97, 98, 99

*Sears v. Upton*,
    561 U.S. 945 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 60

*Shepard v. United States*,
    544 U.S. 13 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Strickland v. Washington*,
    466 U.S. 688 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 44, 49, 50, 52, 68

*Taylor v. United States*,
    495 U.S. 575 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88

*United States v. Cotton,*
 535 U.S. 625 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 92, 93

*United States v. Hayman,*
 342 U.S. 205 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Vialva v. United States,*
 539 U.S. 928 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Walton v. Arizona,*
 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 89

*Weems v. United States,*
 217 U.S. 349 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Wheat v. United States,*
 486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34, 36

*Wiggins v. Smith,*
 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50, 54, 62

*Williams v. Taylor,*
 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 55, 59, 60, 62

*Wood v. Georgia,*
 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

### Federal Cases

*Atley v. Ault,*
 191 F.3d 865 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

*Beason v. Marske,*
 926 F.3d 932 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Beets v. Scott,*
 65 F.3d 1258 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 39, 43, 44

*Boyle v. Johnson,*
 93 F.3d 180 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Combs v. Coyle,*
 205 F.3d 269 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Dunagan v. Dretke*,
    No. 3-03-CV-0374-K, 2003 WL 22519443, (N.D. Tex. Nov. 4, 2003) . . . . . . . . . .   45, 80

*Flores v. Johnson*,
    210 F.3d 456 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78

*Garcia v. Bunnell*,
    33 F.3d 1193 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Garza v. Lappin*,
    253 F.3d 918 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3, 11

*Gersten v. Senkowski*,
    426 F.3d 588 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

*Hamblin v. Mitchell*,
    354 F.3d 482 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

*In re Davenport*,
    147 F.3d 605 ((7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 11

*In re Dorsainvil*,
    119 F.3d 245 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*In re Jones*,
    226 F.3d 328 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*In re Smith*,
    285 F.3d 6 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*King v. Illinois Cent. R.R.*,
    337 F.3d 550 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

*Lewis v. Cockrell*,
    No. 3-93-329-G, 2002 WL 1398554, at *11 (June 26, 2002 N.D. Tex.) . . . . . . . . . . . .   70

*Lewis v. Dretke*,
    355 F.3d 364 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68, 70

*Lockhart v. Johnson*,
    104 F.3d 54 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Loyd v. Whitley*,
    977 F.2d 149 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Moore v. Johnson*,
    194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Perillo v. Johnson*,
    205 F.3d 775 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 39, 41, 43, 44

*Poindexter v. Nash*,
    333 F.3d 372 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Skaggs v. Parker*,
    235 F.3d 261 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65, 76

*Soffar v. Dretke*,
    368 F.3d 441 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Taylor v. Gilkey*,
    314 F.3d 832 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*United States v. Allen*,
    357 F.3d 745 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 93, 94

*United States v. Bernard*,
    299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 91, 92, 95

*United States v. Bernard*,
    762 F3d 467 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

*United States v. Boone*,
    245 F.3d 352 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States v. Carpenter*,
    769 F.2d 258 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Casseus*,
    282 F.3d 253 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Davidson*,
    No. 92-CR-35, 1992 WL 165824 (N.D.N.Y. July 10, 1992) . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Davis*,
 No. CR.A. 01-282, 2003 WL 1837701, at \*5 (E.D. La. Apr. 9, 2003) . . . . . . . . . . . . . . 91

*United States v. Dufur*,
 648 F.2d 512 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Fell*,
 217 F. Supp. 2d 469 (D. Vt. 2002) *judgment vacated by* 360 F.3d 135 (2d Cir. 2004) . 90

*United States v. Fulton*,
 5 F.3d 605 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Garcia*,
 517 F.2d 272 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Grimes*,
 142 F.3d 1342 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Higgs*,
 353 F.3d 281 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Horton*,
 845 F.2d 1414 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Lee*,
 89 F. Supp. 2d 1017 (E.D. Ark. 2000), *rev'd*, 274 F.3d 485 (8th Cir. 2002) . . . . . . . . 76

*United States v. Lentz*,
 225 F. Supp. 2d 666 (E.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Miranda*,
 148 F. Supp. 2d 292 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Regan*,
 228 F. Supp. 2d 742 (E.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Robinson*,
 367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 92, 93, 94

*United States v. Schwartz*,
 283 F.3d 76 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Shepherd*,
    576 F.2d 719 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*United States v. Steel*,
    759 F.2d 706 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*United States v. Suárez*,
    233 F. Supp. 2d 269 (D.P.R. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*United States v. Vaquero*,
    997 F.2d 78  (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*United States v. Vialva*,
    299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103

*United States v. Vialva*,
    904 F.3d 356 (5th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9

*United States v. Watson*,
    496 F.2d 1125 (4th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 19

*United States v. Weddell*,
    567 F.2d 767 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*United States v. Williams*,
    544 F.2d 1215 (4th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Unthank v. Jett*,
    549 F.3d 534 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Webster v. Daniels*,
    784 F.3d 1123 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 8

*Williams v. Reed*,
    29 F.Cas. 1386 (C.C.D. Me. 1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Willingham v. Johnson*,
    No. Civ. A. 3:98-CV-0409-L, 2001 WL 1677023, *9
    (N.D. Tex. Dec. 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

## State Court Cases

*Commonwealth v. Bredhold,*
    599 S.W.3d 409 (Ky. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99, 100

*People v. Spreitzer,*
    525 N.E.2d 30 (Ill. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*State v. Dhaliwal,*
    53 P.3d 65 (Wash. Ct. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## Federal Statutes

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 83, 84

18 U.S.C. § 1117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

18 U.S.C. § 2119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 83, 84, 86

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17, 18, 22, 23

18 U.S.C. § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 87

18  U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 87

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 8, 12, 102

28 U.S.C. § 2242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 2243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 2244 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 8, 10, 11, 12

## Miscellaneous

*Assessing the Risk for Violence*, AM. PSYCH. ASS'N, APA DOC. REF. NO. 200109 . . . . . . . . . 79

Erica Beecher-Monas & Edgar Garcia-Rill, Ph.D., *Danger at the Edge of Chaos:*

xi

*Predicting Violent Behavior in A Post-Daubert World*,
24 Cardozo L. Rev. 1845, 1845-47 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV. at 14 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Job Negotiations with Adverse Firm or Party*, ABA Comm. on Ethics and Prof. Resp.,
Formal Op. 96-400, at *1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E. Cauffman, et al., *Age Differences in Affective Decision Making as Indexed by Performance on the Iowa Gambling Task*, 46 Dev. Psychol., 193-207 (2010) . . . . . . . 100

Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71, 82, 87 (1998) . . . . . . . . . . 70

Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*,
26 CRIM. JUSTICE & BEHAV. 20, 38 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

N. Dosenbach, et al., *Prediction of Individual Brain Maturity Using fMRI*,
329 Sci. 1358-61 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

D. Fair, et al., *Functional Brain Networks Develop From a "Local to Distributed" Organization*, 5 Plos Computational Biology 1-14 (2009) . . . . . . . . . . . . . . . . . . . . . . 101

Lawrence J. Fox, *Making the Last Chance Meaningful: Predecessor Counsel's Ethical Duty to the Capital Defendant*, 31 HOFSTRA L. REV. 1181, 1189 (2003) . . . . . . 47

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L.Rev. 1538, 1563 (Oct. 1998) . . . . . . . . . . . . . . . 46

T. Grisso, et al., *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants*, 27 Law & Hum. Behav. 333-63 (2003) . 100

A. Hedman, et al., *Human Brain Changes Across the Life Span: A Review of 56 Longitudinal Magnetic Resonance Imaging Studies*, 33 Hum. Brain, Mapping 1987-2002 (2012) . . 101

James W. Marquart, et al., *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases*, 23 LAW & SOC'Y REV. 449, 458 (1989) . . . 79

Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION, at 8 (Mar. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7, cmt. 10,

Personal Interest Conflicts (5th ed. 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

A. Pfefferbaum, et al*., Variation in Longitudinal Trajectories of Regional Brain
    Volumes of Healthy Men and Women (Ages 10 to 85 Years) Measures with Atlas-Based
    Parcellation of MRI*, 65 NeuroImage 356-68 (2014)  . . . . . . . . . . . . . . . . . . . . . . . .  101

RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 (2003)  . . . . . . . . . . . . .  29, 33, 34

David M. Siegel, *My Reputation or Your Liberty (Or Your Life):
    the Ethical Obligations of Criminal Defense Counsel in Postconviction
    Proceedings*, 23 J. LEGAL PROF. 85, at *113 (1998-99)  . . . . . . . . . . . . . . . . . . . . . . . .  47

L. Somerville, et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent
    Sensitivity to Appetitive and Aversive Environmental Cues*,
    72 Brain & Cognition 124-33 (2010))  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

L. Steinberg, et al., *Age Difference in Future Orientation and Delay Discounting*,
    80 Child. Dev. 28-44 (2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  100

L. Steinberg, et al., *Are Adolescents Less Mature Than Adults? Minors' Access to
    Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop,"*
    64 Am. Psychologist 583-94 (2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  100

Jonathan P. Tomes, *Damned if You Do, Damned if You Don't: The Use of
    Mitigation Experts in Death Penalty Litigation*,
    24 AM. J. CRIM. L. 359 (1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9,
    Rule 1.06 (Vernon Supp. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

## JURISDICTIONAL STATEMENT

Christopher André Vialva is a prisoner confined in custody under the authority of the United States as a result of a Judgment entered by United States District Judge Walter S. Smith in *United States v. Vialva,* Western District of Texas Waco Division, Case Number W-99-CR-70.   The Judgment imposed a sentence of death for offenses in violation of federal law.   Mr. Vialva has been advised the United States intends to execute him at the United States Penitentiary Terre Haute, Indiana, September 24, 2020.   The execution of Christopher Vialva violates the Constitution and the laws of the United States.   Mr. Vialva invokes the jurisdiction of this Court pursuant Title 28, United States Code, Section 2241 and requests a writ of *habeas corpus* issue preventing his execution.   The legal and factual bases for this request are enumerated within this consolidated Petition and Memorandum in Support.

## CITATIONS TO THE RECORD

References to the original record of *United States v. Vialva,* W.D. TX, Case Number W-99-CR-70, will be *O.R. Doc.,* followed by the document number in the Electronic Case Filing system, and any pertinent internal page reference.   References to trial transcripts will be *O.R. Doc.,* followed by the document number, Tr. Trial, and page citation.   For ease of reference, specific attachments to the post conviction pleadings, as well as relevant orders and decisions will be contained as Exhibits in the Appendix to this Petition.   Those documents will be identified as *App. Ex.*, followed by the number, document identification, and internal citation.

## INTRODUCTION

Christopher Vialva was sentenced to death for a crime he committed forty-one days after his nineteenth birthday.   Mr. Vialva's mental age was several years younger than his chronological age.   The jury that determined Mr. Vialva's guilt and sentenced him to die never heard the wealth of

evidence that illuminated his vulnerabilities and provided context to the events. Trial counsel failed to complete the investigation and testing recognized as necessary before the trial began. As a result of counsel's misdirected efforts, the jury was presented with a picture of a heartless killer who posed a risk of danger in the future. The fact that some of the most damaging evidence was presented by Mr. Vialva's court appointed lawyers is only one of the instances of ineffective assistance of counsel evident from the record, but it is far from the worst violations of the Fifth and Sixth Amendments.

The lawyer who was supposed to be acting as Mr. Vialva's "learned counsel" was, at the same time, seeking employment with the United States Attorney. The District Judge's response to this obvious conflict, and to additional substantive errors raised in post-conviction, cannot be reconciled with the requirements of the Constitution. One reason for this aberrant conduct came to light after Mr. Vialva's § 2255 petition was summarily denied without a hearing, without an opportunity for discovery, and without the issuance of a Certificate of Appealability, and after the Fifth Circuit, misapplying the standard of review, affirmed the denial of  Certificate of Appealability. Mr. Vialva sought relief through Rule 60(b)(6) after the trial judge's alcoholism and misconduct prompted action by the Fifth Circuit and, ultimately, the judge's retirement in lieu of further investigation. The motion was denied without a hearing based on a misapplication of Rule 60(b) and the rules governing second in time petitions. No evidentiary, substantive, or appellate hearing has been conducted throughout this capital post-conviction process.

The Constitution and federal law provide post-conviction review as the vehicle for rectifying such errors. These processes are intended to secure the convicted person has one full and fair opportunity for review. Without this independent scrutiny, there can be no confidence in the outcome of the proceeding. Without meaningful review, the writ of habeas corpus is eviscerated.

Christopher Vialva never received a full and fair opportunity to litigate his claims.  Mr. Vialva is seeking redress of these violations through the process provided by 28 U.S.C. § 2241.

## I.   BECAUSE § 2255 HAS BEEN FOUND TO BE AN INADEQUATE AND INEFFECTIVE REMEDY UNDER THE CIRCUMSTANCES OF HIS CASE, MR. VIALVA IS ENTITLED UNDER § 2255'S SAVINGS CLAUSE TO TURN TO § 2241.

### A.   The Seventh Circuit Has Found § 2241 Jurisdiction in a Range of Circumstances Where 28 U.S.C. § 2255 Has Proved Ineffective to Vindicate the Denial of a Constitutional Right.

Section 2255(e) sets out what is known as the "savings clause." On the rare occasions when the ordinary operation of the § 2255 statute is neither adequate nor effective to test the legality of a conviction or sentence, the savings clause allows the federal prisoner to do so through a motion filed pursuant 28 U.S.C. § 2241. A § 2241 motion functions neither as a substitute for § 2255 litigation nor an end-run around the successor bars of § 2255(h). Section 2255(e) instead provides a "safety valve," a way for a federal prisoner to pursue a viable claim that § 2255 is not otherwise equipped to resolve.

The Seventh Circuit has described § 2255(e) inadequacy variously as a "glitch" in the remedy, *Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008), a "lacuna" in its functioning, *Webster v. Daniels,* 784 F.3d 1123, 1138 (7th Cir. 2015) (en banc), or a "structural problem" in § 2255 that "forecloses even one round of effective collateral review" of the claim, *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002). To invoke jurisdiction under § 2241, Mr. Vialva must show that § 2255 has proved inadequate or ineffective to "test the legality" of his death sentence. 28 U.S.C. § 2255(e); *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001) (something more than an inability to satisfy § 2254(h) is necessary to invoke the savings clause; prisoner must show that the § 2255 remedy has proved inadequate or ineffective). The petitioner files his § 2241 in the district of incarceration, not

conviction. 28 U.S.C. §§ 2242, 2243. For Mr. Vialva, on death row in Terre Haute, that is the

Southern District of Indiana, with the Seventh Circuit providing the governing law.

 To determine whether § 2255 has proved inadequate or ineffective, the Seventh Circuit does

not employ a single, overarching test. Inadequacy is demonstrated when § 2255 is "so configured

as to deny a convicted defendant *any* opportunity for judicial rectification" of a fundamental defect

in his conviction or sentence; when the "essential function" served by habeas corpus is impaired "by

the limitations on the use of the remedy provided in section 2255." *In re Davenport*, 147 F.3d 605,

609, 611 (7th Cir. 1998). Therefore, a petitioner with claims of the sort that "justif[y] collateral

review, [but do not] justify sequential collateral attacks [under § 2255(h)]" may be able to pursue

them via § 2241. *Taylor*, 314 F.3d at 835 (internal citations omitted).

 The Seventh Circuit has found § 2241 jurisdiction available in a limited number of cases but

a variety of situations. While each case or line of cases, such as *Davenport* and its progeny,

discusses specific conditions necessary for § 2241 review, the cases read together do not establish

any single rigid "test" for when § 2255 will be deemed inadequate. On the contrary, the need for §

2241 review arises from the particular way in which § 2255 has proved inadequate under the unique

circumstances of the individual case. Close scrutiny of the case law finding § 2241 jurisdiction

reveals one common theme: Where courts are confronted with a claim of fundamental injustice

unreviewable under § 2255, they have adopted a flexible approach to § 2241 review. *See Beason v.

Marske*, 926 F.3d 932, 935 (7th Cir. 2019) (citing *Webster* as "noting differing emphases in our

caselaw interpreting *Davenport* and concluding that '[a]ll of these decisions hold, nevertheless, that

there must be some kind of structural problem with section 2255 before section 2241 becomes

available.'").  This analysis is consistent with other circuits. *See*, *e.g., Poindexter v. Nash*, 333 F.3d

372, 378 (2d Cir. 2003); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002); *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000); *In re Dorsainvil*, 119 F.3d 245, 251-52 (3d Cir. 1997).

B.   **Because It Has, Under the Circumstances, Denied Mr. Vialva His "One Meaningful Opportunity" to Litigate His Constitutional Claims, the § 2255 Remedy Has Proved Inadequate in This Case.**

There are patent "glitches" in the operation of the § 2255 statute when it comes to Mr. Vialva's constitutional claims.  Due to the unique circumstances in his case – specifically, the District Judge's impairments during the trial, his continuing reluctance to acknowledge those impairments during post conviction, and the unconstitutionally cramped Fifth Circuit process for obtaining a certificate of appealability – Mr. Vialva did not receive the "one fair shot at habeas review that Congress intended that [the movant] have." *Gonzalez v. Crosby*, 545 U.S. 524, 542 (2005) (Stevens, J., dissenting).

On June 14, 2004, Mr. Vialva filed a post-conviction motion under 28 U.S.C. § 2255 seeking redress of his conviction and sentences. *O.R. Doc.* 372.  One of Mr. Vialva's claims was that his court-appointed lawyer had a conflict of interest because he was actively seeking employment with the United State's Attorney's office while representing Mr. Vialva at trial.  Mr. Vialva also claimed that District Judge Walter Smith, Jr. had failed to follow statutory requirements and policies established by the Judicial Conference regarding selection and appointment of counsel.  Mr. Vialva supported his § 2255 motion with affidavits and other proffers of evidence. *O.R. Docs.* 373, 374. He also sought the district court's permission to conduct discovery, including a deposition of appointed counsel, who had since joined the United States Attorney's office. *O.R. Doc.* 404. The lawyer had declined to provide an affidavit in connection with Mr. Vialva's § 2255 motion and had failed to preserve files relating to the representation of Mr. Vialva at trial. *O.R. Doc.* 404 at 8-9.

The United States filed a response in opposition denying the factual allegations in Mr. Vialva's § 2255 motion. *O.R. Doc.* 407. It did not proffer any evidence in support of its opposition. Nor did the United States move for summary judgment. Mr. Vialva filed a reply in support of his § 2255 motion, and the motion was fully briefed.

Judge Smith retained jurisdiction over Mr. Vialva's § 2255 motion despite the assertion of error based on his violation of the law and Judicial Conference policy in appointing trial counsel. Judge Smith denied Mr. Vialva's motion to disqualify the United States Attorney's Office (*O.R. Doc.* 400) the day after it was filed (*O.R. Doc.* 401), he did not resolve any of the ancillary motions Mr. Vialva filed in connection with his § 2255 motion, including requests for discovery (*OR. Docs.* 404, 410, 425). On September 28, 2012, without allowing discovery or conducting an evidentiary hearing, Judge Smith summarily denied Mr. Vialva's motion. *App. Ex. 1 (O.R. Doc.* 449).

Judge Smith's denial of the § 2255 motion resolved numerous factual questions against Mr. Vialva. The court ruled, for example, that alleged deficiencies in counsel's performance were actually strategic decisions. *App. Ex. 1*, Doc. 449 at 28. On the issue of his own failure to follow statutory requirements and Judicial Conference policies concerning the appointment of counsel, Judge Smith admitted he did not follow the rules but held the failure did not prejudice Mr. Vialva. *App. Ex. 1*, Doc. 449 at 15-16. Judge Smith terminated the proceeding, denied all relief, and denied a Certificate of Appealability (COA). *App. Ex. 1*, Doc. 449 at 1, 63. The Fifth Circuit denied review, holding that Mr. Vialva's claims were "meritless" based solely on the briefing that addressed whether a COA should issue. *See United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014).

In September 2014, after the Fifth Circuit had denied Mr. Vialva's appeal in his case, a court employee lodged a complaint that Judge Smith made inappropriate and unwanted sexual advances

6

in 1998.  *See App. Ex.* 3, *In re Compl. of Judicial Misconduct Against United States District Judge Walter S. Smith, Jr.,* No. 05-14-90120,  Order and Mem. of Reasons at 1, (Sept. 28, 2016).  In 2015, the Judicial Council of the Fifth Circuit imposed "severe sanctions" against Judge Smith after investigating the allegations. *App. Ex. 4, id.,* Order of Reprimand and Memorandum of Reasons (Dec. 3, 2015).  The investigation uncovered evidence that Judge Smith had significant problems with alcohol abuse – problems that impacted Judge Smith's decision-making.  One court employee described Judge as having a "reputation for drinking" and described him as having been intoxicated during the work day.  *App. Ex. 5,* Redacted Complaint, Transcript, March 7, 2014 at 10.  One of Judge Smith's law clerks asked the employee for help managing Judge Smith's behavior, complaining that he was "not functioning" and "falling apart." The law clerk stated that Judge Smith was not even able to get himself to the courthouse.  *App. Ex. 5*, *id.,* at 19.

Over the course of the investigation, there were additional allegations against Judge Smith. The Judicial Council determined that Judge Smith had knowingly allowed others to make "false factual assertions" on his behalf. *App. Ex. 4*, at 2.  Judge Smith also allowed the lawyer who was personally representing him in connection with the judicial-misconduct investigation to appear before him in court. *Id.* at 3.  Nor did Judge Smith disclose the conflict to opposing counsel in his cases.  *Id.*. The Judicial Council criticized Judge Smith for failing to "understand the gravity of such inappropriate behavior and serious effects that it has on the operation of the courts." *App. Ex. 4*, at 2.  It ordered Judge Smith to desist from misconduct. *App. Ex. 4*, at 3, n.1. After an extended investigation into Judge Smith's misconduct, Judge Smith resigned from the bench on September 14, 2016. See *App. Ex. 3* at 3. The Judicial Council ended the proceedings after determining that it could not impose sanctions on Judge Smith after he resigned.  *Id.*

In light of the revelations about Judge Smith's problems with alcohol and misconduct on the bench, Mr. Vialva moved under Rule 60(b) to reopen the judgment denying habeas relief. *O.R. Doc.* 553. The allegations of misconducted against Judge Smith dated from 1998, shortly before Judge Smith presided over Mr. Vialva's capital trial. Judge Smith's alleged wrongdoing persisted through 2015, a few years after the district court abruptly and summarily denied Mr. Vialva's § 2255 motion. The evidence that Judge Smith was impaired and unable to perform his duties as a federal judicial officer provided important context to Judge Smith's seven-year delay in acting on Mr. Vialva's § 2255 motion and other procedural irregularities.

The district court dismissed Mr. Vialva's Rule 60(b) motion for lack of jurisdiction. *App. Ex. 6*, Doc. 570 at 1. The court determined that the Rule 60(b) motion was successive for purposes of 28 U.S.C. § 2255(h) and § 2244(b). *Id.* at 2. The district court's six-page order barely addressed the allegations of wrongdoing against Judge Smith, noting in a footnote that Judge Smith's alleged impairments included "a reputation for drinking and having a temper." *App. Ex. 6*, Doc. 570 at 2, n. 2. The Fifth Circuit again denied a COA, holding that Mr. Vialva's Rule 60(b) motion was "merits-based," and that his allegations against Judge Smith lacked evidentiary support. *United States v. Vialva*, 904 F.3d 356, 362 (5th Cir. 2018).[1]

The Supreme Court has emphasized time and again that an application for a COA need only show that "jurists of reason could disagree with the district court's resolution of . . . constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S.

---

[1]In determining the availability of § 2241 jurisdiction, this Court must accept the Fifth Circuit's decision that Rule 60(b) is unavailable to Mr. Vialva due to the structure of a § 2255 action. *Webster*, 784 F.3d at 1135 n.5.

322, 327 (2003)) (internal quotation marks omitted). The Court has also instructed that a claim can

be "debatable," for purposes of granting a COA, "even though every jurist of reason might agree,

after the COA has been granted and the case has received full consideration, that petitioner will not

prevail." *Id.* at 774 (quoting *Miller-El*, 537 U.S. at 338) (internal quotation marks omitted). Despite

these clear directives, the Fifth Circuit continues to commit errors with respect to COAs, as

evidenced by its denial of Mr. Vialva's appeals from  the district court's denial of his Rule 60(b)

motion.

The Fifth Circuit applied, once again, the wrong standard when it purported to reject Mr.

Vialva's Rule 60(b) motion on the merits. The court rejected Mr. Vialva's Rule 60(b) motion on the

grounds that it did not "*credibly* allege[] a non-merits defect in the prior habeas proceedings."

*Vialva*, 904 F.3d at 361 (emphasis added). It ruled that "evidence from Judge Smith's misconduct

investigation does not *credibly* implicate the procedural integrity of [Mr. Vialva's] prosecutions or

subsequent habeas proceedings." *Id.*  (emphasis added). Indeed, the Fifth Circuit went so far as to

fault Mr. Vialva for "offer[ing] no evidence – beyond gross speculation – that Judge Smith was . .

. 'impaired' or 'unfit' to oversee the[] 2000 trial and subsequent habeas proceedings." *Vialva*, 904

F.3d at 361.

The Fifth Circuit's analysis of the Rule 60(b) motion reprises the same errors that the

Supreme Court corrected in *Buck.* By ruling that Mr. Vialva's allegations were not credible and

faulting him for not putting forth more evidence in support of his motion, the Fifth Circuit inverted

the statutory order of operations, deciding the merits of Mr. Vialva's motion without first granting

a COA. The flaw in this approach is clear: "it has placed too heavy a burden on the prisoner *at the COA stage*." *Buck*, 137 S. Ct. at 774 (citing *Miller-El*, 537 U.S. at 336-37)).[2]

It was improper for the Fifth Circuit to make credibility determinations and evidentiary findings without first granting the COA and allowing Mr. Vialva a fair opportunity to develop his arguments. *See Buck*, 137 S. Ct. at 773. The Supreme Court has held, when a court of appeals sidesteps the COA process "by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an appeal with jurisdiction." *Id.* (quoting *Miller-El*, 537 U.S. at 336-37) (internal quotation marks omitted). The Fifth Circuit's sidestep in this case was particularly problematic because neither the court of appeals nor the district court allowed any opportunity to develop the record or even to present argument in support of the Rule 60(b) motion.

As detailed below, Mr. Vialva has substantial constitutional claims that have not been subject to meaningful review. The evidence of Judge Smith's severe impairments and serious misconduct was not available until after the conclusion of Mr. Vialva's § 2255 proceedings.  There is no mechanism within § 2255 that provides a path for adjudication of these claims. His Rule 60(b) motion was rejected, and he cannot seek relief under the successor provisions of § 2255: his claims neither establish his innocence of the offense (§ 2255(h)(1)), nor do they rest on a new rule of constitutional law (§ 2255(h)(2)). The Seventh Circuit has found "inadequacy" where § 2255 denies a prisoner "a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *See Webster*, 784 F.3d at 1136. This is one of those "rare

---

[2]The Fifth Circuit utilized the same flawed approach in its denial of Mr. Vialva's COA application after the district court's denial of Mr. Vialva's § 2255 motion. *Bernard*, 762 F.3d at 483.

circumstances in which the operation of the successive petition rules absolutely prevent[s]" Mr. Vialva from accessing an available remedy and establishing a right to relief. *Garza*, 253 F.3d at 922. There must be *some* forum in which Mr. Vialva can receive a meaningful opportunity to present his constitutional claims.

## II. ANY INTERPRETATION OF §§ 2255(e) AND 2241 THAT WOULD PRESENT AN ABSOLUTE BAR TO MR. VIALVA'S CLAIMS WOULD RESULT IN AN UNCONSTITUTIONAL SUSPENSION OF THE WRIT.

The United States Constitution forbids Congress from suspending the writ of habeas corpus except during periods of invasion or rebellion. U.S. Const. art. I, § 9, cl. 2. When Congress enacted § 2255, and later amended it under the Antiterrorism and Effective Death Penalty Act (AEDPA), it did not eliminate federal prisoners' access to the Great Writ. As the Supreme Court explained in *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal citations omitted):

> When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the "writ of habeas corpus plays a vital role in protecting constitutional rights." . . . It did not seek to end every possible delay at all costs. . . . The importance of the Great Writ, the only writ explicitly protected by the Constitution. . . , along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

*See also United States v. Hayman*, 342 U.S. 205, 223 (1952) (noting that § 2255's "inadequate or ineffective" language preserves habeas for federal prisoners).  Congress thus retained a "safety hatch" in the form of § 2255(e)'s savings clause to prevent the possibility of the suspension of the writ for federal prisoners. *See In re Davenport*, 147 F.3d at 609 ("[I]f section 2255 proved in a particular case not to be an adequate substitute for habeas corpus, the prisoner could seek habeas corpus. This would block any argument that Congress was suspending the writ.").

Mr. Vialva's petition meets the plain language and purpose of both § 2255(e) and § 2241. He has established constitutional violations that render his death sentence unconstitutional. Ordinarily, such violations are redressable under § 2255. But where, as here, § 2255 in unavailable, through no fault of Mr. Vialva, § 2241 is the only avenue for review. Under these circumstances, denying under §2241 would result in no review at all of claims establishing the unconstitutionality of Mr. Vialva's death sentences and would therefore constitute an unconstitutional suspension of the writ.

**III.  MR. VIALVA IS ENTITLED TO § 2241 RELIEF BECAUSE HIS DEATH SENTENCE WAS BASED UPON CONSTITUTIONAL VIOLATIONS WHICH EVADED MEANINGFUL § 2255 REVIEW.**

**A.  The District Court Failed to Comply with the Statutory Procedure for Appointment of Counsel in Death-Eligible Prosecutions, Denying Mr. Vialva Access to Counsel Qualified to Defend Him in a Federal Capital Prosecution.**

In a criminal complaint filed June 23, 1999, Mr. Vialva and Brandon Bernard were charged with carjacking, a violation of 18 U.S.C. § 2119.  The complaint alleged Mr. Vialva took the motor vehicle "by force and violence or by intimidation" "with intent to cause death or serious bodily harm."  *O.R. Doc.* 1.  Attorney Stanley Schwieger was appointed to represent Mr. Vialva, incident to the initial presentment. *O.R. Doc*. 4.  At the conclusion of the June 24 preliminary and detention hearing, the Magistrate Judge ordered the detention of Mr. Vialva and Mr. Bernard, in part, "Because you are both facing a potential death penalty . . . ." *O.R. Doc*. 11 at 32.

Neither the United States Magistrate Judge nor the United States District Judge consulted with the Federal Public Defender for the Western District of Texas prior to appointing Mr. Schwieger or after determining Mr. Vialva was potentially subject to the death penalty.  *App. Ex. 7*, Dec. Lucien Campbell at  ¶ 2.  At all times relevant to these proceedings, Mr. Lucien Campbell

was serving as the Federal Public Defender for the Western District of Texas.  Mr. Campbell provided indigent defense services through his headquarters office in San Antonio and staffed branch offices throughout the Western District, excluding Waco, Texas.  *Id.* at  ¶ 1.

Mr. Vialva was named in a four-count indictment returned July 13, 1999.  Three of the four counts carried a maximum  punishment of death. *O.R. Doc.* 14.  On July 16, 1999, Mr. Schwieger filed a "Motion for Appointment of Co-Counsel in Death Penalty Case."   Mr. Schwieger advised the court he had "limited death penalty experience" based on his participation in three "capital murder Writs of Habeas Corpus" and his preparation of a motion to suppress in another death penalty case. *O.R. Doc*. 19, at  2, § IV.  Mr. Schwieger stated he was advised by Mr. William Johnson of the United States Attorney's Office of the government's intention to seek the death penalty in Mr. Vialva's case.  *Id.* at § V. In support of the Motion, Mr. Schwieger advised the court:

> Current counsel has spoken to Mr. B. Dwight Goains, of Goains & Goains, whose offices are located in Cameron, Texas.  Mr. Goains has been lead counsel [in] several state capital  murder trials, including State v. Kenneth Allen McDuff, in the 54th District Court of McLennan County, Texas.  Mr. Goains is a Texas board certified criminal law practitioner.  Current counsel for the defense believes that Mr. Goains is "learned in the law applicable to capital cases."  *See* 18 U.S.C. § 3005 (1998).

*O.R. Doc*. 19, at  4, § VII.  The United States responded, "The Government leaves this matter to the discretion of the Court."  *O.R. Doc.* 31.  The court appointed Mr. Goains without consulting with Mr. Campbell.  *App. Ex. 8,* Dec. Richard Burr at  ¶ 3.  Mr. Richard Burr, who at that time served as Capital Resource Counsel on retainer with the Administrative Office of the United States Courts, was not consulted by the court or by Mr. Schwieger prior to Mr. Goains's appointment as "learned counsel."  *Id*. at ¶¶ 2, 8.  The court made no express findings concerning Mr. Goains's qualifications. *O.R. Doc.* 29.

13

The right of the accused "to make his full defence by counsel learned in the law" and the obligation of the court to assign counsel, "not exceeding two,"  to assist a defendant indicted "for treason or another capital crime" was enacted by Congress in 1790.  Act of Apr. 30, 1790, ch. 9, §29, 1 Stat. 118.  This fundamental right to representation has remained secured by statute since its initial enactment. The current statute, codified in 18 U.S.C. § 3005, in 1948, was amended by the Federal Death Penalty Act of 1994. June 25, 1948, ch. 645, §1, 62 Stat. 814; Sept. 13, 1994, Pub.L. 103-322, Title VI, §60026, 108 Stat. 1982.   The version of  § 3005, which controlled the appointment of counsel in Mr. Vialva's case, directs the court:

> . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours.  In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts.

The purpose of requiring a recommendation from the Federal Public Defender organization is rooted in the federal courts' commitment to providing effective assistance of counsel, consonant with the Sixth Amendment.

In response to the expansion of the federal death penalty statutes and the correlative increase in the number of prosecutions, the Judicial Conference of the United States, through its Defender Services Committee, conducted a plenary review of the federal courts' provision of resources for capital defense.  In May 1997, the Chair of the Defender Services Committee appointed a three judge subcommittee, chaired by Judge James R. Spencer of the Eastern District of Virginia "to study the judiciary's current approach to the appointment and compensation of counsel in these cases, its success in recruiting qualified attorneys, and the quality and cost of services provided." *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense*

14

*Representation* [hereinafter *Spencer Committee Report*], Subcommittee on Federal Death Penalty

Cases, Committee on Defender Services, Judicial Conference of the United States (May 1998),

available at https://www.uscourts.gov/sites/default/files/original_spencer_report.pdf.  Addressing

the importance of learned counsel,  the Spencer Subcommittee noted:

> Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment *and* the intricacies of federal criminal practice and procedure.  Neither one alone is sufficient to assure high quality representation. Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues. . . . On the other hand, differences between state and federal practice place a lawyer who may have prior capital experience but no prior federal criminal trial experience at a disadvantage. The federal sentencing guidelines, speedy trial act issues, rules of evidence and procedure, and the specifics of the federal death penalty law play an important role in representation.

*Spencer Committee Report*, §I (C) (1) (emphasis in original).  The Spencer Subcommittee proposed

eleven recommendations "to enhance the judicial administration of federal death penalty cases."

*Id*., Introduction.

The Judicial Conference adopted the Spencer Subcommittee's recommendations September

15, 1998.   The recommendations, accompanied by the Subcommittee's commentary, were

promulgated by the Administrative Office of the United States Court in Volume VII, Appendix I,

of the *Guide to Judiciary Policies and Procedures* (1999) [hereinafter *Guide*].   The

recommendations address the qualifications for appointed counsel, beginning with a direction to the

courts about quality:

> Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation.  High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

15

*Guide*, Vol. VII, App. I (1)(a).  The *Guide* notes the statute requires the appointment "at the outset of every capital case" of two counsel, "at least one of whom is experienced and knowledgeable about the defense of death penalty cases."  *Guide*, Vol. VII, App. I (1)(b).

> Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

*Id.*  Consonant with § 3005, the *Guide* directs the appointing court to consider the recommendation of the Federal Public Defender, unless the organization has a conflict.  *Guide*, Vol. VII, App. I (2)(b).  The commentary notes the requirement for consultation:

> . . . reflects the [Spencer] Subcommittee's view that recommendations concerning appointment of counsel are best obtained on an individualized, case-by-case basis. . . .  Currently, within approximately 24 hours of receipt of a request, the Administrative Office or federal defender provides the court with the names of attorneys who are not only qualified to serve as counsel but who also have been contacted and indicated their willingness to serve in the particular case.  These individualized recommendations help to ensure that counsel are well-suited to the demands of a particular case and compatible with one another and the defendant.  Case-specific consultation is also required by existing Judicial Conference policy (see paragraph 6.01B of the Guidelines for the Criminal Justice Act (CJA Guidelines), Volume VII, *Guide to Judiciary Policies and Procedures*, explaining the 18 U.S.C. § 3005 consultation requirement and suggesting that in developing a recommendation, consideration be given to "the facts and circumstances of the case.").

*Guide*, Vol. VII, App. I (2), Commentary p. I-6- I-7 (footnotes omitted).  Based on the information available to the Spencer Subcommittee in 1997, the members commented:

> Since 1994, courts have been required to consider the recommendation of their federal public defender organization or the Administrative Office regarding the appointment of counsel in each federal death penalty case.  The Administrative Office has notified the courts of this relatively recent innovation, and it has been largely followed and yielded results satisfying to judges, defense counsel and prosecutors.  In a small number of cases, however, the Subcommittee found that courts had ignored or been unaware of the consultation requirement.

*Id.* at  I-6 (footnotes omitted).  Mr. Schwieger cited the Spencer Subcommittee Report in his *Motion*, solely as support for his argument that learned counsel should be appointed to assist in preparing for the Department of Justice's death penalty authorization meeting.  *O.R. Doc.* 19 at  2-4, § VI.  Mr. Schwieger did not provide the district court with a copy of the report, or with a reference for its retrieval from the United States Courts' website.  Mr. Schwieger cited § 3005, but did not quote it in its entirety or otherwise explain the appointing court's duty to consult the Federal Public Defender. Thus, the district court's failure to consult Mr. Campbell is attributable, in part, to counsel's failure to apprise the court of the applicable law.

The actions of the Judicial Conference in response to the Spencer Subcommittee's findings and recommendations are a direct measure of the importance the United States Courts place on providing the "high quality representation" necessary in capital cases.  The implementing procedures devised to assist the courts are not optional.  While a court may decline to follow the recommendation of the Federal Public Defender, the statute does not vest the court with the option to ignore the statutory requirement of consultation.  The record establishes the appointments of Mr. Schwieger and Mr. Goains were made in derogation of  § 3005 and the implementing procedures established by the Judicial Conference in the *Guide*.  *See also, App. Ex. 8* (Burr) at ¶ 6.

Section 3005 has been construed, in varying factual contexts, by a number of courts outside the Fifth Circuit.  These decisions highlight the structural nature of errors arising from  the courts' misapplication of § 3005.

In *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973), the defendant was charged with first degree murder, a violation of 18 U.S.C.§ 1111.  Section 1111 provided death as a possible punishment.  Mr. Watson's court appointed counsel requested the appointment of co-counsel, based

17

on his need for assistance in preparing to defend the complex case.  The district court denied the request. *Id*. at 1126.  Mr. Watson was convicted and appealed, contending, *inter alia*, that his rights were violated by the district court's denial of second counsel pursuant § 3005.  The government asserted no error occurred because the Supreme Court's ruling in *Furman v. Georgia*, 408 U.S. 238 (1972) effectively abrogated the death penalty as a possible punishment for the federal first degree murder statute.

The Fourth Circuit agreed *Furman* prohibited the imposition of the death penalty in Mr. Watson's case, but disagreed that the right to second counsel secured by § 3005 was also rendered void.

> Not every capital crime is a complex one and not every capital crime arises from a complex set of facts which would require extensive investigation and trial preparation by defense counsel.  Yet it seems to us that it is more likely than not that an alleged offense of the type for which Congress has purportedly continued the death penalty will be a complex and difficult case to prepare and try.  The kinds of crimes made punishable by death are usually such as to generate revulsion in the trier of fact and, as a result, a high degree of prejudice if the trial is not conducted strictly in accord with recognized procedures, including the rules of evidence and burden of proof.  It is not unlikely that Congress may have also sought to buttress the defense with two attorneys to provide greater assurance that a defendant's rights would be fully observed.

*Watson*, 496 F.2d at 1128 (footnotes omitted).  The government urged that even if error occurred, no prejudice could be shown from the district court's denial of counsel.  The Fourth Circuit noted the evidence against Mr. Watson was "substantial, if not overwhelming," but:

> . . . we recognize the almost insuperable difficulty which would be placed upon any defendant, if the burden is placed on him, to show post hoc that he was prejudiced by denial of his right to two attorneys.

*Watson*, 496 F.2d at 1129.  Finding the statute "unequivocal," the Fourth Circuit concluded it had no right to construe the language as vesting the district court with discretion in its application.  *Id.* at

18

1125. The Fourth Circuit concluded "the statute would be eviscerated by application of the harmless error doctrine" and so reversed the conviction and ordered a new trial. *Id*. at 1130; *see also United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976) (holding failure to appoint second counsel in a capital case "gives rise to an irrebuttable presumption of prejudice").

The Fourth Circuit revisited § 3005 following the 1994 amendment. In *United States v. Boone*, 245 F.3d 352 (4th Cir. 2001), the defendant was charged with destroying a vehicle by the use of an explosive, in violation of 18 U.S.C. § 844(i). Since the driver of the vehicle was killed in the explosion, the death penalty was available as a punishment. Mr. Boone sent a *pro se* letter to the district judge referring to the death penalty and asking at what point additional counsel would be available. The district court did not respond to the letter, but noted on the record that the issue was preserved for further review. *Id*. at 358. The government argued the 1994 amendment to § 3005 restricted the appointment of second counsel to only those cases in which the death penalty was actually sought. The Fourth Circuit agreed with Mr. Boone that the amendment did not require reversal of *Watson. Id.* at 359. The Fourth Circuit reaffirmed its decision that the unambiguous language of § 3005, as amended, mandates the court provide two counsel to assist a defendant if the death penalty is the "maximum sentence" that could be imposed. *Id*. Mr. Boone's conviction was vacated and the case was remanded for a new trial. *Id.* at 364.

The dissent in *Boone* noted other Circuits restricted the right to second counsel to those cases in which the death penalty was actually sought by the United States. *Id.* at 365 (Kiser, J., concurring in part, dissenting in part). This assertion is relevant when the cases on which the dissent relies are examined. With two exceptions, all of the cases cited by the dissent were decided prior to the reinstatement of the federal death penalty and its expansion in the Federal Death Penalty Act of 1994.

19

None of the cases required the appellate courts to consider the impact of the Department of Justice's death penalty authorization process on the accused's right to learned counsel.[3]  In the two remaining cases, the United States stipulated it would not seek the death penalty.  Neither case noted when this stipulation occurred.[4]  *See also United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) (Appellants indicted for a capital offense March 25, 1999; requests for second counsel not addressed; United States announced decision not to seek death May 12, 1999; harmless error analysis applied: "Because the right to additional counsel is created by statute, and not coterminous with the right to counsel contained in the Sixth Amendment, the essential question is whether there is a 'high probability' that the error did not prejudice the appellants.").  The critical fact distinguishing these cases from Mr. Vialva's is that none of the defendants were subject to imposition of the  death penalty under the present statutory and procedural scheme.  Prior constructions of the statute provide no basis for the conclusion a reviewing court would apply a harmless error analysis to a case in which the accused's statutory rights were not observed and a death sentence was obtained.

A second line of cases, concerning whether counsel qualifies as "learned in the law applicable to capital cases," was addressed in *United States v. Miranda*, 148 F. Supp. 2d 292, 293 (S.D.N.Y. 2001).   The district court examined the standards expressed by the Spencer Subcommittee, by Federal Death Penalty Resource Counsel David Bruck, and by the American Bar Association.  The court found it "should consider the recommendation of the federal public defender." *Id.* at 296 (citing

---

[3] *United States v. Steel*, 759 F.2d 706 (9th Cir. 1985); *United States v. Dufur*, 648 F.2d 512 (9th Cir. 1980);  *United States v. Shepherd*, 576 F.2d 719 (7th Cir. 1978); and *United States v. Weddell*, 567 F.2d 767 (8th Cir. 1977).

[4] *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998); *United States v. Davidson*, No. 92-CR-35,1992 WL 165825, *1 (N.D.N.Y., July 10, 1992).

Section 6.01 of the *Guide to Judiciary Policies and Procedures*).   The court noted the *Guide* recommends consultation about the facts and circumstances of the case to determine the qualifications required to provide effective representation.  *Id.* The court also noted the availability of the Federal Death Penalty Resource Counsel "in order to identify qualified counsel."  *Id.* at 297. Finding the application for appointment of counsel failed to establish proposed counsel's qualifications, the court directed a hearing on the application.  *Id.*

A separate problem was presented in *United States v. Sterling Suárez*, 233 F. Supp. 2d 269 (D.P.R. 2002), in which the district court found an attorney  "learned in the law" over the attorney's objections.  The counsel selected by the district court was the Federal Public Defender for Puerto Rico.  The opinion is silent on whether the court sought the advice of the Administrative Office or Death Penalty Resource Counsel before making its determination.  The court recited the 1989 American Bar Association standards, as well as counsel's prior experience in death penalty cases that did not proceed to trial.  The court made no findings concerning the Federal Public Defender's availability or willingness to serve as learned counsel.  While the district court did not address all of the concerns expressed in the Spencer Subcommittee Report, it did engage in a qualitative analysis of counsel's credentials, as they appeared from the public record.  The court failed to perform a similar inquiry in this case.

The threshold question of whether the United States would seek the death penalty was never in doubt  in this case.  The Assistant United States Attorney responded to counsel's request for second counsel by stating the government left the matter "to the court's discretion."  *O.R. Doc.* 31. In the absence of a government stipulation to the contrary, the Magistrate Judge's conclusion the accused were "facing the potential death penalty" was correct and § 3005 was apposite.  The court's

21

initial appointment of Mr. Schwieger did not comply with § 3005. Mr. Schwieger's subsequent application for appointment of Mr. Goains was similarly improper. If the court would have consulted Mr. Campbell and the Death Penalty Resource Counsel, neither Mr. Schwieger nor Mr. Goains would have been recommended for appointment. *App. Ex.* 7 (Campbell) at ¶¶ 5- 6;  *App. Ex.* 8 (Burr) at ¶¶ 9-10.

Even if this Court determines Mr. Vialva must demonstrate prejudice from these sequential violations of § 3005, such prejudice is manifest from the face of the record and from extra-record facts developed during post-conviction litigation. These errors began with Mr. Schwieger's request for appointment of Mr. Goains and continued through the course of the litigation. These errors prove Mr. Vialva was denied the rights secured to him by 18 U.S.C. § 3005. The trial court's departure from the statutory and judicial procedures established to ensure the appointment of qualified counsel denied Mr. Vialva Due Process and his Sixth Amendment Constitutional right to the effective assistance of counsel. Mr. Vialva requests that habeas relief from his sentences of death be granted.

**B.     Mr. Vialva's Sixth Amendment Right to Effective Assistance of Counsel Was Abridged When His Trial Counsel Applied for Employment with the United States Attorney's Office During the Pendency of His Trial Without Securing Consent Before the Conflict Arose or an Effective Waiver After the Conflict Had Occurred.**

Mr. Goains's application for employment with the United States Attorney's Office during the pendency of Mr. Vialva's trial created a conflict of interest. In the opinion of noted legal ethicist Lawrence J. Fox, former chair of the American Bar Association's Standing Committee on Ethics and Professional Responsibility, it was an unwaivable conflict that "represents one of the most profound and sad conflicts of interest I have ever observed." *App. Ex.* 9, Declaration of Lawrence J. Fox at 18. As Mr. Fox explains, the conflict resulted in "violations so serious that they clearly implicate Mr.

22

Vialva's constitutional right to effective assistance of counsel." *Id*. at 1.  The only remedy for this "egregious violation of our rules of professional conduct is to provide Mr. Vialva with a new sentencing trial at which he is represented by the effective lawyer which the Constitution guarantees him – one true champion whose loyalty to the accused is unconditional and uncompromised." *App. Ex.* 9 at 18.

### 1.    How the Conflict Unfolded.

On June 23, 1999, United States Magistrate Judge Green appointed Mr. Stan Schwieger to represent Mr. Vialva. *O.R. Doc.* 4.  On July 16, 1999, Mr. Schwieger moved  for the appointment of additional counsel to represent Mr. Vialva, citing 18 U.S.C. § 3005[5]. *O.R. Doc.* 19.  In the motion, Mr. Schwieger stated he had "limited death penalty experience" and requested the appointment of Mr. Dwight Goains, whom Mr. Schwieger believed to be "learned in the law applicable to capital cases." *Id*. at 2, 4.  On July 21, 1999, the district court  appointed Mr. Dwight Goains to serve as co-counsel with Mr. Schwieger in the trial of Mr. Vialva's capital case. *O.R. Doc.* 29.  Mr. Goains undertook the representation of Mr. Vialva without  reservation.

Unbeknown to Mr. Vialva, Mr. Goains had "for about the last eight or ten years . . . been trying to apply to be an Assistant United States Attorney." *App. Ex. 10* (Conflict Hearing) at 3.  In early February 2000, while his representation of Mr. Vialva was underway and without prior notification to Mr. Vialva, Mr. Goains acted on that interest and interviewed for an opening in the Waco field office of the U.S. Attorney's Office of the Western District of Texas, the very agency, the very district, and the very field office that was prosecuting Mr. Vialva. *See App. Ex. 11,* Letter from

---

[5]Whoever is indicted for . . . [a] capital crime shall be allowed to make his full defense by counsel; and the court . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . ."  18 U.S.C. § 3005.

Susan Otto to Dwight Goains (Feb. 24, 2004) (Otto Letter) at ¶¶ 1-2;  *App. Ex. 12,* Letter from

Dwight Goains to Susan Otto (Feb. 27, 2004) (Goains Letter) at ¶¶ 1-2 ; *and App. Ex. 13,* Declaration

of Lisa S. McCalmont (McCalmont) at ¶ 6.

Although Mr. Goains was not hired for the opening in the Waco field office, he expressed

continuing interest in a position with the United States Attorney's Office in a letter sent in March,

2000.  *See App. Ex. 12,* (Goains Letter) at ¶ 4; and *App. Ex. 11*, (Otto Letter)  at ¶ 4; *App. Ex. 13,*

(McCalmont) ¶ 8.

On May 3, 2000, Mr. Goains visited Mr. Vialva in jail to discuss his conflict and exacted a

waiver from Mr. Vialva.  *App. Ex. 14,* Electronic Mail from Stan Schwieger to Lisa Brown (5/4/00).

Mr. Schwieger apparently did not accompany Mr. Goains to the meeting with Mr. Vialva. Mr. Goains

has no specific recollection of what he told Mr. Vialva in that visit.  *App. Ex. 13,* (McCalmont) at ¶

9 .

On Friday May 12, 2000, three days before the commencement of trial on Monday May 15,

2000, and three months after his job interview, Mr. Goains requested a hearing before the district

court to make a record about his application to the United States Attorney's Office.   *App. Ex. 10*

(Conflict Hearing) at 3.  Mr. Goains acknowledged the substance of the hearing accurately reflects

his discussions with Mr. Vialva on May 3, 2000.  *App. Ex. 13,* (McCalmont) at ¶ 12.

At the hearing, Mr. Goains reminded the court that, "as this Court is well aware, Your Honor,

for about the last eight or ten years I've been trying to apply to be an Assistant United States

Attorney."  *App. Ex. 10* (Conflict Hearing)  at 3.  Mr. Goains asserted his application to join the

United States Attorney's Office had nothing to do with Mr. Vialva's case, but "there's more than an

excellent chance I may receive an offer" and that "if that offer does come in, I'm going to accept it."

*Id.* at 4.   Mr. Goains asserted he had discussed the matter with Mr. Vialva and had offered to withdraw or permit the substitution of another counsel, but that Mr. Vialva wished him to continue in the case.  *App. Ex. 10* at 3- 4. Mr. Goains presented Mr. Vialva to the court for its examination. *Id.* at 4-5.  The court asked Mr. Frazier, the Assistant United States  Attorney in charge of prosecuting Mr. Vialva's case, for comment.  Mr. Frazier requested a waiver from Mr. Vialva that "to the extent there is any conflict, if there is any, that Mr. Vialva waives it and understands that that's permanent waiver of any type of potential issue."  *App. Ex. 10* at 5.  The court exacted the waiver from Mr. Vialva by explaining to him that he would not be able to say later "Well, I didn't get a fair trial, because Mr. Goains had applied for a job with the U.S. Attorney's Office."  *App. Ex. 10* at 6.

After the trial of Mr. Vialva's case was concluded, Mr. Goains moved to withdraw as counsel because he "d[id] not wish to represent Mr. Vialva in his appeals process."  *O.R. Doc.* 292.  The court granted Mr. Goains's motion to withdraw.  *O.R. Doc.* 294.  Sometime after trial, Mr. Goains disposed of his files regarding his representation of Mr. Vialva and was not able to produce those files to post-conviction counsel.  *App. Ex. 15* Declaration of  George Rawlings (Rawlings) at ¶ 5  During the pendency of Mr. Vialva's appeal, Mr. Goains accepted employment with the United States Attorney's Office for the Western District of Texas.[6]

### 2.   The Law of Conflicts and the Constitutional Right to Effective Assistance of Counsel.

Every defendant has a Constitutional right guaranteed under the Sixth Amendment to "the assistance of an attorney unhindered by a conflict of interests."  *Holloway v. Arkansas*, 435 U.S. 475,

---

[6] Mr. Goains was subsequently appointed to the position of a federal magistrate judge for the United States District Court for the Western District of Texas on November 10, 2007.  He retired from this position November 9, 2015. Administrative Office of the United States Courts, "Judicial Milestones" ( https://www.uscourts.gov/judicial-milestones/b-dwight-goains).

483 n.5 (1978).  A criminal lawyer "owes [his] client a duty of loyalty, [and] a duty to avoid conflicts of interest."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  It is well settled that "[w]hen a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity."  *Williams v. Reed*, 29 F. Cas. 1386, 1390 (C.C.D. Me. 1824) (No. 17,733).

Breach of the fundamental duty of loyalty owed by a lawyer to his client so risks unhinging the fundamental fairness of the criminal trial process that the Supreme Court has examined issues of conflicts frequently and created a framework for conflicts analysis.

The first step in the analysis is to ascertain whether there was a conflict.  The Court looks to the rules of professional conduct to ascertain whether there is a present conflict or a situation that can develop into a conflict.  For example, in criminal representations, one question is whether there is a joint or concurrent representation which causes the lawyer to simultaneously serve two masters, or whether there is a situation which implicates duties of loyalty to clients in successive representations.  *Compare Holloway*, 435 U.S. at 478 (concurrent); *Glasser v. United States*, 315 U.S. 60, 68-69 (1942) (concurrent); *with Mickens v. Taylor*, 535 U.S. 162, 164-65 (2002) (successive representation).

Second, the Court must determine whether the conflict was waivable.  If the conflict is waivable, then it must be determined whether there was a waiver, when the waiver occurred, and whether any waiver was effective.  At this point, the Court considers whether the defendant, through counsel, recognizes and objects to the conflict or has knowingly and intelligently waived the conflict.

26

*Compare Wheat v. United States*, 486 U.S. 153, 157 (1988) (client waiver); *with Glasser*, 315 U.S. at 70 (no affirmative waiver); *and Holloway*, 435 U.S. at 478 (objection to concurrent conflict).

Third, the Court must determine to what extent the trial court provided the needed prophylaxis through inquiry into the conflict to assure that the conflict would not adversely impact the defendant or the fairness of the proceedings.  In this inquiry, the Court considers whether a trial judge knew of or should have known of the conflict, or made any inquiry into the conflict.  *Compare Glasser*, 315 U.S. at 71 (no meaningful inquiry); *Holloway*, 435 U.S. at 478 (failure to meaningfully inquire); *Mickens*, 535 U.S. at 174 (no inquiry); *with Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) (no duty to inquire).

Finally, the Court  must ascertain whether the conflict rises to the level of a Constitutional violation by looking at the nature and extent of the conflict.  In an effort to characterize the nature and extent of the conflict, courts somewhat confusingly pose the question as whether there is an "actual," "possible," or "potential" conflict.  *See, e.g.*, *Mickens*, 535 U.S. at 167-73 (collecting cases); *Sullivan*, 446 U.S. at 350 (considering whether actual as opposed to potential conflict exists); *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (possible conflict).  But regardless of the terminology used, the point of this inquiry is to determine what standard of review applies to the conflict, whether harm can be presumed, or whether harm is less certain to have occurred and therefore some level of proof of adverse impact or prejudice to the defendant is required.

Based on this analysis, the Court applies any one of a range of standards of review.  In limited circumstances, the Court concludes, based on the nature and extent of the conflict, that no proof of harm is necessary and reversal for a new trial is automatic.  *See, e.g., Holloway*, 435 U.S. at 491; *Glasser*, 315 U.S. at 76.  More routinely, the Court requires a showing that the conflict has had an

adverse effect on representation. *Sullivan*, 446 U.S. at 350. Finally, although the Supreme Court has never addressed the question directly, some lower courts have applied the *Strickland* standard that requires proof of objective unreasonableness of counsel's conduct coupled with a likely prejudicial impact on the outcome of the case. *See, e.g., Lockhart v. Johnson*, 104 F.3d 54, 58 (5th Cir. 1997) (holding that *Strickland* standard is "ordinarily" used in cases of attorney conflict and that the *Cuyler/Sullivan* standard is "primarily" reserved for cases of multiple representation); *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) (applying *Strickland* outside of the multiple or serial client context).

Mr. Goains labored under a conflict. The conflict was unwaivable. Even if the conflict had been waivable, it was not knowingly and intelligently waived. The district court failed to fulfill its independent duty to inquire and protect Mr. Vialva's rights and the fairness of the proceedings. Under any of the possible standards of review, this conflict caused prejudice to Mr. Vialva and warrants habeas relief from his sentences of death.

### 3. Mr. Goains's Application for Employment with the Government Created a Conflict of Interest.

The Fifth Circuit has held that "'[a] conflict exists when defense counsel places himself in a position conducive to divided loyalties.'" *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993) (quoting *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985)) (internal quotation marks omitted). To determine if any particular situation creates such a conflict, we look to the national and local rules of professional conduct. *Perillo v. Johnson*, 205 F.3d 775, 801 (5th Cir. 2000) (the ABA Model Rules of Professional Conduct are the "relevant ethical standards"); *Vaquero*, 997 F.2d at 90-91 (Court of Appeals determines significance of conflict by reference to national standards of legal ethics).

The relevant national and local rules of professional conduct all recognize that conflicts can arise when a lawyer's personal interests affect the representation of a client. The black letter rule of law is that "[u]nless the affected client consents . . . , a lawyer may not represent a client if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's financial or other personal interests." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 (2003).

A lawyer who has discussions regarding employment with an entity adverse to his client breaches the fundamental duty of loyalty to his client and places himself in a position of divided loyalties. *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7, cmt. 10, Personal Interest Conflicts (5th ed. 2003) ("[W]hen a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, . . . such discussions could materially limit the lawyer's representation of the client."); *see also* TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06 (Vernon Supp. 1999); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 cmt. d (2003).

A lawyer is thus prohibited from undertaking substantive employment discussions, specifically prohibited from accepting employment, unless he has consulted and has received prior consent from his client. *Job Negotiations with Adverse Firm or Party*, ABA Comm. on Ethics and Prof. Resp., Formal Op. 96-400, at *1 (1996) (employment discussions or negotiations by a lawyer with an adverse firm or party "clearly raise ethical issues under Rule 1.7(b), which prohibits a lawyer, without consultation and consent, from representing a client when his personal interests may materially limit the representation"). "[F]or the protection of clients, Rule 1.7(b) requires a lawyer who is actively representing a client in a matter, and who is considering an association with a firm

29

or party to whom he is opposed in the matter, to consult with his client and obtain the client's consent to his continuing to work on the matter while the lawyer explores such association." *Id*. at *5. Consent to the conflict must occur before the conflict materializes.

> We, therefore, conclude that a lawyer who has an active and material role in representing a client in litigation must consult with and obtain the consent of that client, ordinarily *before* he participates in a substantive discussion of his experience, clients or business potential or the terms of an association with an opposing firm. The consultation that the Committee here concludes that a job-seeking lawyer should have with a client whom he is currently representing, *before he participates in substantive employment discussions*, should include all facts that the client should consider in making an informed decision. These include the posture of the case, the nature of the work that the lawyer could or should be doing, and the availability of others in the firm to assume the work that the lawyer is doing.

*Id*. at *3 (emphasis added) (internal footnotes omitted). "If discussion of employment has become concrete and the interest in such employment is mutual, the lawyer must promptly inform the client. Without effective client consent, the lawyer must terminate all further discussions concerning the employment, or withdraw from representing the client." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 cmt. d (2003) (internal citations omitted).

> The rationale for requiring prior consent to such conflicts is that:

> Personal interests of a lawyer that are inconsistent with those of a client might significantly limit the lawyer's ability to pursue the client's interest. Even if a lawyer could subordinate significant personal interests to the interests of clients, it is difficult to determine after the fact whether a lawyer had succeeded in keeping a client's interests foremost.

*Id.* § 125 cmt. b.

The importance of consultation and consent before the conflict arises cannot be overemphasized. Prior consultation serves the purpose of putting the power over the conflict in the hands of the client. *See id.* § 122 cmt. b ("In effect, the consent requirement means that each affected client or former client has the power to preclude representation by withholding consent.").

A world of options is open to an ordinary client if he is consulted before the conflict arises. The client, if he wishes, can prohibit the conduct outright or he can seek independent advice before consenting.[7]

Mr. Goains was appointed to represent Mr. Vialva in July 1999.  He engaged in substantive employment discussions with the United States Attorney's Office in February 2000, some six months after his representation of Mr. Vialva began.  *See App. Ex. 12* (Goains Letter) at  ¶ 2; App. Ex. 11, (Otto Letter) at ¶ 2; *App. Ex. 13*, (McCalmont) at  ¶ 7.  Mr. Goains's best recollection and records show  he did not speak with Mr. Vialva about the conflict until May 3, some three months after substantive employment discussions had occurred.  *See App. Ex. 13* (McCalmont) at  ¶ 9; *App. Ex. 10* (Conflict Hearing) at 3.  Having failed to secure Mr. Vialva's consent to the employment discussions before those discussions took place, Mr. Goains was in violation of the rules of professional ethics by which he was bound and in breach of the duty of loyalty to his client.  Mr. Goains's substantive employment discussions with the United States Attorney's Office created a conflict which "is one of the most egregious one can imagine."  *App. Ex. 9*, (Fox) at 6.  At that point, the conflict became current and substantial and "evolved into the expectant waiting for an offer, reflect[ing] the worst level of betrayal, a betrayal whose damage can never be cured by tardy disclosure or waiver or both."  *Id.*

**4.       This Conflict Was Unwaivable.**

---

[7]Of course, Mr. Vialva's situation was not that of an ordinary client.  Mr. Vialva was indigent.  The court created the attorney client relationship when it appointed Mr. Goains.  Only the court had the power to terminate the relationship.  Thus, the options available to any ordinary client, specifically the power to preclude the conflict if apprised of the conflict before it occurred, were not available to Mr. Vialva without the court's assistance.  Mr. Vialva's dependence on the court makes the notice to the court and the court's inquiry, discussed *infra*, all the more important.

Some conflicts are simply unwaivable.  *See United States v. Schwartz*, 283 F.3d 76, 95-96 (2d Cir. 2002).  Particularly insidious are those conflicts which, as here, implicate the self-interest, the pecuniary interests, of the lawyer.  "'No rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation.'" *Id*. at 96 (quoting *United States v. Fulton*, 5 F.3d 605, 613 (2d Cir. 1993)).  In general, a client has the right to waive an attorney conflict.  But  this was not a conflict  any reasonably advised client would actually waive.  In this case, there is a significant risk that Mr. Goains, expectantly waiting for a forthcoming job offer, would consciously or subconsciously "pull his punches."  As Mr. Fox explains, "[t]he fact is there is no reasonable lawyer who would have advised Mr. Vialva to accept Mr. Goains as his lawyer with all these limitations on Mr. Goains' freedom of action." *App. Ex. 9* (Fox) at 10.  Indeed, there is no lawyer, "consistent with our profession's ethical obligation to act competently  – who could recommend accepting <u>any</u> limitation, let alone these profound limitations, on the zealous representation Mr. Vialva could receive." *Id*.  This was an unwaivable conflict.

### 5.      This Conflict Was Not Waived.

#### i.      Waivers Must Occur Before the Conflict Arises.

Even if this conflict could have been waived, there was no waiver in this case.  For a waiver to be effective, no matter how comprehensive or what form it takes, it must occur ***before*** the conflict arises.  ABA Comm. on Ethics and Prof. Resp., Formal Op. 96-400 (1996), at *3, 5.  No such prior waiver occurred.

#### ii.      Waivers Are Knowing and Voluntary Relinquishments of Rights.

Even if an after-acquired waiver were theoretically possible, Mr. Goains's belated attempt to secure a waiver from Mr. Vialva was ineffective. Mr. Vialva's purported waiver was neither knowing nor voluntary.

A waiver of the right to unconflicted counsel "must be 'an intentional relinquishment or abandonment of a known right.'" *United States v. Garcia*, 517 F.2d 272, 276 (5th Cir. 1975) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Waivers must be "voluntary but also be 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Id.* (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* at 277 n.5 (citing *Johnson*, 304 U.S. at 464). Moreover, "[t]o preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights." *Glasser*, 315 U.S. at 70 (citations omitted).

Consent must be informed and "made with adequate information about the material risks." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 122 (2003). "A client's consent will not be effective if it is based on an inadequate understanding of the nature and severity of the lawyer's conflict." *Id.* cmt. b. Importantly, "[t]he[] imponderables [of conflict analysis] are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics." *Wheat*, 486 U.S. at 163. Thus, care must be taken to insure that the client understands all of the ramifications of the potential for adverse impact on his case.

33

Mr. Goains apparently told Mr. Vialva nothing before engaging in substantive discussions with the United States Attorney's Office. Three months after those discussions began, Mr. Goains approached Mr. Vialva on May 3 and told him of his interview, that there was a more than excellent chance he would be offered a job with the United States Attorney's Office, that he would take the job if offered, and that he knew his employment discussions would not interfere with his representation of Mr. Vialva. *App. Ex. 13* (McCalmont) at ¶¶ 9, 10.

Mr. Goains told Mr. Vialva nothing of his right to consult with independent counsel and nothing of the risk, recognized by courts, that lawyers interviewing or having pending employment with prosecution offices may have difficulty challenging the prosecution's case or cross examining government witnesses who will be future colleagues. *See, e.g.*, *Atley v. Ault*, 191 F.3d 865, 867-68 (8th Cir. 1999). Most specifically, there is no indication Mr. Vialva was told Mr. Goains interviewed for a vacancy in the same United State Attorney's branch office that was prosecuting him. There is no indication Mr. Vialva was told the interview was conducted by William Blagg, the United States Attorney, who took a personal interest in the prosecution of this high profile case, the first death penalty case in the Western District of Texas, and who held the power to hire Mr. Goains.

Mr. Goains repeated his attempt at a waiver, compounding his failure to get a knowing waiver, when he appeared before the court on May 12, 2000. There, he volunteered to the court what he had previously told Mr. Vialva and then presented Mr. Vialva to the court for examination. In court, the waiver exacted from Mr. Vialva was highly coercive, occurring on the Friday before trial began on Monday. Conflicted counsel was the lawyer "learned in the law of capital cases" and responsible for the first stage of the case. Mr. Vialva was in no position to ask him to leave the case, especially since the trial court did not explain to Mr. Vialva his rights: consultation with an

independent lawyer; time to consider the impact of the conflict on his case; and, if Mr. Vialva chose to have Mr. Goains replaced, time for his new lawyer to prepare for the case.  Mr. Vialva's consent to Mr. Goains continuing in the case was not freely, knowingly, or intelligently given.  There was no waiver.  *App. Ex. 9* (Fox) at 13-16.

> **6.**     **The Trial Court Failed to Make an Adequate Inquiry into the Conflict or Inform Mr. Vialva of His Rights to Unconflicted Counsel.**

To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court has an affirmative obligation to explore the possibility of conflict when such conflict is brought to the attention of the trial judge in a timely manner.  *See Holloway*, 435 U.S. at 484-86.  When a trial judge "knows or should know that a conflict does exist, the duty to make a *thorough inquiry* is manifest and unqualified."  *Mickens*, 535 U.S. at 185 (Stevens, J., dissenting) (emphasis added) (commenting on the undisputed duty of the trial court to inquire into conflicts).  The duty to make inquiry is especially profound when the court has appointed counsel for an indigent defendant.  *Id.* at 184-85. In such a case, the client does not exercise control over the representation as a private client would.  He has not chosen the lawyer, and he may not discharge appointed counsel without the assistance of the court.  In this situation, the court must be especially vigilant.

Indeed, it has long been recognized that "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *Wheat*, 486 U.S. at 160.  The judge has an "affirmative obligation to investigate a disclosed possibility that defense counsel will be unable to act with uncompromised loyalty to his client."  *Mickens*, 535 U.S. at 194 (Souter, J., dissenting).  The Supreme Court explained:

Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. Speaking of the obligation of the trial court to preserve the right to jury trial for an accused Mr. Justice Sutherland said that such duty 'is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.' *Patton v. United States*, 281 U.S. 276, 312, 313, 50 S.Ct. 253, 263, 74 L.Ed. 854, 70 A.L.R. 263. The trial court should protect the right of an accused to have the assistance of counsel. 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.' *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

*Glasser,* 315 U.S. at 71.

So serious is the requirement that the court monitor the process of the relinquishment of the right to unconflicted counsel, the Fifth Circuit has promulgated a procedure for trial court inquiry into conflicts:

As in Rule 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

*Garcia*, 517 F.2d at 278.[8]

The potential for conflict arising from pending employment with an adversary is specifically a circumstance which triggers a duty of inquiry by the trial court to assess the gravity of the conflict

---

[8]*Abrogated by Flanagan v. United States*, 465 U.S. 259 (1984) (regarding immediate appealability of pre-trial disqualifications).

by "ask[ing] questions of counsel or of the defendant to ascertain the nature and extent of the conflict of interest." *Atley,* 191 F.3d at 871 (holding the risk that lawyer may fail to zealously cross-examine future co-workers or associates presents a serious conflict); *Garcia v. Bunnell*, 33 F.3d 1193, 1194-97 (9th Cir. 1994) (trial judge conducts extensive inquiry into possible conflict associated with future employment in District Attorney's office including granting a continuance to permit the defendant to consult with independent counsel and his family).

In this case, the district court granted Mr. Goains's request for a hearing on the issue of conflict. But rather than make any inquiry of Mr. Vialva or of Mr. Goains, the court simply allowed Mr. Goains to make a record of his client's consent to Mr. Goains's continued representation and extracted a waiver from Mr. Vialva at the behest of the U.S. Attorney's Office. *App. Ex. 10* (Conflict Hearing) at 3-6.

The court did not inquire of Mr. Goains, nor did Mr. Goains volunteer, whether Mr. Goains had consulted his client regarding the conflict before or after the conflict arose; with whom in the United States Attorney's Office he had interviewed; where within the Western District of Texas the position for which he had originally interviewed was located; if he was interviewing with the civil or criminal branch of the United States Attorney's Office; if any of the lawyers involved in Mr. Vialva's case would be his future colleagues at the United States Attorney's Office; whether any of the Government witnesses at trial represented agencies with which Mr. Goains would work closely as a United States Attorney; and who, within the United States Attorney's Office, would be ultimately responsible for making the final decisions regarding Mr. Goains's application and whether that person had an interest in the outcome of Mr. Vialva's case, which, as the first death penalty case in the Western District of Texas, was a notably high publicity trial.

37

The court never informed Mr. Vialva of his rights. The court did not tell Mr. Vialva he could receive outside legal advice before waiving any conflict. The court never informed Mr. Vialva he could ask questions. The court never informed Mr. Vialva he had an absolute right to a conflict-free attorney. Rather, the court implied, without explanation, that Mr. Vialva's right to conflict-free representation was contingent on the court's consideration: "if you did want me to appoint you a different lawyer from Mr. Goains, then, I would certainly consider that." *App. Ex. 10* (Conflict Hearing) at 6. The court did not tell Mr. Vialva that, if another lawyer were appointed, the court would give the new lawyer time to prepare for trial. The court did not engage in a colloquy with Mr. Vialva, rather the court requested Mr. Vialva give one word answers - "yes" or "no."

The court had no information on which to independently judge the impact of the conflict on Mr. Vialva or whether Mr. Vialva had the appropriate information necessary for a waiver. In such a situation, the court failed to discharge its unequivocal duty to inquire and to determine that "the risk of inadequate representation is too remote for further concern, or find[] that the defendant has intelligently assumed the risk and waived any potential Sixth or Fourteenth Amendment claim of inadequate counsel." *Mickens*, 535 U.S. 162, 189 (Souter, J., dissenting) (citations omitted); *see State v. Dhaliwal*, 53 P.3d 65 (Wash. Ct. App. 2002) (court knew of possible conflict and failed to adequately inquire). Mr. Vialva lost any opportunity to have the harm of this conflict remedied before trial because the court failed to fulfill its duty of inquiry into the conflict.

> **7.      Under Any Standard of Review, Reversal Was Required to Cure the Harm Arising from This Conflict of Interest.**

Finding that a violation of the rules of professional conduct has occurred and that the conflict has not been waived is the starting place, not the ending place of an analysis of conflicts for purposes of Constitutional law. *See Mickens*, 535 U.S. at 175-76. The final step in the analysis must be to

characterize the nature and impact of the conflict.  When undertaking that task, the "guiding principle" is to ask "whether counsel's allegiance to the accused was compromised by competing obligations."  *Perillo*, 205 F.3d at 798 (citation and internal quotation marks omitted).  Important factors are the "temporal relationship" between the competing obligations and whether the conflict is "transient or insubstantial."  *Id*. at 798-99.

### i.  This Was a Personal Interest Conflict That Was Profound and Current.

This conflict stems from the competing interests which arose when Mr. Goains sought employment with an adversary of his client.  Thus, this conflict emanates from Mr. Goains's personal interests.  Some courts have implied that "personal interests" conflicts can be of relatively minor import.  *See, e.g., Beets*, 65 F.3d at 1271 (noting some personal interest conflicts can be "wholly benign").[9]  But personal conflicts can be among the most profound.  They do not involve the typical situation in which a lawyer merely has to choose between the interests of two clients.  Rather, they require dealing with the competing interests between a client's interest and the lawyer's own self-interest; it is almost impossible for a lawyer to be detached and impartial where his own interests are concerned.

Mr. Goains's conflict demonstrates the evil of the personal interest conflict.  Indeed, his conflict had all the insidious dangers of the classic, and highly egregious, concurrent representation conflicts.  The conflict was concrete and profound and interfered with his representation of Mr.

---

[9]Indeed, the scenarios often described as "personal interest" conflicts "are matters involving payment of fees; doing business with a client; a lawyer's status as a witness; and a lawyer's actions when exposed to malpractice claims."  *Willingham v. Johnson*, No. Civ. A. 3:98-CV-0409-L, 2001 WL 1677023, *9 (N.D. Tex. Dec. 31, 2001).  These are typically not conflicts which require a court to bring into sharp focus the murky problem of how a lawyer's conflict may have affected his adversarial skills.

Vialva. The conflict implicated not only the future pecuniary gain for Mr. Goains in the form of his potential retirement benefits as well as his future remuneration for his day to day work, but it also directly cabined his advocacy skills at trial.  It is deeply troubling that Mr. Goains was still interviewing for his job at the United States Attorney's Office, with the United States Attorney himself,[10] during Mr. Vialva's trial.  Each time he challenged evidence at the trial or the conduct of the government, he would have been challenging the work and opinions of those he desired to be his future colleagues and doing so before the very man who would determine whether he would be hired. As the Court in *Holloway* explained, the evil of having two present interests is "what the advocate finds himself compelled to *refrain* from doing." *Holloway*, 435 U.S. at 490-91 (emphasis in original). That evil was a specter throughout this case.

> ### ii.      Under Any Standard of Review, This Conflict Required Reversal.

Given the very factually dependent nature of the conflict inquiry, it is not always easy to tell which of the various standards of review of attorney conflicts should apply in any given case.  "Even a brief review of the precedent reveals that any categorical treatment of when an actual conflict exists is difficult. . . .  Instead, the determination of actual conflict and adverse effect is tightly bound to the facts of the case at hand."  *Perillo*, 205 F.3d at 782 (citation omitted).  Because the task of conflicts review is so difficult, the Fifth Circuit has cautioned us that ascertaining which standard of review applies:

> depends, not so much upon the label used to define the attorney's conflict, as upon these and any other factors that illuminate whether the character and extensiveness of the prior representation were such that counsel is prevented by his interest in another's welfare from vigorously promoting the welfare of his current client.

---

[10]The United States Attorney was introduced at the first session of jury selection. *O.R. Doc. 304* (Jury Trial 05/15/00) at 10.

*Id.* at 799 (citations and internal quotation marks omitted).  "[G]eneralizations" about the nature of the conflict, "may not, however, hold universally true."  *Id.* at 798 (citations omitted).  The "guiding principle" therefore must be to ask "whether counsel's allegiance to the accused was compromised by competing obligations."  *Id.* at 798 (citation and internal quotation marks omitted).  Important factors are the "temporal relationship" between the competing obligations and whether the conflict is "transient or insubstantial."  *Id.* at 798-99.

Mr. Vialva maintains his case falls squarely within the rationale offered by the Supreme Court for automatic reversal.  In each case of automatic reversal, *e.g., Holloway* and *Glasser*, the Court has focused on the existence of a conflict and the inherent difficulty of ascertaining the effect of the conflict if the Court is called upon to speculate what the conflict may have caused counsel *not to do*.  Thus, the Court concludes automatic reversal is required when it is clear the conflict exists but "to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible."  *Holloway*, 435 U.S. at 491.  This is especially true when the trial court has failed to make an adequate inquiry into the nature of the conflict and the defendant's understanding of his rights.  *See, e.g., Wood v. Georgia*, 450 U.S. 261, 272 n.18 (1981) ("*Sullivan mandates* reversal when the trial court has failed to make an inquiry even though it knows or reasonably should know that a particular conflict exists.") (citation and internal quotation marks omitted) (emphasis in original).[11]

---

[11]The Court subsequently limited the statement in note 18 of *Wood v. Georgia* to a mere rebuttal argument directed at the dissent in that case and not a pronouncement of a rule of law.  *Mickens v. Taylor*, 535 U.S. 162, 170 n.3 (2002).  *Mickens* does not construe a trial judge's failure to inquire as requiring automatic reversal.  However, the circumstances that warranted remand in *Wood v. Georgia*, as acknowledged by *Mickens*,  apply when the facts of Mr. Vialva's case are taken in their entirety.

No man can serve two masters.  *Glasser*, 315 U.S. at 75.  When a lawyer attempts that impossible task, the Supreme Court has declined to engage in parsing the adverse impact the conflict may have had on the trial, saying that assessing prejudice where one must attempt to ascertain what chilling effect the conflict may have had on counsel "is at once difficult and unnecessary."  *Id*. at 75-76.  These concerns are heightened in death penalty cases:

> While unrevealed conflicts always cast these shadows on the representation, the problem is particularly acute in criminal representations, especially capital cases. There is no way to recreate what might have, could have, or should have happened if the accused were represented by a lawyer with undivided loyalty. The defense of capital cases is an art, not a science. Each case is literally unique. The decision-tree from retainer to final appeal includes hundreds of branches -- dead ends, false starts and choices, ranging from the minor -- do I ask one more question on cross-examination? -- to the major -- should the client defend on self-defense or insanity? As a result, when confronted with a case involving a conflict of interest violation this Court must be particularly sensitive to the harm the client suffered and to the damage to the system of justice any failure to remediate the ethical lapse will cause.

*Motion of Legal Ethicists and the Stein Center for Law and Ethics for Leave to File Brief as Amici Curiae and Brief in Support of Petitioner*, in *Mickens v. Taylor*, No. 00-9285, 2001 WL 881242, at *5 (filed in the S. Ct. July 19, 2001).

For all of the reasons justifying automatic reversal in *Holloway* and *Glasser*, Mr. Vialva should have been granted automatic reversal.  *Cf. People v. Spreitzer*, 525 N.E.2d 30, 35 (Ill. 1988) (a *per se* conflict arises when a defense counsel has ties to a person or entity that would benefit from an unfavorable verdict for the defendant); *cf. Perillo*, 205 F.2d at 804 ("actual conflict may exist when an attorney represents two clients whose interests in the outcome of a matter are different").

Alternatively, if the totality of circumstances did not warrant automatic reversal, then the *Cuyler/Sullivan* standard (actual conflict which adversely affected representation, but no requirement

for showing prejudice to outcome) is the standard that should have governed the determination of the issues in this case.  It is a standard Mr. Vialva met.  *See Perillo*, 205 F.3d at 781, 797; *id*. at 804 n.12 (explaining *Sullivan/Cuyler* standard, and noting that the court was "not persuaded that *Beets* requires the conclusion that an attorney's personal relationship with a client is always immaterial when determining whether counsel labored under an actual conflict between the interests of two clients" and declining to resolve the precise scope of *Beets*).  The principal reasons the Fifth Circuit recognizes as requiring the *Cuyler/Sullivan* standard apply:  First, "a cold record may not reveal the erosion of zeal that may ensue from divided loyalty" and second, there was no inquiry by the court or prosecutors for the protection of Mr. Vialva's interests.  *Id.* at 806 n.13 (citations and internal quotation marks omitted).

Even if the most rigorous standard enunciated in *Strickland* is applied to this conflict, the facts support habeas relief from Mr. Vialva's sentences of death.  *See Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995)[12] (applying *Strickland* in conflict cases where multiple representation is not at issue).

An actual conflict arises when "defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client."  *Perillo*, 205 F.3d at 781 (citations omitted).  This conflict was an "actual conflict" which had an adverse effect, indeed caused prejudice to Mr. Vialva, meeting both the *Cuyler/Sullivan* or *Strickland* standards for relief.  The evils of this conflict are evident in the record of this case.

---

[12]For all the reasons elucidated in the foregoing argument, Mr. Vialva disagrees that *Beets* is the appropriate standard as both a matter of law and on the facts of this case, and herein preserves his objection on this point for further review.

The trial of Mr. Vialva was the first federal death penalty case tried in the Western District of Texas. The United States Attorney was present for trial of the case and thus Mr. Goains was, in effect, continuing his interview throughout the trial. Indeed, the appearance of the United States Attorney himself at the trial was so notable that court took a moment to introduce the U.S. Attorney to the jury: "Members of the Jury, those of you who were not here Monday-before-last would not have been introduced to our U.S. Attorney for this District, Bill Blagg, who is here with us today, Mr. Blagg." *O.R. Doc.* 310 (Tr. 05/23/00) at 1643-44. Unlike many instances of attorney conflict, this was a "high publicity" case. *United States v. Horton*, 845 F.2d 1414, 1420 (7th Cir. 1988) (finding no adverse effect in part because case was not a "high-publicity criminal prosecution in which there was public interest, or anything else that would attract the attention of those involved in the selection and confirmation process").

Mr. Goains's performance during the first and second stages was inexplicably deficient in the most fundamental elements of representation. As courts universally acknowledge:

> Cross-examination is the greatest legal engine ever invented for the discovery of truth. The importance of cross-examination in the American judicial system cannot be overstated. It sheds light on a witness' perception, memory and narration and can expose inconsistencies, incompleteness, and inaccuracies in his testimony. There are few subjects, perhaps, upon which the Supreme Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

*Dunagan v. Dretke*, No. 3-03-CV-0374-K, 2003 WL 22519443, at *6 (N.D. Tex. Nov. 4, 2003) (internal citations, quotation marks, and brackets omitted). Inexplicably, Mr. Goains failed to cross examine government witnesses on key evidence.

One example is Mr. Goains's failure to test the acquisition of gunshot trace evidence. *O.R. Doc.* 312 (Tr. 05/25/00) at 1779 ("Mr. Goains: We have no cross-examination, Your Honor."). Mr.

44

Schwieger, under the direction of Mr. Goains in the first stage, failed to cross a examine government witness on chemical testing for gunshot residue. *O.R. Doc.* 314 (Tr. 05/05/30/00) at 2282 ("Mr. Schwieger: I don't believe we have anything, Your Honor."). There was no reason not to cross examine these witnesses. The government collected samples for gunshot residue testing using outdated and outmoded tests that were incapable of identifying with certainty the presence of gunshot residue at all. The government then declined to test the samples that it had collected, claiming that it was worried that the defendants had been contaminated by "ambient" gunshot residue as a result of riding in a police car. The unsoundness of the government's efforts could have been readily exposed to the jury. *App. Ex. 16* Declaration of Robert White at ¶ 21. One conclusion that could have been drawn is that the government was not seeking the truth of who fired the gun that killed the Bagleys. *Id.* ¶ 23. Mr. Goains never advanced this theory to the jury.

When the government has no forensic evidence linking the defendant to the crime, the unwillingness to adversarily test the decisions that led to the absence of forensic evidence is insupportable, unless Mr. Goains was disinclined to embarrass the prosecution by pointing out their flawed collection and preservation of evidence and evident disinterest in establishing the facts of the case. As the Supreme Court has noted "declin[ing] cross-examination" "luminates the cross-purposes under which [counsel] was laboring." *Glasser*, 315 U.S. at 73.

The prosecution told the jury: "The physical evidence and the non-criminal witnesses who the Government brought you, who you heard a number of, all explain and support the facts." *O.R. Doc. 316* (Tr. 06/01/00) at 2681. That statement was patently false. There was no physical or forensic evidence linking Mr. Vialva to the crime, no blood or gunshot residue or other trace evidence. There were no neutral "non-criminal" witnesses who placed a gun in Mr. Vialva's hands.

Yet Mr. Goains failed to challenge this, the last statement the jury heard before retiring to deliberate on guilt and innocence. There can be no justification for lead counsel's failure to object to the prosecution's overt misstatement of the facts.[13]

Mr. Goains's post-trial conduct is evidence of the adverse effect and prejudice to Mr. Vialva. After the trial Mr. Goains disposed of his files and was unable to produce them for post-conviction counsel. *App. Ex. 15* (Rawlings) at ¶ 5. Mr. Goains was under an affirmative obligation to "maintain[] the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.13(A) (2003) [hereinafter "2003 Guidelines"]. This obligation was not new as of 2003 when the ABA Guidelines were published. It is well known that capital cases in which a death sentence is handed down will be appealed and then subject to post-conviction relief. The obligation to keep and maintain records should have been quite clear to Mr. Goains. *See* David M. Siegel, *My Reputation or Your Liberty (Or Your Life): the Ethical Obligations of Criminal Defense Counsel in Postconviction Proceedings*, 23 J. LEGAL PROF. 85, at *113 (1998-99) [hereinafter "*My Reputation*"]; *see also* Lawrence J. Fox, *Making the Last Chance Meaningful: Predecessor Counsel's Ethical Duty to the Capital Defendant*, 31 HOFSTRA L. REV. 1181, 1189 (2003). There are any number of inferences that can be drawn from Mr. Goains's destruction of his

_____

[13]The prejudice resulting from counsel's failures impacted the penalty phase by destroying any residual doubt, which would have given counsel an effective sentencing argument. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (noting "residual doubts" by a jury during guilt phase are effective grounds for argument in capital-sentencing phase). Residual doubt is a powerful factor influencing juries to vote for less than death. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L.Rev. 1538, 1563 (Oct. 1998). These failures, and all of the additional issues raised, *infra,* in Section III(C), illustrate Mr. Goains had an actual conflict which manifested itself throughout the trial in inadequate advocacy.

records and one certainly is, like spoliation of evidence, that he wished to eliminate any facts adverse to his representation of Mr. Vialva.[14]  At a minimum, Mr. Goains did not have his client's interests at the forefront of his considerations.  As Mr. Fox explains, in a capital case, "there can be no benign explanation – short of fire or theft – to explain Mr. Goains failure to treat Mr. Vialva's files as if they were the crown jewels."  *App. Ex. 9* (Fox) at 17.

Further, Mr. Goains was unwilling to assist post-conviction counsel in establishing the facts regarding the trial.  Mr. Goains is under an absolute duty to assist the work of successor counsel, even when that work includes "investigating or asserting a claim that prior counsel was ineffective."  2003 Guidelines, 10.13, commentary.  At a minimum, that duty must include a duty to come forward with a truthful and accurate account of the lawyer's interactions with the client.  "'Where trial counsel refuses to cooperate with the investigation of a claim of ineffective assistance of counsel . . . counsel is violating the ethical duty she owes her client.'"  *My Reputation*, at *105-08; *App. Ex. 9* (Fox) at 17-18.

Mr. Vialva presented all of the foregoing and additional argument in his § 2255.  The declarations and evidence tendered in support of his claim were unrebutted by the United States. Despite all of these facts and the law, Judge Smith summarily dismissed the issues without a hearing. The most obvious explanation is that Judge Smith was in no position to objectively assess a conflict about which he was well aware.  The prejudice resulting from this conflict was pervasive.  Its impact on the penalty phase undermines any confidence in the resulting sentences.  For these, and all of the

---

[14]"An adverse inference based on the destruction of potential evidence is predicated on the 'bad conduct' of the defendant."  *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (citations omitted).  Bad conduct would appear to include destruction of records that are required to be kept and which are known to be relevant to litigation.  *Cf. id.*

foregoing reasons, and on this ground alone, Mr. Vialva should be granted habeas relief from his sentences of death.

C.     **Mr. Vialva Was Denied the Effective Assistance of Counsel Guaranteed to Him by the Sixth and Eighth Amendments During the Penalty Phase of His Trial. Trial Counsel's Failure to Obtain Adequate Funding Resulted in a Complete Failure to Develop and Present Readily Available Mitigating Evidence. Counsel Failed to Develop Information About Mr. Vialva's Mental State, Upbringing, Character, and Potential. Counsel Failed to Address the Government's Allegations About Mr. Vialva's "Future Dangerousness" and Failed to Preserve Error Arising from the Government's Presentation of This and Non-Statutory Aggravating Factors.**

Counsel has an obligation to investigate and present evidence to ensure the jury considers punishment in the full context of the defendant's life.  *See Sears v. Upton*, 561 U.S. 945, 948-51 (2010); *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Rompilla v. Beard*, 545 U.S. 374, 383-93 (2005); *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (affirming longstanding recognition of the importance of a wide range of evidence as relevant for purposes of mitigation); *Eddings v. Oklahoma*, 455 U.S. 104, 115-117 (1982) (family history of capital defendant is vital mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (individualized consideration of capital defendant must take place prior to Constitutional imposition of death penalty).

The Supreme Court recognized the standards established by the American Bar Association Guidelines for Appointment and Performance of Counsel in Death Penalty Cases constitute an appropriate guide to what is reasonable in the performance of capital defense counsel.  *Wiggins*, 539 U.S. at 524 (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  "[T]he *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective

48

assistance cases.  This principle adds clarity, detail and content to the more generalized and indefinite 20-year-old language of *Strickland* . . . ."  *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) (finding trial counsel deficient in penalty phase for failing to investigate and present mitigation evidence and such failure caused prejudice, requiring a new penalty phase trial).  The ABA Guidelines "are not aspirational."   Rather,  "they embody the current consensus about what is required to provide effective defense representation in capital cases." 2003 ABA Guide 1.1, History of Guideline at 2.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show his counsel's performance was deficient, and the deficient performance prejudiced his defense.  *Strickland*, 466 U.S. at 687. "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 534 (quoting *Strickland*, 466 U.S. at 692).   The representation of Mr. Vialva during the penalty phase was patently deficient.  The consequent prejudice to Mr. Vialva is equally evident.

1.   **Specific Instances of Ineffective Assistance of Counsel.**

i.   **Counsel Failed to Secure Adequate Funding for Necessary Resources and to Devote Adequate Time and to Investigate, Prepare, and Present a Mitigation Case**.

On August 2, 1999, Dwight Goains submitted a proposed budget requesting, in part, to hire and funds for a "mitigation/social study expert/investigator."  The expert would prepare information

counsel intended to submit to the Department of Justice during the death penalty authorization process.  The budget identified Tena Francis as the proposed expert, to be compensated at a rate of $60.00 per hour, for an estimated 400 hours, with a total estimated cost of "$18,000.00 [sic]."  *O.R. Doc.* 46 at § IV.  The budget failed to provide the district court with any information concerning case needs after the authorization process.  The budget contained one ambiguous comment to the effect Ms. Francis would "assist the defense in the investigation of mitigating circumstances," but did not apportion the costs between pre-authorization and post-authorization work.  Counsel failed to secure the funding requested in the initial budget, resulting in a lapse of services.

Counsel pursued the funding issue through a petition for writ of mandamus to the Fifth Circuit.  Once the matter was returned from the Circuit, counsel appeared before the district court to resolve the pending funding request.  Mr. Schwieger explained Ms. Francis's remaining work:

> She stated that she needed to spend more time with the client.  She stated there were several immediate family members who needed to be interviewed, including four former stepfathers, two maternal aunts who raised Christopher.  She included school teachers, three coaches, neighbors, and mental health professionals who treated him.  She also stated that she would like to investigate and alleged bad behavior from the McLennan County Jail as a precursor for any future dangerousness argument --
>
> THE COURT:   Well, now, we just talked about future dangerousness.
>
> MR. SCHWIEGER: Yes.  I understood.  But this would also include any type of investigation that would need to be conducted out there.  But the person that's doing future dangerousness, Your Honor, includes, I believe, a look at the federal penitentiary and not – forecasting forward, not basically focusing in on any behavior at this point.  But, basically, I think there might be some overlap there, I would agree.

*O.R. Doc.* 304 (Tr. 05/15/00) at 5-6.  The district court asked counsel how much additional funding was being requested.  Counsel asked for $15,000.00, in addition to the $5,760.00 Mr. Francis was paid before funding was stopped by the district court.  The court responded, "Well, I'm sure she would love to have $30,000.00, too.  Talk to her and see what she can do for $3,000.00." *Id.* at 6-7.

At the conclusion of this hearing, counsel began jury selection without requesting a continuance to allow Ms. Francis sufficient time to complete her investigation.

Ms. Francis "was able to accomplish little within the time constraints, and did not produce much information with which to supplement the preliminary investigation that had been completed. There was simply not enough time to complete the investigation at that point." *App. Ex. 17* Declaration of Tena Francis (Francis) at ¶17.  Counsel's failure to secure adequate, uninterrupted funding resulted in a "woefully inadequate" social history investigation. *Id.* at ¶ 20.  Without the predicate investigation, the defense was completely unprepared to present an integrated, coherent case for mitigation.  At an early stage in the case preparation, Ms. Francis recognized the serious consequences to Mr. Vialva resulting from counsel's failure to comprehend the importance of mitigation in a capital case.  Ms. Francis's account of her limited investigation, the difficulties she encountered with counsel, and her ultimate inability to complete critical tasks was detailed in her unrebutted Declaration.  *App. Ex. 17* (Francis) at 11, 12, 13, 15, and 16.

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011) (internal quotation marks omitted). *See, e.g., Soffar v. Dretke*, 368 F.3d 441, 477-78, 480 (5th Cir. 2004); *Loyd v. Whitley*, 977 F.2d 149, 156-61 (5th Cir. 1992); *Gersten v. Senkowski*, 426 F.3d 588, 611, 615 (2d Cir. 2005) (all cases granting relief based on IAC for failure to call experts).  It should have been obvious to any reasonably effective lawyer that the assistance of a skilled expert was crucial.

51

In *Hinton*, a unanimous Supreme Court found that under *Strickland*, counsel performed deficiently in failing to seek additional funding from the court to obtain an adequate expert. 571 U.S. at 273. The Court found:

> Hinton's attorney knew that he needed more funding to present an effective defense, yet he failed to make even the cursory investigation of the state statute providing for defense funding for indigent defendants that would have revealed to him that he could receive reimbursement not just for $1,000 but for "any expenses reasonably incurred." An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.

*Id.* at 274 (citations omitted).

The American Bar Association expressly recognizes adequate funding for non-attorney defense team members is essential to the defense of a capital prosecution. 2003 ABA Guideline 9.1(C). The mitigation specialist "is also an indispensable member of the defense team throughout all capital proceedings." *Id.* at 4.1, Commentary, *The Core Defense Team* (B). These standards express well-settled principles of practice. In 1997, legal scholars commented on the necessity of using mitigation experts in capital cases. *See* Jonathan P. Tomes, *Damned if You Do, Damned if You Don't: The Use of Mitigation Experts in Death Penalty Litigation,* 24 AM. J. CRIM. L. 359 (1997); *see also* 1989 ABA Guidelines 8.1 *Supporting Services*, commentary, (e.g. social scientists, trial assistants, and requirement to "conduct a thorough investigation of the defendant's life history and background"); 11.8.6 *Defense Case at the Sentencing Phase.* The mitigation specialist, qualified by experience and training, is essential since he or she "insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict." 2003 ABA Guidelines 4.1,

52

Commentary, *The Core Defense Team* (B).  Counsel wholly failed to obtain the funding necessary for Ms. Francis's critical work.

Ms. Francis's impressions are confirmed by the observations of Richard Burr who conferred with the Vialva defense team.  Mr. Burr met with Ms. Francis and the attorneys August 25, 1999.  Mr. Burr noted Mr. Goains's resistance to the idea of developing mitigation evidence, and the need to develop a complete social history before embarking on a course with mental health experts.  *App. Ex. 8* (Burr) at ¶¶ 13-14.  As the attorney with primary responsibility in first stage and by virtue of his position as the defense team member  "learned in the law" of death penalty, Mr. Goains had a duty to ensure the case was properly staffed and adequately funded.  The second critical resource necessary to an adequate defense, time to prepare, was plainly absent.  Neither Mr. Goains nor Mr. Schwieger requested sufficient time to allow full development of the second stage evidence.  As a default position to adequate resources, counsel instead relied on Mr. Vialva's mother as a primary resource for the second stage presentation.  This decision had disastrous results.

Counsel have an affirmative duty to investigate all reasonably available mitigation evidence in rebuttal to aggravating evidence offered by the prosecution.  *Wiggins*, 539 U.S. at 524 (citing 1989 ABA Guidelines).  Counsel must conduct an "investigation regarding penalty . . . regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."  2003 ABA Guidelines 10.7(A)(2); 1989 ABA Guide 11.4.1.  Counsel should consider, among other things, medical history, social and family history, religious and cultural influences, educational history and employment. 2003 ABA Guidelines 10.7, Commentary.  Mitigation evidence is especially important because "death is different" and "avoiding execution is, in many capital cases, the best and only realistic result possible."  Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must*

*be Different, Too*, THE CHAMPION, at 8 (Mar. 1984).   Mr. Vialva's contacts with his counsel were

sporadic and, in view of the magnitude of the case, remarkably brief.   The result of counsel's failure

to develop a working relationship with Mr. Vialva is their essential unfamiliarity with the essential

aspects of their client.   In truth, there was a wealth of positive evidence about Mr. Vialva.

> *Social History*

"It is unquestioned that under the prevailing professional norms at the time of [Mr. Vialva's]

trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"

*Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396).   However, Mr. Vialva's counsel "ignored

pertinent avenues for investigation of which he should have been aware." *Id.* at 40.

Post-conviction counsel, along with Dr. Daneen Milam, were able to complete the social

history investigation Ms. Francis was forced to abandon.   The results of this complete investigation

reflect  Mr. Vialva was raised in profoundly chaotic circumstances.   The chaos was the direct result

of his mother's illness.

Lisa Dickson Brown, like her sisters, suffers from mental and emotional disorders that cause

her to engage in self-destructive behavior. *App. Ex. 18* Declaration of Tina Dickson Erdmann

(Erdmann) at  ¶ 3(sister's diagnosis of bipolar disorder); *App. Ex. 19* Declaration of Debbie Bynum

(Bynum) at ¶ 3 (sister's diagnosis of bipolar disorder, sister's account of mother's possible bipolar

disorder); *App. Ex. 20* Declaration of Daneen Milam (Milam) at ¶ 22 (Dr. Milam's diagnosis of Lisa

Brown's bipolar and borderline personality disorder).   Christopher and his half-sister, Audrey

Mabrey, suffered the impact of their mother's illness. Lisa's sisters were so concerned about her

children they offered to adopt Christopher and Audrey.   *App. Ex. 18* (Erdmann) at ¶ 10.  Debbie

Bynum and her husband, an African-American, offered Christopher a home that would have appeared

unremarkable to society. *App. Ex. 19* (Bynum) at ¶ 6. Lisa refused, despite the fact she viewed her

children as the primary obstacles to her happiness. *Id.*; *App. Ex. 18* (Erdmann) at ¶ 10 ("I feel Lisa

blamed Christopher and Audrey for her disappointments in life and her failure to achieve her personal

dreams."). As a result, Christopher and Aubrey were left to care for themselves at a very young age.

*App. Ex. 20* (Milam) at  ¶ 9. Lisa became involved in a series of abusive relationships with men that

left lasting negative effects on both children. *App. Ex. 20* (Milam) at ¶ 22; *App. Ex. 19* (Bynum) at

¶ 5. Lisa's response to Christopher's "bi-racial" heritage was symptomatic of her mental and

emotional problems, traced back to her relationship with her own father. *App. Ex. 19* (Bynum) at ¶

6; *App. Ex. 18* (Erdmann) at ¶ 5.

Mr. Vialva's biological father, Rowallan Vialva, a native of Trinidad, was excluded from

Christopher's life because of ongoing conflicts with Lisa. *App. Ex. 21* Declaration of Rowallan

Vialva (Vialva) at ¶ 13  Rowallan was consistently portrayed by Lisa as an abusive man, who

practiced voodoo and abandoned his son. *Id.* at  ¶¶ 8, 9. While Rowallan was not without fault, he

would have provided Christopher with a place to stay when Lisa threw him out of the house in June

1999. *App. Ex. 21* (Vialva)  at ¶ 13. Rowallan was willing to assist his son because he ran away from

his mother to live on his own from the age of thirteen and "remember[ed] what is was like to feel

alone in the world." *Id.* Alerted to Christopher's arrest, Rowallan called Mr. Schwieger to inquire

about his representation of Christopher. *App. Ex. 21* (Vialva) at ¶ 10. Unaccountably, Mr. Schwieger

failed to maintain contact with his client's father or to refer the information to Ms. Francis. *App. Ex.

22* Declaration of Stanley Schwieger (Schwieger 06 07 2004) at ¶ 5.

Because of Lisa's untreated disorders, she was particularly ill-equipped to understand and

respond appropriately when Christopher began to manifest symptoms of disorder. The course of

treatment for Christopher was counterproductive with some of the measures exacerbating his symptoms. *App. Ex. 20* (Milam) at 20, 23 (misdiagnosis and counterproductive treatment). As a result, Christopher continued to have problems in school and problems at home. The combination of these factors contributed directly to Christopher's seeking acceptance and approval from peer groups. While the family was living in Heather Glen, Christopher's peer group was composed of supportive friends who looked out for each other. Lisa, in an effort to keep Christopher from associating with "gangs," moved to Long Branch, an area recognized by Christopher's peers as a substantially worse neighborhood for youth gang activity. *App. Ex. 23* Declaration of Jacorby Smith (Smith) at ¶ 4.

Despite all of this, Christopher was well-liked by his positive peer group. Christopher was able to form friendships and attachments. *App. Ex. 23* (Smith) at ¶ 3; *App. Ex. 24* Declaration of James Davidson (Davidson) at ¶ 3. He was a kind, supportive young man who treated his girlfriends with respect and concern. *App. Ex. 25* Declaration of Jessica Haskins (Haskins) at ¶ 5; *App. Ex. 26* Declaration of Jenell Hamilton (Hamilton) at ¶ 5. These young people remember Christopher as a nonviolent person, struggling with conflicts in his home, depression and worries about his mother, and looking for a place to belong. *App. Ex. 23* (Smith) at ¶¶ 6, 7; *App. Ex. 24* (Davidson) at ¶¶ 4, 6; *App. Ex. 25* (Haskins) at ¶¶ 5-7; *App. Ex. 26* (Hamilton) at ¶ 3-5; and *App. Ex. 27* Declaration of Benjamin Sims (Sims) ¶ 7. Charlene Burke, the mother of Christopher's friend Benjamin Sims, was impressed with Christopher's respectful behavior. Ms. Burke felt Lisa Brown "was not very involved in Chris's life." Ms. Burke spoke with Lisa Brown several times. "Instead of being concerned about her [Lisa Brown's] children, she [Lisa] seemed more concerned about finding a man for herself." *App. Ex. 28* Declaration of Charlene Burke (Burke) at ¶¶ 4, 5. Because of Ms. Burke's

family circumstances, she could not give Christopher a home when he asked to stay with her while he and Ben finished high school. Ms. Burke recalls this decision with regret, "I feel guilt that I did not allow Chris to come and live with us, because I feel he would not be in the situation he is in now if I had done so." *Id.* at ¶ 8. Ms. Burke would give Christopher a home today if he were released from prison because she, like Christopher's friends, finds it hard to believe he would have committed such an act of violence. *App. Ex. 28* (Burke) at ¶ 9.

The jury heard none of this evidence, not because the witnesses were unwilling to help Christopher, but because either they did not understand what mitigating evidence was, or they were never contacted by the defense.  The importance of this information about Mr. Vialva's early childhood and adolescence is addressed by Dr. Daneen Milam.  This information would have powerfully rebutted the government's portrayal of Mr. Vialva as a marauding thug who showed no concern for others.

### *Medical History, Mental and Emotional Health Issues*

Dr. Milam documented Mr. Vialva's history of serious illness as an infant, head injuries indicative of brain trauma, and his evolving mental health issues.  Dr. Milam explains the significance of these factors in assessing Mr. Vialva's cognitive capacity and mental age.

Mr. Vialva's childhood records and the accounts of lay witnesses substantiate a history of physical trauma, beginning with his birth by forceps delivery and a streptococcus infection so severe that, at eleven days old, he was hospitalized for seventeen days. *App. Ex. 20* (Milam) at ¶ 7.  Mr. Vialva sustained a number of injuries to his head as a child and teenager. *App. Ex. 18* (Erdmann) at ¶¶ 8, 9; *App. Ex. 20* (Milam) at ¶ 14.  Mr. Vialva began demonstrating behavioral disturbances at an early age, continuing and worsening in his adolescence. *App. Ex. 20* (Milam) at ¶¶ 9 -14.  All of

these records, coupled with clinical testing, led Dr. Milam to conclude Mr. Vialva "has displayed symptoms strongly suggestive of organic brain damage and Bi-Polar Disorder from a very early age. . ." *App. Ex. 20* (Milam) at ¶ 16.  The diagnosis of bipolar disorder is not surprising  in light of the very strong genetic component to the disorder and the prevalence of the disorder in Christopher's maternal family line.

Dr. Milam explains that bipolar disorder is amenable to medical treatment. *App. Ex. 20* (Milam) at ¶ 27.  But Mr. Vialva was not diagnosed with and treated for bipolar disorder as a child. Instead, he was misdiagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD) and medicated with an antidepressant.  *Id* at ¶ 14.   The appropriate medication for a bipolar child is a mood regulator.  The stimulants prescribed for hyperactive children "make a mood disorder worse."  *App. Ex. 20* (Milam)  at ¶ 23.  The accounts of Mr. Vialva's childhood friends and his public school records  reflect the failure of his medical treatment in his frequent depression, mood swings, inability to concentrate, irritability, and impulsiveness.  Mr. Vialva would have struggled with bipolar disorder under the best family circumstances.  The chaotic home in which Mr. Vialva lived served only to exacerbate his illness. Mr. Vialva's mother, struggling with her own undiagnosed and untreated disorder, was genuinely incapable of acting appropriately to assist her son.  *App. Ex. 20* (Milam) at ¶ 22, and appended Exhibit 2.

Two salient points emerge from this mitigating evidence.  First, none of the deficits under which  Mr. Vialva labored were subject to his control.  Second, bipolar disorder is highly treatable and Mr. Vialva's intellectual assets make him amenable to treatment.  This evidence flatly contradicts

the government's contentions the offense was the result of coldly calculated substantial planning and premeditation and Mr. Vialva lacks potential for rehabilitation.

In *Porter*, the Supreme Court found deficient performance where, due to inadequate investigation, "[c]ounsel . . . failed to uncover and present any evidence of Porter's mental health or mental impairment," among other evidence. 558 U.S. at 40. In *Williams*, counsel performed deficiently in failing to investigate and present that his client "had suffered repeated head injuries, and might have mental impairments organic in origin." 529 U.S. at 370. *See also Sears*, 561 U.S. at 949-51 (mitigation investigation inadequate where counsel failed to discover evidence including "significant frontal lobe abnormalities").

### Education and Peer Influences

The government presented evidence that Mr. Vialva was a discipline problem in school and was involved in organized gang activity.  Trial counsel failed to respond to the government's allegations of gang affiliation presented during the guilt phase. The same evidence explaining Mr. Vialva's association with the "212 PIRU" could have been used during the penalty phase.  Mr. Dwight Stewart and Dr. Milam address the influences that cause young people to associate with groups that intentionally portray themselves in counter-cultural expression. *App. Ex. 29* Declaration of Dwight Stewart (Stewart) at ¶5.  Mr. Vialva was prompted by motives other than a natural desire for crime.  Instead, Mr. Vialva, as many young people do, was experiencing the effects of alienation, exacerbated in his case by his bipolar disorder and his chaotic home life.  As Mr. Stewart explains, even when incarcerated, young people can move away from the group and complete life goals.  *App. Ex. 29*  (Stewart) at ¶6.  Contrary to the government's presentation, Mr. Vialva was not doomed by his association with the group to a life of organized crime.

Each of these aspects of Mr. Vialva's life contained precisely the sort of information recognized as essential to effective representation during the second stage of a capital trial. Counsel's failure to develop and present this evidence clearly fell below acceptable standards of practice. The Supreme Court recently found deficient performance for failure to investigate and present mitigating evidence in *Andrus v. Texas*, 140 S. Ct. 1875 (2020), a case remarkably similar to Mr. Vialva's. In *Andrus*, "20-year-old Terence Andrus unsuccessfully attempted a carjacking in a grocery-store parking lot," and during the attempt, killed the car's owner and a bystander. *Id.* at 1878. He was convicted of capital murder. *Id.* During the punishment stage, the State presented evidence that Mr. Andrus

> had displayed aggressive and hostile behavior while confined in a juvenile detention center; that Andrus had tattoos indicating gang affiliations; and that Andrus had hit, kicked, and thrown excrement at prison officials while awaiting trial. The State also presented evidence tying Andrus to an aggravated robbery of a dry-cleaning business.

*Id.* For mitigation, defense counsel presented the testimony of Mr. Andrus's mother, his biological father, an expert witness, a prison counselor, and Mr. Andrus. *Id.* at 1878-79. The jury sentenced him to death. *Id.* at 1879. The Supreme Court found that "[a]lthough counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand . . . , the record leaves no doubt that counsel's investigation to support that case was an empty exercise." *Id.* at 1882. On state habeas, Mr. Andrus presented a "tidal wave of information . . . with regard to mitigation." *Id.* at 1879 (citation omitted):

> The evidence revealed a childhood marked by extreme neglect and privation . . . . Andrus was born into a neighborhood of Houston, Texas, known for its frequent shootings, gang fights, and drug overdoses. . . . The children's fathers never stayed as part of the family. . . . Starting when Andrus was young, his mother sold drugs and engaged in prostitution. . . . In her frequently disoriented state, she would leave her children to fend for themselves. . . . As a close family friend attested, Andrus' mother

> "would occasionally just take a week or a weekend and binge [on drugs]." . . . While attempting to care for his siblings, Andrus struggled with mental-health issues[.]

*Id.* at 1879-80 (internal citations omitted). Finding deficient performance, the Supreme Court held, "In short, counsel performed virtually no investigation, either of the few witnesses he called during the case in mitigation, or of the many circumstances in Andrus' life that could have served as powerful mitigating evidence." *Id.* at 1881, 1883. The same is true of Mr. Vialva's case.

Mr. Vialva's case was prejudiced when the jury was prevented from considering evidence addressing directly and rebutting specifically the most damaging aspects of the government's case in aggravation of punishment. *See Andrus*, 140 S. Ct. at 1877-78 (counsel's failures to investigate and present mitigating evidence "also fettered the defense's capacity to contextualize or counter the State's evidence of Andrus' alleged incidences of past violence"); *Williams*, 529 U.S. at 398 (mitigating evidence that may not wholly rebut future dangerousness yet "might well have influenced the jury's appraisal of his moral culpability") ; *Wiggins,* 539 U.S. at 535 ("Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.") (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *Eddings*, 455 U.S. at 112; *Lockett*, 438 U.S. at 604); *Moore v. Johnson*, 194 F.3d 586, 620-21 (5th Cir. 1999) (trial counsel's failure to investigate mitigating evidence of defendant's  history of deprivation and neglect, coupled with failure to use mitigation evidence that was patent without further inquiry, constituted deficient performance and prejudiced defendant in the penalty phase).

At the time of trial, Christopher Vialva was a young man who was well-liked by many of his peers and loved by the people who knew him best.  James Davidson, Jacorby Smith, and Benjamin Sims were three of Mr. Vialva's closest childhood friends.  All of these young men expressed feeling shocked when they heard about Mr. Vialva's arrest.  The violence of the crime was inconsistent with

their experience of Mr. Vialva's behavior. *App. Ex. 24* (Davidson) at ¶¶ 5, 7; *App. Ex. 23* (Smith) at ¶ 8; *App. Ex. 27* (Sims) at ¶ 9. When Mr. Smith heard Mr. Vialva was accused of being the "triggerman," "I couldn't believe he could do that." *App. Ex. 23* (Smith) at ¶ 8. Two of Mr. Vialva's girlfriends and the mother of one of his friends would have testified Mr. Vialva treated them with consideration, respect, and concern. *App. Ex. 25* (Haskins) at ¶ 6; *App. Ex. 26* (Hamilton) at ¶ 5; *App. Ex. 28* (Burke) at ¶ 4. All of them felt the conduct with which Mr. Vialva was charged was completely out of character for him. *App. Ex. 25* (Haskins) at ¶ 8; *App. Ex. 26* (Hamilton) ¶ 6; *App. Ex. 28* (Burke) at ¶ 9. It is unconscionable that Mr. Vialva's jury was placed in the position of deciding whether he should live or die without having heard from people who knew him well and loved him.

### ii. Counsel Failed to Adequately Prepare, Present, and Preserve Error in the Case Against Future Dangerousness.

In addition to counsel's general failure to investigate, prepare, and present a mitigation case for Mr. Vialva, counsel also failed to rebut the future dangerousness aggravator.

First, counsel presented Dr. Mark Cunningham to discuss the future dangerousness aggravator. Counsel had an absolute obligation to be familiar with the substance of Dr. Cunningham's opinion and know that his testimony would be affirmatively harmful, since he concluded Mr. Vialva was dangerous. Since Dr. Cunningham had concluded erroneously that Mr. Vialva was likely to be dangerous, he should not have testified. Moreover, Dr. Cunningham reached his erroneous conclusion by relying on an "actuarial" analysis of future dangerousness that was completely without scientific validity. Counsel had an obligation to understand Dr. Cunningham's method of analysis and to affirm its validity. A basic review of Dr. Cunningham's published papers

would have allowed counsel to predict the substance of his testimony and would have revealed the fundamental flaws in Dr. Cunningham's methodology.

Second, the presentation of Dr. Cunningham opened the door to the government witnesses Dr. Richard Coons and Anthony Davis who were highly damaging on the issue of future dangerousness.  Neither Dr. Coons's nor Mr. Davis's testimony would have been relevant if the defense had not opened an inquiry into expert prediction of dangerousness.  Moreover, Dr. Coons's testimony should have been challenged on the grounds of his qualifications, as well as the reliability and relevance of his conclusions.  Dr. Coons relied on a method of psychological analysis which requires a personal interview, yet he never personally examined Mr. Vialva.  Mr. Davis's testimony should have been challenged on the grounds of relevance because he knew nothing about the facts of the case and certainly knew nothing about Mr. Vialva.  Yet, without objection from the defense, Mr. Davis opined on the likelihood that Mr. Vialva would join a gang in prison.  Neither Dr. Coons nor Mr. Davis had relevant or reliable information on which to base their  opinions.

Third, counsel failed to object to those elements of the future dangerousness aggravator in the jury instructions which, in violation of the Constitution, effectively mandated a finding of dangerousness for any defendant who had a prior criminal history.

Finally, counsel failed to preserve on appeal objections to the inclusion of future dangerousness as an  unconstitutional non-statutory aggravator.

Counsel's ineffectiveness contributed directly to the jury's conclusion Mr. Vialva  was dangerous and the death sentence was warranted.  Without question, the outcome of the sentencing proceedings would likely have been different without counsel's deficient performance.

a.   **Dr. Cunningham Should Never Have Been Presented to the Jury or, If Presented, His Testimony Should Have Been Limited to a Scientifically Valid Use of His Data.**

A lawyer has a fundamental obligation to know the general substance of his witnesses' testimony and to present witnesses who are helpful to his client's case.  When expert witnesses are at issue, there is a further obligation to insure that the experts are in fact experts, actually competent to testify on the subject matter about which they opine.  *Skaggs v. Parker*, 235 F.3d 261, 273 (6th Cir. 2000) ("[C]ounsel's failure to present an even marginally competent expert on crucial evidence prejudiced [the defendant] at the penalty phase of the trial.").  Mr. Vialva's counsel failed to allow sufficient time or information for Dr. Cunningham to make a complete and thorough analysis. Counsel failed to understand the method of Dr. Cunningham's analysis.  Consequently, they failed to ascertain what Dr. Cunningham would say about future dangerousness.  Counsel failed to understand  Dr. Cunningham would conclude, erroneously, Mr. Vialva  was at high risk for engaging in violent conduct in the future.  Counsel failed to understand  the methodology Dr. Cunningham employed lacked "scientific legitimacy."  *App. Ex. 30*  Declaration of Patrick Brockett at ¶ 13. Counsel called  Dr. Cunningham to testify without appreciating  Dr. Cunningham would not testify favorably to Mr. Vialva.  There is no excuse for such a readily avoidable error.

i.   **Dr. Cunningham Was Hired One Month Before Trial Began.**

Counsel had virtually no time to become familiar with Dr. Cunningham's proposed testimony. Dr. Cunningham was contacted  in April 2000.  He performed services for the defense team between May 17 and June 16, 2000.  *App. Ex. 31* Declaration of Mark  Cunningham (Cunningham) at  ¶¶ 3-4. Voir dire began May 15, 2000;  Dr. Cunningham testified June 9, 2000.  *O.R. Doc.* 318 Tr. Trial at

2960.  Dr. Cunningham began his work after the trial began, leaving 24 days in which to perform his entire analysis and confer with counsel.

The responsibility for failing to provide the expert sufficient time to complete his work and to confer with counsel rests squarely with counsel.  It is incumbent on counsel to prepare adequately for the mitigation phase in a capital case.  Through a chain of events, counsel were attempting to assemble their second stage case while the jury was hearing first stage evidence.  *Skaggs*, 235 F.3d at 270 (noting reversible error when counsel "waited until the eleventh hour to prepare for the penalty phase").  There is simply no legitimate strategic reason for such lack of preparation.  "Preparation for the sentencing phase . . . should begin immediately upon counsel's entry into the case."  1989 ABA Guideline 11.8.3.

Mr. Schwieger knew this was a capital case in July of 1999 when he requested the appointment of learned counsel. *O.R. Doc.* 19.  Although counsel knew a penalty phase would be likely and mitigation development should begin immediately, the initial case budget did not include a future dangerousness expert. *O.R. Doc.* 46.  Other than a social history expert, the only request for assistance related to the penalty stage was a correctional systems expert to explain the meaning of life without parole to the jury. *O.R. Doc.* 46 at § IX.  Mr. Schwieger waited nine months, from August 1999 to April 2000, fully a month and a half after he received notice of the charged aggravators to contact Dr. Cunningham. *O.R. Doc.* 145 (Notice of Intent to Seek Death Penalty, 2/29/00); *App. Ex. 31* (Cunningham) at ¶ 3 (initial contact in April 2000).  Mr. Schwieger submitted a request for funding at the end of April, after being notified all payments for defense experts had been suspended. *O.R. Doc.* 199.  Mr. Schwieger then had to wait a further month to retain Dr.

Cunningham until funds were authorized by the district court.[15]  *App. Ex. 31*(Cunningham) at ¶ 4 (work begins on May 17, 2000);  *O.R. Doc.* 271.

Once funding for the expert was granted, counsel did nothing to secure sufficient time for adequate preparation by the expert and adequate consultation with counsel.  *O.R. Doc.* 304 at 3-7 (failing to lodge objection to time frame once funding was authorized).  As with the mitigation expert, counsel failed to obtain sufficient time to prepare and present a critical aspect of the mitigation case. *See Hinton*, 571 U.S. at 273-75.

> **ii.     The Defense Inappropriately Curtailed Dr. Cunningham's Analysis by Withholding a Personal Interview with Mr. Vialva.**

In the crush of trying to decide how to use the expert as trial was underway, Mr. Schwieger made an affirmative choice to bar Dr. Cunningham from evaluating Mr. Vialva.  In his declaration, Mr. Schwieger explains:

> Prior to retaining Dr. Cunningham, I had retained Dr. William Reid, psychiatrist, to assist me in Mr. Vialva's case.  Dr. Reid told me that, if fully evaluated by a psychologist, Mr. Vialva would likely be diagnosed as having Antisocial Personality Disorder.  After receiving that information, I made a strategic decision to withhold a personal interview/evaluation of Mr. Vialva by Dr. Cunningham.  At trial, Dr. Cunningham said his conclusions regarding Mr. Vialva were necessarily tentative because he had not personally met, interviewed, or evaluated Mr. Vialva.

*App. Ex. 32* Declaration of Stanley Schwieger (04/12/04), at ¶ 4

---

[15]The district court initially denied counsel's April 24 request for further funding requiring counsel to file a Writ of Mandamus on funding to the Fifth Circuit.  It was not until the Fifth Circuit ruled on May 15th, 2000, that the issue of the April 24 funding request was finally resolved.  Of course, there would have been no delay had counsel made their original request for funding timely and inclusive, and then requested the court to seek permission from the Fifth Circuit for the budget to exceed the statutory cap. *See Hinton*, 571 U.S. at 273-75.

Ordinarily, a lawyer's strategic decision is given great deference. *See, e.g.*, *Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (informed strategic decisions are given a heavy measure of deference). But to warrant deference, a decision must be truly strategic, the product of careful planning and consideration. *See id.* In this case, Mr. Schwieger's decision was uninformed and unreasonable. Mr. Schwieger's concern a diagnosis of an "antisocial personality disorder" would compel Dr. Cunningham to conclude Mr. Vialva was likely to be dangerous in the future was unfounded. Dr. Cunningham explains that "a diagnosis of antisocial personality disorder is not relevant to any prediction of institutional violence and is not, in and of itself, an indication of a particularly dangerous or incorrigible inmate." *App. Ex. 31* (Cunningham) at ¶ 12. Thus, Dr. Cunningham concludes, "Mr. Schwieger's concern about antisocial personality disorder was unwarranted for purposes of an assessment of Mr. Vialva's risk of future institutional violence." *Id.*

Dr. Cunningham's opinion on this point is confirmed by the American Psychiatric Association, which says that a diagnosis of antisocial personality disorder is not probative of future dangerousness. *See* Brief of Amicus Curiae American Psychiatric Association, *Barefoot v. Estelle*, No. 82-6080, at *4 (S. Ct. 1982) [hereinafter "APA Br."].[16] Although Mr. Schwieger felt he was making a "strategic" choice regarding the interview, he was not. As the Fifth Circuit has noted, a decision "cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003); *see also Strickland*, 466 U.S. at 690-91.

---

[16]Available at:
https://www.psychiatry.org/File%20Library/Psychiatrists/Directories/Library-and-Archive/amicus-briefs/amicus-1982-barefoot.pdf.

Mr. Schwieger reacted to a possibility he perceived to be bad, but which was actually value neutral. But withholding information caused the expert to lose credibility with the jury since he was forced to admit he was "reluctant to definitively describe [Christopher] who I have not personally evaluated, and so I back off of making, you know, kind of the firmest of conclusions." *O.R. Doc*. 318 Tr. Trial at 3018. Dr. Cunningham reinforced repeatedly the tentative nature of his conclusions: "Because I have not directly interviewed and evaluated 'Chris,' that risk assessment is necessarily somewhat more tentative and cautious, because I –." *O.R. Doc*. 318 Tr. Trial at 2969. My findings are "somewhat more tentative." *Id*. "[T]here is some specific information about [Chris] that I don't have." *Id*. "Well, again, [my findings] these are – somewhat more cautious and tentative, because they're not based on an interview, but, instead, based on review of the records and files." *O.R. Doc*. 318 Tr. Trial at 3016.

Moreover, the absence of a personal interview exposed Dr. Cunningham to devastating cross examination that allowed the prosecution to imply Mr. Vialva was more dangerous than the defense would like the jury to know:

| Q. (Frazier) | All right. Why didn't you talk to "Chris" Vialva. |
|---|---|
| A. (Cunningham) | In this case, I was not requested to by the defense. |
| | * * * |
| | But there is a degree of caution and tentativeness in the absence of an interview, that's correct. |
| Q. (Frazier) | Because if you had the interview and had the opportunity to do that, you might find out more about "Chris" Vialva that would change your opinion |

68

|                    | about "Chris" Vialva and his future dangerousness, isn't that true? |
|--------------------|---------------------------------------------------------------------|
| A. (Cunningham)    | There's certainly always the potential. It's unlikely that clinical data is going to fundamentally change it. |

*O.R. Doc*. 318 Tr. Trial at 3080.

The decision to withhold a personal evaluation of Christopher was ill-informed and unreasonable, and directly damaged the defense case on future dangerousness. If there is any doubt about the value of Dr. Cunningham's opinion made without a personal interview, the United States District Court for the Northern District of Texas has provided an opinion. The district court suggests very little weight should be given to the testimony of Dr. Cunningham on future dangerousness when it is based on statistical evidence alone, without a personal interview of the defendant. *Lewis v. Cockrell*, No. 3-93-329-G, 2002 WL 1398554, at *11 (June 26, 2002 N.D. Tex.) (denying habeas relief), *rev'd, Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) (reversing on grounds failure to adduce evidence of petitioner's abusive childhood at penalty phase was deficient).

> ### iii. Defense Counsel Had a Duty to Know, Before Sponsoring Dr. Cunningham's Testimony, That He Had Concluded, Erroneously, Mr. Vialva Was Dangerous.

Dr. Cunningham is widely published on the subject of future dangerousness. His opinion on future dangerousness is well known and easily discoverable. The factors he attributes to increased risk of violence in a prison setting are the historical "base rate" or number of occurrences of violence in prison, adjusted upward for the youthful age of the offender, the previous history of violence, and membership in a gang. *See* Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71, 82, 87 (1998) (youthful

age, past aggression/violence); *see also* Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 CRIM. JUSTICE & BEHAV. 20, 38 (1999) (gang participation).

If Mr. Vialva's counsel had read Dr. Cunningham's published papers, they would have understood Dr. Cunningham would conclude, based on Mr. Vialva's age, the nature of offense, and his gang membership, Mr. Vialva posed a higher than average risk for violence in prison. As an alternative to independent research, counsel could have simply asked Dr. Cunningham his opinion of the risk that Mr. Vialva would be dangerous in prison. Dr. Cunningham would have told the lawyers what he told the jury: "Mr. Vialva has many of the risk factors that have been identified by the research as risk factors, and he has very few of the protective factors operating." *O.R. Doc*. 318 Tr. Trial at 3068. The obvious conclusion was that Dr. Cunningham would testify Mr. Vialva was at risk for dangerous conduct in the future.

Any lingering doubt about Dr. Cunningham's position on the point was dispelled by the prosecution during cross examination. The prosecution elicited Dr. Cunningham's opinion that if he were incarcerated, he would not wish to share a cell with Mr. Vialva:

|  |  |
|---|---|
| Q. (Frazier) | –would you describe "Chris" Vialva as the type of person you would want to be in a jail cell with? |
| A. (Cunningham) | ***My heart says no.*** My head, because I'm a scientist and I base things on probability, says that I might take him, as opposed to a property offender, or someone else who worked themselves up to a USP by their violence record. |

*O.R. Doc*. 318 Tr. Trial 3081-82 (emphasis added).

The damage of this testimony is obvious.  Counsel could have easily known Dr. Cunningham would not support Mr. Vialva's defense.  In *Hinton*, counsel's deficient performance – his choice of an unqualified expert – stemmed from his mistake of law. 571 U.S. at 275.  But counsel can also be ineffective based on an incomplete or nonexistent investigation of the facts: "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts', is 'virtually unchallengeable.'" *Id.* (emphasis added) (citation omitted).  Thus, *Hinton* counsels that an attorney must conduct a thorough investigation of both law and facts before making choices about what experts to call or whether to call an expert at all.  *See also Andrus*, 140 S. Ct. at 1882 (counsel "did not prepare the witnesses or go over their testimony before calling them to the stand").

As the Sixth Circuit has cogently recognized, a decision to have an expert testify that is made without full investigation of the tenor of the expert's testimony can be "objectively unreasonable" and may be due no deference from the court when the expert's testimony actually controverts an element of the defense case and causes prejudice.  *Combs v. Coyle*, 205 F.3d 269, 288-89 (6th Cir. 2000) (defense counsel ineffective for allowing expert to testify on voluntary intoxication without first ascertaining that the expert's opinion was intoxication in the case was not so great as to deprive the defendant of the ability to form intent).  Under this standard, counsel's decision to call  Dr. Cunningham was unreasonable.  Dr. Cunningham was called to demonstrate Mr. Vialva posed only a slight risk of dangerousness in the future.  Instead, Dr. Cunningham  testified Christopher would be dangerous.  It is ineffective assistance of counsel to undermine the defendant's case by presenting an expert who proves an element of the prosecution's case, as Dr. Cunningham did.

Here, as in *Andrus*, "counsel performed virtually no investigation . . . of the few witnesses he called during the case in mitigation" and "due to counsel's failure to investigate compelling mitigating evidence, what little evidence counsel did present backfired by bolstering the State's aggravation case." 140 S. Ct. at 1881, 1883. "No doubt due to counsel's failure to investigate the case in mitigation, much of the so-called mitigating evidence he offered unwittingly aided the State's case in aggravation. Counsel's introduction of seemingly aggravating evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment." *Id.* at 1883.

> iv. **Defense Counsel Had a Duty to Know, Before Sponsoring His Testimony, That Dr. Cunningham's Methodology for Predicting Future Dangerousness Is Scientifically Invalid.**

There are two principal methodologies for evaluating the future dangerousness of a defendant. The one employed by Dr. Cunningham is the statistical "actuarial" method. The other methodology is a clinical, psychological evaluation, like that employed by Dr. Richard Coons, the prosecution's rebuttal witness.[17] Dr. Cunningham's methodologies are scientifically invalid and resulted in an erroneous conclusion about the likelihood of Mr. Vialva's risk of violence in prison.

Dr. Cunningham testified  his "violence risk assessment" methodology was based on an "actuarial" or "statistical" study of historical occurrences of violence in prisons. Using this "base rate" of the occurrence of violence, he claims he can predict the likelihood that a particular individual will engage in violent conduct in prison. He says, knowing the base rate is "the single most important

---

[17]There is no methodology that has resulted in accurate predictions of future dangerousness. Juries and experts are almost always wrong. Erica Beecher-Monas & Edgar Garcia-Rill, Ph.D., *Danger at the Edge of Chaos: Predicting Violent Behavior in A Post-Daubert World*, 24 Cardozo L. Rev. 1845, 1845-47 (2003) (citations omitted).

piece of information necessary to make an *accurate prediction*."  *O.R. Doc*. 318 Tr. Trial at 2981

(emphasis added).  He explained to the jury that his methodology is a lot like the one used by the

insurance industry which has:

> been commercially involved in the business of risk assessment for hundreds of years.
> For example, your automobile insurance.  When my son turned sixteen, my insurance
> rates went up a thousand a year, and that's based on the insurance company's
> experience with sixteen-year-old male, unmarried drivers, and they used that group
> basis to then estimate the likelihood of my son having an accident in the community.
> Similar sorts of applications of group statistics occur in medicine.  In fact, any
> scientifically-informed practice of medicine or psychology is directly connected with
> group statistics.  For example, if I go to the doctor and he diagnoses a cancer, one of
> the first questions that I have is, "What's my prognosis?"  Well, the prognosis is the
> five-year survival rate of people with a similar cancer, and we consider that group
> estimates, their group outcome to say a lot about what my chances are.  Or even if I
> go to the doctor and have an infection, he prescribes an antibiotic for me, that's also
> based on group statistics, that a large number of patients that have this particular
> infection were given this antibiotic in the drug trials, and this percentage of them
> responded favorably with this small percentage of side effects, and that's how he
> knows to give that medication to me.  So, group statistical information is extensively
> used in a number of different applications in our culture.

*O.R. Doc*. 318 Tr. Trial at 2966-67.

First, despite Dr. Cunningham's reliance on actuarial science in his analysis of future

dangerousness, he is not an actuarial scientist.  He has no specialized training, skill, or experience

in statistics or mathematics, and he did not work with an actuary in the development of his work on

future dangerousness.  *App. Ex. 31* (Cunningham) at ¶ 24, and appended Exhibit A.

Dr. Cunningham was simply wrong.  As Dr. Patrick Brockett, an expert in actuarial science,[18] explained Dr. Cunningham "immediately misinforms the jury when he compares violence risk prediction to insurance industry risk assessment."  *App. Ex. 30* (Brockett) at ¶ 10.  "A principal difference between insurance industry predictions of risk of loss and violence risk prediction is that the insurance industry predicts the risk of loss of the group to assess ***its*** (the insurance company's) risk, not the risk of an individual, whereas violence risk prediction purports to predict the risk that an individual will engage in violent conduct."  *Id*.  Thus, there is "a fundamental difference between the two applications and the legitimacy which the methodology has as applied to the insurance industry cannot be imputed to Dr. Cunningham's violence risk prediction."  *App. Ex. 30* (Brockett) at ¶ 10.         Most importantly, "when Dr. Cunningham begins to speak in specifics about which personal attributes might add to a risk of violence and how one might predict the risk of violence for a specific individual, his statements lose scientific legitimacy."  *App. Ex. 30* (Brockett) at ¶ 13.  Dr. Brockett explains "Dr. Cunningham is simply wrong when he says that understanding the base rate of historical violence can help predict how an individual will behave."  *App. Ex. 30* (Brockett) at ¶ 17.  Group statistical data is fundamentally used to predict how a group will behave and cannot be used to predict how an individual will behave.  Such a prediction is scientifically unjustified and "is

---

[18]Dr. Brockett's exceptional qualifications as an actuarial scientist are detailed as Exhibit 1 to his Declaration.  Among other things, Dr. Brockett holds a Ph.D. in Mathematics from the University of California at Irvine, California.  He is the Director of the Risk Management and Insurance Program at the University of Texas at Austin where he holds the Gus S. Wortham Chair in Risk Management and Insurance and the Director of the Center for Risk Management and Insurance.  He is a professor in the Departments of Management Science and Information Systems, Finance, and Mathematics at the University of Texas at Austin.  Further, Dr. Brockett is a fellow of the American Association for the Advancement of Science, the Institute of Mathematical Statistics, the American Statistical Association, and the Royal Statistical Society, a Special Member of the ASTIN Section of the International Actuarial Association, and an Academic Corresponding Member of the Casualty Actuarial Society.

strongly overstepping the constraints of the statistical methodology and confusing group averages for individual propensities." *Id.*

Dr. Cunningham is misguided in his use of group statistical data. The flaws in his methodology are clear to any expert in the field of actuarial science, like Dr. Brockett, but also should have been clear to counsel in this case. As Dr. Brockett notes, "[w]orkers in the field of violence risk prediction have noted for decades the limitations of using actuarial methods as applied to violence predictions." *App. Ex. 30* (Brockett) at ¶ 18. And importantly,

> This is information that was available to Mr. Vialva's counsel in the . . . published studies and any reasonable investigation should have revealed the inapplicability of Dr. Cunningham's methodology in the assessment of future dangerousness to Mr. Vialva's counsel.

*Id.* at ¶ 20.

Dr. Cunningham's testimony was "junk science" the prosecution turned effectively to support its claim of future dangerousness. *See Andrus*, 140 S. Ct. at 1881; *Hinton*, 571 U.S. at 275. As a result of counsel's ineffectiveness on this point "the jury impos[ed] a death sentence based on inaccurate 'psychobabble.'" *Skaggs*, 235 F.3d at 275. "[C]ounsel's deficient performance rendered the result of the trial unreliable and the proceeding fundamentally unfair." *Id.* (internal quotations omitted).

As time has passed, the error of Dr. Cunningham's predictions has been proven. Dr. Milam noted Mr. Vialva's positive adjustment, concluding "Chris's intellectual potential is well within normal limits and would serve as a protective factor that would enable him to learn, adjust, an improve in a prison setting, as indeed he has." *App. Ex. 20* (Milam) at ¶ 27.

> **v.** **Defense Counsel Should Have Known That Introducing Dr. Cunningham Would Open the Door to Damaging Government Experts.**

Defense counsel should have known the testimony of Dr. Cunningham was ill-advised because it opened the door to adverse government rebuttal witnesses.  The pitfalls inherent in Dr. Cunningham's area of testimony were well known and easily discoverable if counsel performed a reasonable investigation.  *See Hinton*, 571 U.S. at 275. Before counsel engaged Dr. Cunningham, a published case highlighted this specific danger.  *See United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000), *rev'd*, 274 F.3d 485 (8th Cir. 2002) (reversing order of new trial on penalty phase).  In that case, Dr. Cunningham's direct testimony led to cross examination eliciting the defendant showed impulsivity, lack of remorse, poor behavioral control, predatory violence, and was at increased risk for violent recidivism.  *Id*. at 1026.  The government proceeded to destroy Dr. Cunningham's credibility, based on his scientific opinions, and make out an unrebutted case for future dangerousness.  Based on this published decision, reasonably prepared counsel would have avoided this obvious risk.

> **b.** **Defense Counsel Should Have Objected to the Presentation of Richard Coons's testimony.**

Dr. Richard Coons was presented as a rebuttal witness on future dangerousness. *O.R. Doc*. 318 Tr. Trial at 3154.  The defense made no objection to Dr. Coons's testimony.  The defense also made no attempt to voir dire Dr. Coons to determine his qualifications to testify, or the reliability or relevance of his testimony. *See Andrus*, 140 S. Ct. 1881-82 ("counsel failed adequately to investigate the State's aggravating evidence, thereby forgoing critical opportunities to rebut the case in aggravation").

76

Dr. Coons told the jury that, as a psychiatrist, he evaluates future dangerousness by looking generally at the individual's: (1) past history of violence; (2) attitude toward violence; (3) offense (spontaneous or planned); (4) personality and behavior; and (5) conscience. *O.R. Doc*. 318 at 3157-59. Based on this analysis Dr. Coons concluded that Christopher "would" be dangerous in the future, in part because Dr. Coons perceived that Christopher exhibited a "lack of remorse." *O.R. Doc*. 318 Tr. Trial at 3159.

Dr. Coons never examined Mr. Vialva, and, thus, had no basis for his evaluation or conclusions.  To remedy this gross deficiency, the government, without objection, asked a "hypothetical" which was based on the facts of the case.  Without knowing anything about the "gang" with which Mr. Vialva was affiliated, or why he was affiliated, Dr. Coons concluded, "If they're member of a gang on the outside, they'll be a member of the gang inside [prison]." *O.R. Doc*. 318 at 3162.

In the face of this devastating testimony that Mr. Vialva  "would" be dangerous, the only questions defense counsel asked were whether Dr. Coons had statistical data to back up his conclusions, and whether he was he being paid to be at the trial.  *O.R. Doc*. 318 Tr. Trial at 3164. Such a performance was woefully inadequate to reveal the highly significant errors in his analysis and the inadequate basis of his testimony.  The defense failed to object to Dr. Coons's use of "remorse" as a factor in his dangerousness analysis.  The defense had moved to exclude "remorse" as a component of the future dangerousness aggravator.  The district court later agreed "remorse" was an improper characteristic of future dangerousness.  Thus, the defense failed to point out to the jury

and to the court that Dr. Coons was relying on information the court would determine to be impermissible.[19]

The prosecution and Dr. Coons were not challenged on the use of a hypothetical which mirrored exactly the facts of this case.  Such testimony is highly objectionable as "simply subjective testimony without any scientific validity."  *Flores v. Johnson*, 210 F.3d 456, 458 (5th Cir. 2000) (Garza, J., specially concurring); *see also Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV. at 14 (2004) (describing the typical prosecution technique of using a hypothetical to obscure the absence of a personal interview with a defendant).  Moreover, the American Psychiatric Association objects to the use of the hypothetical format where "the limited facts given in the hypothetical fail to disprove other [interpretations] that plainly do not indicate a general propensity to commit criminal acts."  APA Br. at *4.

Finally, Dr. Coons was not questioned regarding his qualifications to render an opinion in this case.  Dr. Coons did not interview Mr. Vialva, yet he employed a quasi-clinical method of analysis of future dangerousness.  This method has been  discredited widely.  Unlike Dr. Cunningham's methodology, Dr. Coons's method depends exclusively on personal evaluation.  Dr. Coons is a psychiatrist, yet the American Psychiatric Association has concluded that psychiatrists ***cannot*** predict dangerousness.  *See* APA Br. at * 4 ("The unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the [psychiatric] profession."); *Assessing the Risk*

---

[19]Mr. Vialva's counsel objected to the inclusion of "lack of remorse" when this aggravator was converted into jury instructions.  *O.R. Doc*. 319 Tr. Trial at  3196); *see also O.R. Doc*. 275 (Objections to Jury Instructions) at 29.  The district court agreed that the "lack of remorse" component would be taken out of the instructions.  *O.R. Doc*. 319 Tr. Trial at 3196).

for Violence, AM. PSYCH. ASS'N, APA DOC. REF. NO. 200109 ("psychiatrists cannot predict dangerousness with definitive accuracy").   Based on this authority, Dr. Coons was not qualified to render his opinion in this case; his testimony was irrelevant. Counsel's failure to challenge the government's rebuttal evidence on the primary aggravator was a deficient performance of counsel's duties at a critical, pivotal point.  There can be no question counsel's failure deeply damaged the case. A prediction of 100% certainty of dangerousness, as Dr. Coons presented, is prejudicial to defendant. James W. Marquart, et al., *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases*,  23 LAW & SOC'Y REV. 449, 458 (1989).  Dr. Coons's testimony was 100% prejudicial to Christopher.

### c.    Defense Counsel Should Have Objected to and Cross Examined the Testimony of Anthony Davis.

After Dr. Cunningham erroneously described  membership in a gang as relevant to the prediction of future dangerousness, the prosecution offered the rebuttal testimony of Anthony Davis, a Federal Bureau of Prisons intelligence officer with a specialty in gangs and gang member activity in federal prisons. *O.R. Doc*. 318 Tr. Trial XV at 3164-65.  Mr. Davis offered opinions on the Bloods and Crips gangs as they operate in federal prisons.  *Id.* at  3166-67.    Mr. Davis was permitted to testify, unchallenged by an objection from the defense.  The jury was not informed Mr. Davis knew nothing about the facts of Mr. Vialva's case.  He had not evaluated the "gang" to which Mr. Vialva allegedly belonged.  He did not know anything about Mr. Vialva's life or his role in the "gang."  He had no idea whether Mr. Vialva was actually a member or affiliate of the nationally organized "Bloods" gang that operates in federal prisons.  His testimony was irrelevant since he knew nothing about the case.  Yet the defense made none of this evident to the jury.  In the absence of a legitimate strategic reason, failure to cross examine a witness on a key aspect of the defense is ineffective.

*Dunagan v. Dretke*, No. 3-03CV-0374-K, 2003 WL 22519443, at *9 (N.D. Tex. Nov. 4, 2003).

Moreover, since "gang" membership was so important to the finding of dangerousness, there can be

no doubt that the failure was prejudicial. *Cf. id*.

> **d.      Defense Counsel Failed to Object to the Jury Special**
> **Verdict Form and the Prosecutor's Opening Statement.**

Mr. Vialva's counsel also failed to control the scope of the issue presented to the jury in the

special verdict form and the prosecutor's opening statement.   The jury was charged by the district

court as follows:

> The non-statutory aggravating factors that the government has alleged in this case as
> to counts one, three and four, which you should consider as to each defendant, are:
>
> > (1) That the defendant is likely to commit criminal acts of violence in the
> > future which would be a continuing and serious threat to the lives and safety
> > of others *in that the defendant has engaged in a continuing pattern of violent
> > conduct, has threatened other [sic] with violence, or has demonstrated low
> > rehabilitative potential*;
> > (2) * * *

*O.R. Doc.* 325 Tr. Trial (Supp. Rec. on Appeal) at 17 (emphasis added).   During the final objections

to the jury charge, Mr. Vialva's lawyers failed to object to this charge.[20]   Yet this charge *requires* a

finding of future dangerousness when the enumerating conditions are met.   Any person who has a

prior conviction for violent conduct will be found to have met these conditions.   An aggravator

cannot be said to be truly individualized for the defendant's conduct and predictive of his future

conduct, assuming *arguendo* such a prediction could be made, unless the aggravator requires more

than simply meeting a checklist of prior bad acts.   As defined by the court, this aggravator does not

---

[20]Mr. Vialva's lawyers had objected to the "rehabilitative potential" phrase in pretrial written
objections, but did not renew that objection at trial.

afford the individualized sentencing required by the Eighth Amendment. Counsel were ineffective for failing to lodge an objection to the aggravator framed by the court.

Counsel were ineffective when they failed to object to the prosecution's reliance on "lack of remorse" in its opening statement. *O.R. Doc.* 317 Tr. Trial at 2712. The defense had a pending objection to the use of lack of remorse as a component of the future dangerousness aggravator. The district court sustained the objection at a later point. Despite the pending objection, the defense allowed the prosecutor to tell the jury that lack of remorse could be considered. The defense then allowed the prosecution rebuttal witness, Dr. Coons, to use lack of remorse in his evaluation of future dangerousness. Counsel had a duty to maintain their objection to lack of remorse; they failed in that duty. The prejudice to Mr. Vialva cannot be overstated. The district court agreed that lack of remorse was an improper component of the future dangerousness aggravator, yet without objection, remorse became an element of the prosecution's case.

### e. Defense Counsel Failed to Preserve on Appeal Objections to the Inclusion of Non-Statutory Aggravators as Unconstitutional.

Counsel moved pretrial to strike the non-statutory aggravating factors as unconstitutional. *O.R. Doc.* 164. Counsel argued Congress did not contemplate a non-statutory future dangerousness aggravator in addition to the statutory dangerousness aggravators. *Id*. at 36. Additionally, counsel

claimed various subparts of the Government's definition of future dangerousness were unconstitutionally vague and permitted unreliable jury findings. *O.R. Doc.* 164 at 37, 40, 46.[21]

Mr. Vialva's appellate counsel failed to preserve these objections by raising the issue on appeal. If the issue had been presented to the Fifth Circuit, it would have likely resulted in a new trial. Counsel could have demonstrated that non-statutory aggravating factors should not be included in federal death penalty cases, that the future dangerousness aggravator is facially unconstitutional, and since only the future dangerousness aggravator serves to undercut mitigation evidence, its absence from the penalty phase of the trial would have likely changed the outcome. Under these circumstances, there can be no confidence in the outcome of the penalty phase of this case. A new trial was required.

"Future dangerousness" is the only aggravator that encourages the jury to conclude the defendant is incorrigible and no mitigating factor offsets the risk of keeping him alive. A decisive rebuttal by the defense was imperative for the jury to conclude sparing the defendant's life is warranted. Counsel not only failed to rebut this aggravator, but materially assisted the government in its proof. Such performance, which is the essence of ineffectiveness and unquestionably results in prejudice, demands habeas relief from Mr. Vialva's sentences of death.

      iii.      **Defense Counsel Failed to Challenge the Indictment, Leading to an Unconstitutional Sentence. The Grand Jury Did Not Determine**

---

[21]The district court denied Mr. Vialva's motion on 4/14/00. *O.R. Doc.* 194. In a motion for reconsideration, Mr. Vialva claimed the non-statutory aggravators were vague and overbroad and violated due process. *O.R. Doc*. 205 at 3, 6. The Government responded by saying only that "The Supreme Court has long held that the future dangerousness of the Defendant is a proper factor for a jury to consider in a capital case. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976) and *California v. Ramos*, 463 U.S. 992, 1003, n.17 (1983)." *O.R. Doc.* 211 at 8. Mr. Vialva's counsel also objected to this proposed aggravator in *Written Objections/Requests to the Penalty Phase Charge with Authorities*. *O.R. Doc.* 275.

**All of the Elements Essential to Establish Capital Murder.  Mr. Vialva's Subsequent Convictions and Sentences of Death Were Imposed in Derogation of the Indictment Clause of the Fifth Amendment.**

Trial counsel did not challenge the indictment based on a violation of the Indictment Clause of the Fifth Amendment.  The Constitutional sufficiency of the indictment was not raised on direct appeal.  Appellate counsel for Mr. Vialva failed to present supplemental argument after the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002).

Mr. Vialva was charged, with Brandon Bernard,  in a four count indictment returned July 13, 1999.  *O.R. Doc.* 14.  A superseding indictment was returned December 14, 1999, charging Tony Sparks as a codefendant with Mr. Vialva and Mr. Bernard.  *O.R. Doc.* 98.  The United States filed a Notice of Intent to Seek the Death Penalty against Mr. Vialva February 29, 2000.  *O.R. Doc.*145.

A final, Second Superseding Indictment was returned March 28, 2000.  Mr. Sparks, Mr. Bernard, and Mr. Vialva were named as codefendants in Count One, which charged them both as principals and as aiders and abettors in the offense of carjacking resulting in death, a violation of 18 U.S.C. §§ 2119 and 2.  Count Two charged Mr. Vialva and Mr. Bernard with conspiring to kill Todd and Stacie Bagley with premeditation and malice aforethought through the use of a firearm and by setting fire to a motor vehicle, in violation of 18 U.S.C. §§ 1117 and 1111.  Count Three charged Mr. Vialva and Mr. Bernard jointly, "aided and abetted by each other and others known to the Grand Jury," killed Todd Bagley by shooting him with a firearm within the special maritime and territorial jurisdiction of the United States.  Similarly, Count Four charged Mr. Vialva and Mr. Bernard with killing Stacie Bagley within the special maritime and territorial jurisdiction of the United States by shooting her with a firearm and setting fire to the vehicle in which she lay after being shot.  *O.R. Doc.*

170.  By statute, Counts One, Three, and Four carried maximum potential punishments of death.  18 U.S.C. § 2119 (3); 18 U.S.C. § 1111(b).

On March 30, 1999, the United States filed a *Motion to Amend Notice of Intent to Seek the Death Penalty*. *O.R. Doc.* 174.  The Court granted the United States leave to file the amended notice in an order docketed May 1, 2000.  *O.R. Doc.* 213.[22]

With regard to Counts One, Three, and Four, the Amended Notice recited the four predicate statutory factors enumerated in 18 U.S.C. § 3591(a)(2).  *App. Ex. 32*, *Amended Notice of Intent to Seek the Death Penalty* at  2-3  (Count One);   5-6 (Count Three);  8-9 (Count Four).  The Amended Notice cited five of the sixteen statutory factors enumerated in 18  U.S.C. § 3592(c) and four non-statutory aggravating factors, consonant with 18 U.S.C. § 3593(a)(2).  The statutory and non-statutory aggravating factors were identical for the three Counts.  *Id.* at 4-5 (Count One); 7-8 (Count Three); 10-11 (Count Four).

At the conclusion of the penalty phase, the jurors were presented a Special Findings Form that required them to find  unanimously one of the four predicate factors of § 3591 beyond a reasonable doubt,  prior to considering the aggravating factors for each of the three counts.  *O.R. Doc.* 286 at 1-2;  14-15;  27-28.[23]  If the jurors found one of the four predicate factors beyond a reasonable doubt, the form directed them to proceed with deliberations on the statutory aggravating factors.  Four of the five factors listed in the Amended Notice were submitted for consideration.  The first listed factor, Mr. Vialva's previous conviction of a violent felony, was omitted from the jury's consideration.  *O.R.*

---

[22]The Court Clerk's docket does not reflect the United States Attorney filed the Amended Notice after the Court granted leave to do so.

[23]The *Special Findings Form* encompassed the verdicts on each count, for each defendant. The form was filed as a single document, without internal pagination.

*Doc.* 286 at 3-4;  16-17;  29-30.  The form directed the jurors to proceed with deliberations on the non-statutory aggravating factors if they reached a unanimous affirmative decision on at least one of the statutory aggravating factors.  The non-statutory aggravating factor,  "vileness of the crime" was not submitted for the jury's consideration.  *O.R. Doc.* 286 at 5; 18; 31.  The jury returned affirmative findings on all of the statutory and non-statutory aggravating factors alleged against Mr. Vialva.  *O.R. Doc.* 286 at 3-6; 16-18;  29-31.

Trial counsel failed to recognize the application of the Fifth Amendment Indictment Clause in this capital prosecution.  Extant Supreme Court authority construing the Constitutionality of the federal carjacking statute provided a clear roadmap to this issue.  Counsel's failure to recognize the Indictment Clause issue is inexplicable since counsel presented general challenges to the Constitutionality of the carjacking statute and the sufficiency of death penalty notice process.[24] Counsel's failure to recognize this issue of federal law is another instance of ineffective assistance of counsel stemming from inexperience in federal capital litigation.

Four months prior to the return of the first indictment against Mr. Vialva, the Supreme Court decided *Jones v. United States*, 526 U.S. 227 (1999).  The issue in *Jones* was whether the federal carjacking statute, 18 U.S.C. § 2119, enumerated three distinct offenses with distinct degrees of punishment, or one offense for which three sentencing enhancements were possible.  The Court began its analysis, noting:

---

[24]Three motions were filed March 21, 2000 that, respectively, challenged the Constitutionality of the carjacking statute on Commerce Clause grounds, attacked the factual and legal sufficiency of the individual aggravating factors identified in the first notice, and sought dismissal of the notice as unconstitutional.  *O.R. Docs.* 163, 164, 167 (Motion) and 168 (Memorandum) .  The *Memoranum*, cited the Fifth Amendment, but did not specifically cite or advance any argument based on the Indictment Clause.

> Much turns on the determination that a fact is an element of the offense rather than a sentencing consideration, given that *elements must be charged by indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt.*

*Id.* at 232 (emphasis added). The Court examined its prior decisions addressing the due process and trial by jury rights secured by the Fourteenth and Sixth Amendments, as well as the historical underpinnings of the American jury system. The Court's canvass concluded with its recognition that prevailing Sixth Amendment construction does not require submission to the jury of every fact bearing on sentencing. Yet, the Court reaffirmed the Sixth Amendment is implicated if the jury is removed from the process of deciding facts that determine a statutory sentencing range. *Id.* at 244-48. The Court noted a series of three cases involving state capital sentencing schemes did not resolve the Constitutional question presented by the carjacking statute. One of those cases was *Walton v. Arizona*, 497 U.S. 639 (1990). *Jones*, 526 U.S. at 250-52, *overruled by Ring v. Arizona*, 536 U.S. 584 (2002),. To avoid a construction that would leave the Constitutionality of § 2119 in doubt, the Court found the statute established three separate offenses, with "distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." *Id.* at 252.

The decision in *Jones* should have alerted trial counsel to the two key elements of an Indictment Clause challenge: the statute enumerates one or more distinct offenses, each of which must be proven beyond a reasonable doubt; distinct punishments, varying in severity, are attributed to the distinct offenses. *Jones* settled the question of whether the carjacking statute encompassed separate offenses. The analysis of *Jones*, applied to the federal death penalty scheme, would result in the conclusion first, that "distinct elements" must be found beyond a reasonable doubt by a jury as a condition precedent to considering whether to impose the death penalty. 18 U.S.C. § 3591(a).

Further, the jury may not impose a sentence of death without first determining the existence of at least one statutory or non-statutory aggravating factor beyond a reasonable doubt, and determining the aggravating factor sufficiently outweighs all the mitigating factors. 18 U.S.C. § 3593(e). The statute requires a unanimous verdict before a death sentence can be imposed. *Id.* Distinct elements requiring proof beyond a reasonable doubt are patent from the plain language of the death penalty statutes.

*Jones* was an unmistakable signal for an argument the Indictment Clause prohibited imposition of the death penalty on any notice less than the return of an indictment, enumerating all of the requisite elements. Mr. Vialva's jury was required to determine beyond a reasonable doubt the predicate statutory factors, and the statutory and non-statutory aggravating factors submitted from the government's Amended Notice, placing this case squarely within the reasoning of *Jones*. There is no reason apparent from the record explaining counsel's failure to present a Fifth Amendment challenge to the trial court.

Federal jurisprudence concerning the elements or facts distinction has taken a direct path to this conclusion starting as early as the Supreme Court decision in *Taylor v. United States*, 495 U.S. 575 (1990). Before a defendant is subject to an enhanced statutory penalty under the Armed Career Criminal Act, a sentencing court is permitted only to review the statutory definitions, and not particular facts, of a potential qualifying predicate offense. *Id.* at 600. The logical extension of this holding permits courts to review elements of an underlying statute of conviction – those constituent parts of a crime's legal definition requiring proof beyond a reasonable doubt. *Mathis v. United States*, 136 S.Ct. 2243, 2245 (2016). *See also Shepard v. United States*, 544 U.S. 13, 24 (2005) (discussing the prescience of *Taylor* in anticipating the necessity of a rule preserving rights discussed

in *Jones* and *Apprendi*).  Counsel's failure to raise the issue is all the more egregious when considering the enormous weight of authority recognizing the application of *Jones*.

Mr. Vialva's appellate counsel missed a second opportunity to challenge the Constitutionality of the death penalty process on direct appeal, despite another significant decision from the Supreme Court.  Part of this error is attributable to the circumstances surrounding Mr. Vialva's representation.  Attorney Steven Losch was appointed as counsel on appeal with trial counsel Stan Schwieger.  The direct appeals of Mr. Vialva and Mr. Bernard were consolidated by the Fifth Circuit.  Mr. Vialva's Appellant's Brief, filed May 31, 2001, did not raise a Constitutional challenge to the sufficiency of the notice procedure.  In a letter dated October 22, 2001, Mr. Losch advised the Fifth Circuit that he would be entering the hospital in two days for emergency surgery on his spine.  *App. Ex. 34*  Letter of Steven Losch.  Mr. Losch did not recover his health after his surgery.  His health continued to decline until his death at the beginning of May, 2003.  *App. Ex. 35* Declaration of Kay Losch.  Mr. Losch's incapacity resulted in Mr. Schwieger's bearing full responsibility for several critical stages of the appeal.[25]

Appellate counsel failed to recognize the significance of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), decided June 26, 2000, two days before Mr. Vialva's direct appeal was docketed.  Any attempted excuse for counsel's failure to understand the implications of *Jones* will not survive a first reading of *Apprendi*.  Justice O'Connor's dissent explicitly and thoroughly explains the inevitable consequence of *Jones*, as extended by the majority in *Apprendi*, in the context of capital sentencing.  Justice O'Connor addressed the impact of the majority's decision on *Walton v. Arizona*, identifying

---

[25]  Mr. Schwieger requested the appointment of additional counsel to present the oral argument for Mr. Vialva.  The motion was denied by the Fifth Circuit.

*Walton* as an important refutation to the Court's "'increase in the maximum penalty' rule." *Apprendi*, 530 U.S. at 537 (O'Connor, J., dissenting).  The dissent revisited the result in *Walton* in light of the majority's result:

> Thus, using the terminology that the Court itself employs to describe the constitutional fault in the New Jersey sentencing scheme presented here, under Arizona law, the judge's finding that a statutory aggravating factor exists "exposes the criminal defendant to a penalty *exceeding* the maximum he would received if punished according to the facts reflected in the jury verdict alone." *Ante,* at 2359 [483].

*Id.* (emphasis in original).  From this point, the shortest possible logical step would have prompted appellate counsel to challenge the Constitutionality of a federal statute that vests the prosecutor, not the judge, with the authority to place a defendant at risk of receiving "a penalty *exceeding* the maximum he would have received if punished according to the facts" on which the indictment was returned.

Two additional decisions of profound significance in death penalty jurisprudence were announced during the pendency of Mr. Vialva's appeal.  *Ring v. Arizona*, 536 U.S. 584 (2002) and *Harris v. United States,* 536 U.S. 545 (2002), *overruled by Alleyne v. United States*, 570 U.S. 99 (2013) (holding any fact that increases mandatory minimum sentence for crime is an "element" that must be submitted to jury), were decided June 24, after the Fifth Circuit heard oral argument, but before it rendered its decision in the consolidated appeals.  Counsel for Mr. Bernard filed a Notice of Supplemental Authorities and, following the July 19, 2002 decision of the Fifth Circuit, a Petition for Rehearing and Rehearing En Banc in which he presented argument based on *Ring* and *Apprendi*.  On September 18, 2002,  Mr. Schwieger requested leave to file Mr. Vialva's petition for rehearing out of time, citing the continued incapacity of Mr. Losch and his inability to file the pleading.  The petition for rehearing and application for rehearing *en banc* did not assert *Ring* warranted rehearing.

Counsel did not adopt Mr. Bernard's arguments by reference or otherwise attempt to include an issue based on *Ring*.

The Fifth Circuit  noted Mr. Bernard's argument in the opinion on direct appeal, but rejected the argument finding, "*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors." *United States v. Bernard*, 299 F.3d 467, 488-89 (5th Cir. 2002).  Alternatively, the Fifth Circuit concluded that even if *Apprendi* were apposite, "the alleged error in the indictment does not amount to plain error." *Id.* (citing *United States v. Cotton*, 535 U.S. 625 (2002).).  Because of Mr. Losch's continuing disability, Mr. Schwieger wrote the Petition for Writ of Certiorari.  He did not raise  an issue based on *Ring*.  Mr. Vialva protested the omission of the issue in a letter to his counsel and in a letter directed to the Fifth Circuit.  *App. Ex. 35* Letter of Christopher Vialva to Stan Schwieger, "Received Jan 15 2003; " *App. Ex. 36* Letter of Christopher Vialva to Clerk, "Received Jan 16 2003."

The impact of *Ring* on federal capital prosecutions was immediate and extensive.  The United States sought superseding indictments in its pending death penalty prosecutions.   The new indictments included the requisite statutory intent and aggravating factors as charged elements of the capital offense, clearly indicating the government's recognition of *Ring* as controlling authority.  *E.g., United States v. Regan*, 228 F. Supp. 2d 742, 746 (E.D. Va. 2002);  *United States v. Lentz*, 225 F. Supp. 2d 666, 669 (E.D. Va. 2002);  *United States v. Fell*, 217 F. Supp. 2d 469, 483-84 (D. Vt. 2002) *judgment vacated by* 360 F.3d 135 (2d Cir. 2004); *United States v. Davis*, No. CR.A. 01-282, 2003 WL 1837701, at *5 (E.D. La. Apr. 9, 2003) (denying motion to declare federal death penalty unconstitutional; "Here, the government filed a second superseding indictment alleging a requisite mental state and two statutory aggravating factors that would make the defendant eligible for the

death penalty."). In cases that had proceeded to verdicts of death, the government tacitly or explicitly acknowledged the error, but argued it was harmless. *See United States v. Allen*, 357 F.3d 745, 749 (8th Cir. 2004) ("First, the government argues that Allen's indictment sufficiently alleged the requisite elements for imposition of the death penalty. Second, if error is found, the government argues the error is harmless.") *rehearing en banc granted, judgment vacated* (May 11, 2004); *United States v. Robinson*, 367 F.3d 278, 283-84 (5th Cir. 2004) ("As we have noted, the government concedes the indictment is constitutionally deficient because it fails to allege the statutory aggravating factors that make Robinson eligible for the death penalty. The government argues, however, that the error is harmless.").

In this case, the appeal was not stayed for further briefing or additional oral argument by the parties, nor was the matter considered by the Fifth Circuit sitting *en banc*. The panel's decision did not reconcile the facts of this case with the authorities on which it relied to reach its legal conclusion. Any attempt at such a reconciliation calls into question the soundness of the panel's reasoning.

First, the panel focused on the absence of a challenge to the Constitutionality of the indictment in *Ring*. *Bernard*, 299 F.3d at 488-89. The panel's statement is true as far as it goes: Mr. Ring did not contend that his Arizona state indictment violated the Fifth Amendment's Indictment Clause. Such an argument would have been ill-founded since the Indictment Clause of the Fifth Amendment is not enforced against the States through the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516 (1884). It does not follow, however, that the Supreme Court held the Indictment Clause is unenforceable in the case of a capitally charged federal defendant.

In similar reasoning, the panel cited *Cotton* as support for its factual conclusion any arguable defect would survive a plain error analysis, "[e]ven if *Apprendi* were applicable to this case."

*Bernard*, 299 F.3d at 489.  *Cotton* involved defendants charged with the non-capital offense of conspiracy to distribute cocaine and cocaine base.  The Supreme Court noted the history and evolution of subject matter jurisdiction in criminal cases.  The Court noted defects in subject matter jurisdiction are never forfeited or waived and may be raised at any time.  "In contrast, the grand jury right can be waived."  *Cotton*, 535 U.S. at 630, citing, *inter alia*, Rule 7(b), Fed.R.Crim.P.  Based on these predicate findings, the Court proceeded to engage in a plain error inquiry.  Since the issue was not presented, the Supreme Court had no occasion to consider the charging defect presented in a federal capital case in which the right to indictment is expressly excluded as a right subject to waiver pursuant Rule 7.  The Fifth Circuit ignored this patent distinction in its summary disposition of Mr. Bernard's argument.

In *Robinson*, the United States conceded the capital indictment returned in the Northern District of Texas constituted error after *Ring*.  367 F.3d at 286.  The issue presented to the Fifth Circuit was whether the error was reversible *per se*, or was subject to harmless error review.  *Id.* Resorting once again to *Cotton* and a similar, non-capital case, *Neder v. United States*, 527 U.S. 1 (1999), the Circuit concluded the failure to obtain a indictment charging the elements of the offense was "difficult to distinguish" from a case in which the petit jury was not instructed on an essential element.  *Robinson*, 367 F.3d at 286.  The Circuit conducted a harmless error analysis based on the evidence presented against the defendant at trial, concluding "any rational grand jury would find probable cause to charge Robinson with at least one of the statutory aggravating factors omitted from this indictment."  *Id.* at 288.  The Circuit was able to reach this conclusion only by first deciding the failure to submit the elements of the capital charge to the grand jury for its independent consideration,

and the omission of those elements from the final charge issued by the grand jury, was not a structural error. *Id.* at 286.

The flaw in this reasoning was examined by the Eighth Circuit when its considered a procedurally identical case involving a defective federal capital indictment. The matter was presented for the Eighth Circuit's review when certiorari was granted, the decision vacated, and the matter remanded in light of *Ring*. Like the Fifth Circuit, the Eighth Circuit rejected a reading of *Neder* that would leave a *per se* rule of reversal intact. Instead, the Eighth Circuit adopted a harmless error standard of review. Noting the Supreme Court's analysis in *Cotton*, the Eighth Circuit held:

> Nothing in the petit jury's findings compels the conclusion that a completely different group of people - the grand jury - would have found the same fact, even if the evidentiary burdens are lower. This is particularly true where, as here, at issue are relatively qualitative determination which do not lend themselves to precise fact-finding in that same way that drug quantity determinations might.

*Allen*, 357 F.3d at 757-58. Unable to conclude "beyond a reasonable doubt that the indictment error did not affect Allen's substantial rights," the Eighth Circuit concluded the government failed in its burden of proving the error was harmless, vacated the sentence of death, and remanded the case for resentencing to life. *Id.* at 758.

*Robinson* and *Allen* stand in direct opposition, creating a split among the Circuits.[5] The Fifth Circuit's summary disposition of the error presented in this case does not constitute a full

---

[5]The Fourth Circuit has addressed this subject in the context of a capital prosecution. *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). The case involved charges of kidnaping resulting in death and murder within the special territorial jurisdiction of the United States, charged as "felony murder" counts. The Fourth Circuit found dispositive the fact that one of the statutory aggravating factors, prior conviction of a felony, did not have to be charged pursuant *Apprendi*. The Fourth Circuit did not address the issue of post indictment amendment by the government's adding additional aggravators once the indictment is obtained. This problem was addressed directly by the Eight Circuit in *Allen*, 357 F.3d at 755-56.

determination on the merits.  The United States was never required to address the error in this case.  Having assumed no burden, the government advanced no argument or authorities regarding harmless error.  This Court should consider the undeniable error in this case and grant habeas relief from Mr. Vialva's sentences of death.

### D. The Enforcement of the Death Penalty on a Person Who, Because of His Mental Age, Lacks Adult Moral Culpability, Violates the Eighth Amendment's Prohibition Against the Imposition of Cruel and Unusual Punishment.

Trial counsel challenged the Constitutionality of applying the death penalty to Mr. Vialva.  Trial counsel raised a general objection to the imposition of the death penalty in a pretrial motion to strike the United States's notice of its intention to seek the death penalty.  Trial counsel asserted: "The death penalty is, in all circumstances, cruel and unusual punishment, therefore the statute is unconstitutional." *O.R. Doc.* 167 at 2, ¶5.  Mr. Vialva's youth was presented as a mitigating factor during the penalty phase.  Trial counsel requested a jury instruction that included Mr. Vialva's age as mitigating factor. *O.R. Doc.* 265 at 21 ("(5)  CHRISTOPHER VIALVA was only nineteen at the time of the offense.").  The jury unanimously rejected the mitigating factor, "Christopher Vialva was nineteen years old at the time of the offense." *O.R. Doc.* 286.

On direct appeal, counsel argued the imposition of the death penalty violated the Eighth Amendment "because the jury arbitrarily found that he [Mr. Vialva] did not establish the existence of the mitigating factor that he was 19 years old when he committed capital murder." *United States v. Vialva*, Fifth Circuit Case No. 00-50523, *Appellant's Brief*, Issue 10.  In rejecting the argument, the Fifth Circuit reiterated its prior expression of "doubt regarding its authority to review jury findings relating to mitigating factors." *United States v. Bernard*, 299 F.3d 467, 485 (5th Cir. 2002).

94

In Mr. Vialva's petition to the Supreme Court for *certiorari,* he argued the Eighth Amendment's prohibition against the arbitrary and capricious infliction of capital punishment was violated when the verdict form and jury instructions permitted the jurors to "refuse to recognize an undisputed historical fact about the defendant's character and background or crime that he proffered as a mitigating circumstance." *Vialva v. United States*, U.S. S. Ct. Cause No. 02-8448, *Petition for Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit*. The Supreme Court denied Mr. Vialva's petition. *Vialva v. United States*, 539 U.S. 928 (2003).

 Trial counsel failed to recognize Mr. Vialva's mental age was a factor that should have been presented to jury on the issue of his ability to form requisite intent, as well as to challenge the government's theory that Mr. Vialva was the "leader" of the group and  thus responsible for the homicides.  Further, trial counsel failed to present readily available evidence that would have explained why Mr. Vialva's mental age was a mitigating factor.  The correlative to these instances of ineffective assistance is that trial counsel failed to raise a specific Eighth Amendment challenge to the imposition of the death penalty based on the mental age of the accused.

Full presentation of this claim required the extra-record fact development conducted during post-conviction proceedings.  Moreover, the Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005), provides direct support for the application of Eighth Amendment  proportionality review.

Dr. Daneen Milam conducted a review of Mr. Vialva's childhood medical, educational,  and mental health records. *App. Ex. 20* (Milam) at ¶¶ 3, 4.  Dr. Milam also conducted neuropsychological testing and an interview of Mr. Vialva incident to her evaluation.  *Id.* at ¶ 17.  Dr. Milam's inquiry included interviews with Mr. Vialva's mother, stepfather, maternal aunts, and several of his peers at

the time of the offense. *App. Ex. 20* (Milam) at ¶ 4. Dr. Milam's inquiry included a review of the

sequence of the events that led to the homicides. *Id.* at ¶ 25. Dr. Milam offered the following

opinion, based on all of the information she reviewed and her evaluation of Mr. Vialva:

> There is a growing body of knowledge that indicates the average child does not
> become a fully functioning mature adult into the early twenties. See <u>Exhibit 3</u> to this
> declaration. Christopher, with all of his neuropsychological deficits, would have a
> high probability of being two to three years younger in brain development than his
> age peers. Therefore, he had less control than other adolescents and less ability to
> foresee consequences of actions. The conclusions that his neuropsychological deficits
> would cause him to behave even younger than his chronological age is corroborated
> by the comments of his male peers who describe him as "silly" "a follower" and a
> "clown." This is also consistent with his association during the crime with boys who
> are closer to his mental age rather than his chronological age. A review of the
> sequence of events of the crime are consistent with a poorly planned and executed
> event where these four boys were responding as children to unfolding and unplanned
> occurrences. Clearly, the neuropsychological evaluation of Christopher Vialva reveals
> an individual who was incapable of and responding to a rapidly changing situation.
> In addition, his poor ability to think and plan (a frontal lobe function) makes him
> particularly unsuited to control the situation throughout the day. When combined
> with a Bi-Polar nature and the consequences of a much younger mental status, Chris
> did not have the cognitive skills to control the situation; it spiraled out of his control.

*App. Ex. 20* (Milam) at ¶ 25. Mr. Vialva's nineteenth birthday, May 10, was forty-one days before

the offense.

The factors noted by Dr. Milam and the conclusions she reached about Mr. Vialva's mental

age and its consequences give rise to the same concerns that prompted the Supreme Court's decision

in *Roper*. *Roper* begins with the Eighth Amendment, followed immediately by the Court's

reaffirmation of the principle it enunciated in *Atkins v. Virginia*, 536 U.S. 304 (2002):

> As the Court explained in *Atkins*, the Eighth Amendment guarantees individuals the
> right not to be subjected to excessive sanctions. The right flows from the basic
> "'precept of justice that punishment for crime should be graduated and proportioned
> to [the] offense.'"

*Roper*, 543 U.S. at 560 (quoting *Weems v. United States,* 217 U.S. 349 (1910)).  *Roper* enforced the principle of proportionality through its examination of the factors that make imposing a death sentence against a defendant who committed a capital crime while a juvenile under the age of eighteen unconstitutional.  These factors ranged from common sense to social science to prevailing legal standards to international law.  While Mr. Vialva is not categorically excluded from the death penalty by *Roper*, the Supreme Court's reasoning and conclusion support an independent basis for relief.

The majority noted three broad areas distinguishing adults and juveniles.  First, "as any parent and as the scientific and sociological studies" tended to confirm, juveniles lack maturity and have an underdeveloped sense of responsibility.  "These qualities often result in impetuous and ill-considered actions and decisions."  *Roper,* 543 U.S. at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1972)).   The Court noted for that reason, legislatures impose limits restricting by age alone when a person may legally enter into contract, drive automobiles, purchase alcohol, vote, and marry. *Id.* Second, juveniles are "more vulnerable or more susceptible to negative influences and outside pressures, including peer pressure."  *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)).  Third, the personality traits of a juvenile are not as well formed as those of an adult and so are "more transitory, less fixed."  *Id.*   These recognized differences "render suspect any conclusion that a juvenile falls among the worst offenders."  *Id.*

> The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of an irretrievably depraved character.  From a moral standpoint, it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.

*Id.* at 570.  The Court recognized the flaw in adopting a categorical rule based solely on age: "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18.  By the same token, some under 18 have already attained a level of maturity some adults will never reach." *Id.* at 574.  The Court's conclusion that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed" unequivocally rendered that distinct class of offenders ineligible for the death penalty.  *Id.* at 578. The conclusion leaves unresolved whether an offender who is eighteen years old, but still lacks sufficient mental development to exercise mature judgment, is deserving of the death penalty.

*Roper* is dispositive of the Eighth Amendment's outer limits when applied to a group of defendants identified by the single, objectively verifiable criterion of chronological age.  The same Eighth Amendment concerns apply to the group of defendants whose mental age is less than that of a fully functioning adult.  As in *Atkins*, the evaluation of a young person's mental age requires consideration of the variables that impact directly on the individual's moral culpability.  Like intellectual disability, mental age is subject to proof through testing, expert evaluation, historical records, and current observation.  Both Dr. Cunningham and Dr. Milam noted current medical studies documenting the course of human brain development.  These studies provide objective evidence that "adulthood" is less a function of chronology than the synergy of organic components, giving rise to a penumbral group of defendants between the ages of eighteen and twenty-five whose cognitive capacity and concomitant moral culpability are in doubt.  While this group of defendants may be legally accountable for their actions, the imposition of the death penalty presents a distinct Eighth Amendment violation.

Subsequent developments, including recent scientific findings and court opinions, further corroborate that turning eighteen does not turn a youth into an adult. Five years after *Roper*, in *Graham v. Florida*, 560 U.S. 48, 63 (2010), the Supreme Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." The Court then explained, "parts of the brain involved in behavior control continue to mature through late adolescence." *Id.* And critically, "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." *Id.* (quoting *Roper*, 543 U.S. at 570). *See also Miller v. Alabama*, 567 U.S. 460, 471 (2012) (recognizing *Roper* and *Miller* established that "children are constitutionally different from adults for purposes of sentencing" because "juveniles have diminished culpability and greater prospects for reform").

Applying *Roper*, a state circuit court in Kentucky declared Kentucky's death penalty statute unconstitutional "insofar as it permits capital punishment for offenders under twenty-one (21) at the time of their offense." *Commonwealth v. Bredhold*, Case No. 14-CR-161, Fayette Circuit Court, Seventh Division, Order Declaring Kentucky's Death Penalty Statute As Unconstitutional at 12 (August 1, 2017), *abrogated by Commonwealth v. Bredhold*, 599 S.W.3d 409, 412 (Ky. 2020) (vacating order because the constitutional issue was not a justiciable cause before the circuit court where Bredhold had no standing to raise an Eighth Amendment challenge to statute before conviction and sentencing). The state circuit heavily relied on recent scientific studies to support its conclusion. *Id.* at 6.

Citing recent psychological research, the circuit court demonstrated why "individuals in their late teens and early twenties (20s) are less mature than their older counterparts in several important

99

ways." *Id.* at 7. First, individuals under twenty-one are "more likely to underestimate the number, seriousness, and likelihood of risks involved in a given situation. *Id.* at 7 (citing T. Grisso, et al., *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants*, 27 Law & Hum. Behav. 333-63 (2003)). Second, individuals under twenty-one are "more likely to engage in 'sensation-seeking,' the pursuit of arousing, rewarding, exciting, or novel experiences, which is especially pronounced among individuals between the ages of eighteen (18) and twenty-one (21)." *Id.* (citing E. Cauffman, et al., *Age Differences in Affective Decision Making as Indexed by Performance on the Iowa Gambling Task*, 46 Dev. Psychol., 193-207 (2010)). Third, individuals under twenty-one "are less able than older individuals to control their impulses and consider the future consequences of their actions and decisions because gains in impulse control continue to occur during the early twenties (20s)." *Id.* (citing L. Steinberg, et al., *Age Difference in Future Orientation and Delay Discounting*, 80 Child. Dev. 28-44 (2009)). And fourth, in individuals under twenty-one "basic cognitive abilities, such as memory and logical reasoning, mature before emotional abilities, including the ability to exercise self-control, to properly consider the risks and rewards of alternative courses of action, and to resist coercive pressure from others." *Id.* at 8 (citing L. Steinberg, et al., *Are Adolescents Less Mature Than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop*," 64 Am. Psychologist 583-94 (2009)).

An objective and observable reason explains why individuals under twenty-one are far less mature than their older counterparts: Through the use of functional Magnetic Resonance Imaging, scientists have discovered that "key brain systems and structures, especially those involved in self-regulation and higher-order cognition, continue to mature . . . well into the mid-twenties (20s); this notion is now widely accepted among neuroscientists." *Id.* at 6-7 (citing N. Dosenbach, et al.,

100

*Prediction of Individual Brain Maturity Using fMRI*, 329 Sci. 1358-61 (2011); D. Fair, et al., *Functional Brain Networks Develop From a "Local to Distributed" Organization*, 5 Plos Computational Biology 1-14 (2009); A. Hedman, et al., *Human Brain Changes Across the Life Span: A Review of 56 Longitudinal Magnetic Resonance Imaging Studies*, 33 Hum. Brain, Mapping 1987-2002 (2012); A. Pfefferbaum, et al.*, Variation in Longitudinal Trajectories of Regional Brain Volumes of Healthy Men and Women (Ages 10 to 85 Years) Measures with Atlas-Based Parcellation of MRI*, 65 NeuroImage 356-68 (2014); L. Somerville, et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 Brain & Cognition 124-33 (2010)).

Mr. Vialva is within a distinct class of offenders on whom the death penalty may not be imposed Constitutionally. At nineteen years old, with specific developmental deficits, he lacked the cognitive skills of an adult. There can be no confidence in the jury's determination of Mr. Vialva's moral culpability under the circumstances of this case. As a result, this Court should grant Mr. Vialva habeas relief from his sentences of death.

## CONCLUSION

Petitioner Christopher Vialva presents this Court with an exceptional set of circumstances. The attorney appointed as Mr. Vialva's "learned counsel" was, at the time of Mr. Vialva's trial, actively seeking employment with the office prosecuting the case. Inevitably, several violations of Mr. Vialva's Fifth Amendment right to Due Process and Sixth Amendment right to the effective assistance of counsel flowed from this conflict of interest. The jury that sentenced Mr. Vialva to death never heard the extensive mitigating evidence that was available to counsel but that he failed to investigate. The jury did not hear critical evidence regarding the mental age of Mr. Vialva, who was

nineteen years old at the time of the offense but, due to his neuropsychological deficits, was several years younger in terms of brain development. The jury did, however, hear damaging and scientifically illegitimate evidence about Mr. Vialva's potential for future dangerousness, including from the expert testifying on his behalf. Mr. Vialva has never had a full and fair opportunity to litigate the serious Constitutional violations that resulted in his death sentence.

Mr. Vialva asks this Court to exercise its jurisdiction pursuant § 2241 and grant him habeas relief from his death sentences, which demonstrably rest on violations of the Fifth, Sixth, and Eighth Amendments to the Constitution.

## REQUEST FOR RELIEF

For all of the above reasons, Petitioner requests that the Court provide the following relief:

1.  That Petitioner be granted a stay of execution pending a final resolution of the claims raised in this Petition;

2.  That leave to amend this Petition, if necessary, be granted;

3.  That Respondents be ordered to respond to this Petition;

4.  That Petitioner be permitted to file a Reply and/or a Traverse;

5.  That leave to conduct discovery be granted if necessary to prove the facts as alleged in this Petition;

6.  That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact; and

7.  That habeas relief from Petitioner's sentence of death be granted.

**STATEMENT IN COMPLIANCE WITH LOCAL CRIMINAL RULE 38-2(c)**

In conformity with Local Criminal Rule 38-2(c), Petitioner identifies all other legal actions challenging the conviction or sentence challenged in the current petition, followed by citation to every relevant judicial opinion, memorandum decision, order, and/or transcript.

**I.      Trial - Post Verdict Motions**

*United States v. Christopher André Vialva*, Criminal No. W-99-CR-70 (W.D. Tex. Waco Div.) - None.

**II.     Direct Appeal**

*United States v. Christopher André Vialva*, No. 00-50524 (5th Cir)
Relevant Opinion:     299 F.3d 467 (5th Cir. 2002).

**III.    Motion to Vacate Pursuant 28 U.S.C. § 2255**

**A.      Western District of Texas, Waco Division**

*United States v. Christopher André Vialva*, Criminal No. W-99-CR-70;  *§ 2255 Motion*, document 372; *Appendix* Volume I, document 373; *Appendix* Volume II, document 374, filed 06/14/2004.

Relevant opinion/orders:

1.      Document 449, filed 09/28/2012
        *Order Denying § 2255 Motion and Certificate of Appealability*;

2.      Document 473, filed 02/08/2013
        *Order Denying Motion to Amend Judgment* (document 454) *and Motion for Reconsideration* (document 455);

3.      Document 570, filed 12/21/2017
        *Order Dismissing Motion for Relief from Judgment Pursuant Rule 60(b)(6), Fed. R. Civ. P.* (document 553);

**B.      United States Court of Appeals**

*United States v. Christopher André Vialva*, No. 13-70016
Relevant Opinion:     762 F.3d 467 (5th Cir. 2014) (Certificate of Appealability denied from denial of issues presented in § 2255 Motion).

3.       Document 570, filed 12/21/2017
         *Order Dismissing Motion for Relief from Judgment
         Pursuant Rule 60(b)(6), Fed. R. Civ. P.* (document
         553);

**B.      United States Court of Appeals**

*United States v. Christopher André Vialva*, No. 13-70016
Relevant Opinion:      762 F.3d 467 (5th Cir. 2014) (Certificate of Appealability
                       denied from denial of issues presented in § 2255 Motion).


*United States v. Christopher André Vialva*, No. 18-70007
Relevant Opinion:      904 F.3d 356 (5th Cir. 2018) (Certificate of Appealability
                       denied on whether Rule 60(b) Motion was unauthorized
                       second or successive motion to vacate).


The following document referenced in this Petition is not accessible through PACER or

Odyssey; it is appended to this Petition as Attachment 1: Order of Memorandum and Reasons, *IN RE:*

*Complaint of Judicial Misconduct Against United States District Judge*

*Walter S. Smith, Jr.,* Docket No. 05-14-90120 (Sept. 28, 2016).


                       Respectfully submitted,


                       SUSAN M. OTTO
                       Federal Public Defender Western District of Oklahoma
                       215 Dean A. McGee Avenue   Suite 109
                       EMMA V. ROLLS
                       Assistant Federal Public Defender
                       Capital Habeas Unit   Suite 707
                       Oklahoma City, Oklahoma  73102
                       Telephone 405 609-5930        Telefacsimile 405 609-5932
                       Electronic Mail for Service: Susan_Otto@fd.org
                       Counsel for Christopher André Vialva

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2020, I electronically transmitted the attached document to the Clerk of the Court using the CM/ECF System. I further certify that service was made *via* Federal Express on the following:

John F. Bash
United States Attorney
Western District of Texas
601 NW Loop 410     Suite 600
San Antonio, Texas 78216

Joseph H. Gay Jr.
Mark Frazier
Assistant United States Attorneys
W.D. Texas Waco Division
800 Franklin Street Suite 280
Waco, Texas 76701

T.J. Watson, Warden
United States Penitentiary Terre Haute
4700 Bureau Road South
Terre Haute, Indiana 47802.

SUSAN M. OTTO