# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER ANDRÉ VIALVA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 2:20-cv-00413-JMS-DLP** |
| | ) | |
| **WARDEN, USP-TERRE HAUTE,** | ) | **CAPITAL CASE** |
| **UNITED STATES OF AMERICA,** | ) | **EXECUTION SCHEDULED FOR** |
| | ) | **SEPTEMBER 24, 2020** |
| **Respondents.** | ) | |

---

## PETITIONER'S REPLY TO RESPONDENTS'
## RETURN TO ORDER TO SHOW CAUSE

---

SUSAN M. OTTO
OBA# 6818
Federal Public Defender
  Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
(405) 609-5930    Telefacsimile 405 609-5932
Susan_Otto@fd.org

EMMA V. ROLLS
OBA# 18820
Assistant Federal Public Defender
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405) 609-5975
Emma_Rolls@fd.org

Counsel for Petitioner Christopher André Vialva

Dated: August 31, 2020

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      28 U.S.C. § 2241 PROVIDES A REMEDY WHERE A PETITIONER CAN
        ESTABLISH THAT § 2255 HAS PROVED INADEQUATE OR INEFFECTIVE. . . . . 2

II.     MR. VIALVA IS ENTITLED TO § 2241 RELIEF BECAUSE HIS DEATH
        SENTENCES WERE BASED UPON CONSTITUTIONAL VIOLATIONS WHICH
        EVADED MEANINGFUL § 2255 REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      The District Court Failed to Comply with the Statutory Procedure for
                Appointment of Counsel in Death-Eligible Prosecutions, Denying
                Mr. Vialva Access to Counsel Qualified to Defend Him in a Federal
                Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Mr. Vialva's Sixth Amendment Right to Effective Assistance of
                Counsel Was Abridged When His Trial Counsel Applied for
                Employment with the United States Attorney's Office During the
                Pendency of Mr. Vialva's Trial Without Securing Consent Before the
                Conflict Arose or an Effective Waiver After the Conflict Had
                Occurred.  The Conflict Caused an Adverse Effect on and/or
                Prejudice to the Outcome of Mr. Vialva's Trial and Sentencing. . . . . . . . . . . . . 11

                1.      This Conflict Requires Relief Under Any Standard of Review. . . . . . . . 11
                2.      Mr. Goains Had an Actual Conflict. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
                3.      Mr. Vialva Did Not Waive His Right to Conflict-Free Counsel. . . . . . . 15
                4.      Mr. Vialva Was Prejudiced by Counsel's Conflict. . . . . . . . . . . . . . . . . 18

        C.      Mr. Vialva Was Denied the Effective Assistance of Counsel
                Guaranteed to Him by the Sixth and Eighth Amendments During the
                Penalty Phase of His Trial. Trial Counsel's Failure to Obtain
                Adequate Funding Resulted in a Complete Failure to Develop and
                Present Readily Available Mitigating Evidence. Counsel Failed to
                Develop Information About Mr. Vialva's Mental State, Upbringing,
                Character, and Potential. Counsel Failed to Address the
                Government's Allegations About Mr. Vialva's "Future
                Dangerousness" and Failed to Preserve Error Arising from the
                Government's Presentation of This and Non-Statutory Aggravating
                Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                1.      Specific Instances of Ineffective Assistance of Counsel. . . . . . 19

i

D. The Enforcement of the Death Penalty on a Person Who, Because of His Mental Age, Lacks Adult Moral Culpability, Violates the Eighth Amendment's Prohibition Against the Imposition of Cruel and Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III. MR. VIALVA IS ENTITLED TO A STAY OF EXECUTION . . . . . . . . . . . . . . . . . . . 32

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Andrus v. Texas*,
140 S.Ct. 1875 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Atkins v. Virginia*,
536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 30, 31

*Buck v. Davis*,
137 S. Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cuyler v. Sullivan*,
446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Flanagan v. United States*,
465 U.S. 259 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Glasser v. United States*,
315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Graham v. Florida*,
560 U.S. 48 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hall v. Florida*,
572 U.S. 701 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hinton v. Alabama*,
571 U.S. 263 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

*Holloway v. Arkansas*,
435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

*Jones v. United States,*
526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Lockhart v. Fretwell*,
506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lonchar v. Thomas*,
517 U.S. 314 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Mickens v. Taylor*,
535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

*Miller v. Alabama*,
567 U.S. 460 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Roper v. Simmons*,
543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Strickland v. Washington*,
466 U.S. 688 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20, 21

*Wheat v. United States*,
486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wiggins v. Smith*,
539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27

**Federal Cases**

*Beason v. Marske*,
926 F.3d 932 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Brown v. Caraway*,
719 F.3d 583 (7th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Burns v. Hompe*,
No. 07-3820, 2009 WL 2233107, at *4 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . 25

*Fulks v. Krueger*,
No. 2:15-cv-00033, 2019 WL 4600210, at *14 (S.D. Ind. Sept. 20, 2019) . . . . . . . . . . . 4

*Garcia v. Bunnell*,
33 F.3d 1193 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Garza v. Lappin*,
253 F.3d 918 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Higgins v. Renico*,
470 F.3d 624 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Davenport*,
147 F.3d 605 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Lee v. Warden,*
    Case No. 2:19-cv-468-JPH-DLP (S.D. Ind.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Lewis v. Mayle,*
    391 F.3d 989 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Purkey v. United States,*
    964 F.3d 603 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Roundtree v. Krueger,*
    910 F.3d 312 (7th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Boone,*
    245 F.3d 352 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Diozzi,*
    807 F.2d 10 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Garcia,*
    517 F.2d 272 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Horton,*
    845 F.2d 1414 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Johnson,*
    555 F.2d 115 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Sampson,*
    335 F.Supp.2d 166 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Williams,*
    544 F.2d 1215 (4th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Webster v. Caraway,*
    No. 14-1049 (7th Cir. Apr. 30, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Webster v. Daniels,*
    784 F.3d 1123 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 8

*Webster v. United States,*
    No. 4:00-cv-1646, 2003 WL 23109787, at *4, 14 (N.D. Tex. Sept. 30, 2003) . . . . . . . . . 5

*Zuck v. Alabama*,
      588 F.2d 436 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## State Cases

*Haley v. Boles*,
      824 S.W.2d 796 (Tex. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Federal Statutes

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

18 U.S.C. § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 5, 8, 32

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 5, 6, 7

## Miscellaneous

*Job Negotiations with Adverse Firm or Party*, ABA Comm. on
      Ethics and Prof. Responsibility, Formal Op. 96-400, at *1 (1996) . . . . . . . . . . . . . . . . 13

TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9,
      Rule 1.06 (c)(1) (Vernon Supp. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**INTRODUCTION**

Mr. Vialva's § 2241 petition raises basic questions about the fairness of death penalty administration in the federal courts. After the conclusion of Mr. Vialva's § 2255 proceedings, he became aware of evidence that the district judge who presided over his federal capital trial, capital sentencing, and § 2255 proceedings[1] was compromised by substance abuse, conflicts of interest, and courthouse misconduct during the period in which he made critical decisions regarding this case. Mr. Vialva's death sentences rest on numerous Constitutional violations. Yet this compromised district judge summarily denied Mr. Vialva's § 2255 motion without an opportunity for discovery, without a hearing, and without the issuance of a Certificate of Appealability. Compounding the violation of Mr. Vialva's full and fair opportunity to litigate his claims, the Fifth Circuit Court of Appeals, misapplying the standard of review, affirmed the denial of a Certificate of Appealability. Mr. Vialva sought relief through Rule 60(b) after the Fifth Circuit recognized the district judge's impairments and misconduct. The motion was denied without a hearing and the Fifth Circuit again denied a Certificate of Appealability based on a misapplication of the standard of review.

The Government's Return to Order to Show Cause ("GR") fails to meaningfully engage with the seriousness of the district judge's substance abuse, conflicts of interest, and misconduct; it also fails to rebut the obvious impact the district judge's impairments had on Mr. Vialva's opportunity for meaningful review. Further, the Government presents an overly restrictive interpretation of the Seventh Circuit's § 2241 jurisprudence. Mr. Vialva presents abundant evidence of prejudicial error and a limited argument for § 2241 jurisdiction and review.

---

[1]Section 2255(a) and (e) require that such motions be filed before the court which imposed the sentence.

1

**ARGUMENT**

**I.     28 U.S.C. § 2241 PROVIDES A REMEDY WHERE A PETITIONER CAN ESTABLISH THAT § 2255 HAS PROVED INADEQUATE OR INEFFECTIVE.**

There is no dispute between the parties that post-conviction challenges to federal convictions and sentences are governed by 28 U.S.C. § 2255.  Mr. Vialva timely filed a § 2255 motion in the Western District of Texas in 2004.  But unfortunately for Mr. Vialva, District Judge Walter Smith Jr., who presided over both Mr. Vialva's trial and § 2255 proceedings, engaged in a "pattern and practice" of deeply troubling behavior during the precise period in which he oversaw Mr. Vialva's proceedings.  ROA 3500-01 from 60(b) cert.  Demonstrating impaired judgment, Judge Smith continued to preside over the case even though Mr. Vialva alleged he violated the law during the trial.  Ultimately, Judge Smith summarily denied Mr. Vialva's § 2255 motion and all ancillary motions without allowing discovery or holding an evidentiary hearing.  *App. Ex. 1 (O.R. Doc. 449)*.  Evidence of Judge Smith's alcohol abuse and serious misconduct did not come to light until after the conclusion of Mr. Vialva's § 2255 proceedings.  *See App. Ex. 3*, Order of Mem. & Reasons, *In re Compl. of Judicial Misconduct Against United States District Judge Walter S. Smith, Jr.*, No. 05-14-90120 at 1 (Sept. 28, 2016).  Also unfortunately for Mr. Vialva, the Fifth Circuit Court of Appeals twice utilized the same flawed approach condemned by the Supreme Court in *Buck v. Davis*, 137 S. Ct. 759 (2017) in its denial of Certificates of Appealability for Mr. Vialva's § 2255 motion and subsequent Rule 60(b) motion, in which he alleged Judge Smith's impairments and misconduct constituted a defect in the integrity of Mr. Vialva's habeas proceedings.

In § 2254 cases, defendants have both state and federal avenues for post-conviction reviews for post-conviction and federalism concerns are at play.  In contrast, post-conviction review of federal convictions explicitly recognizes there may be times when the federal post-conviction

2

remedy may not be adequate to address a patent injustice. *See* 28 U.S.C. § 2255(e). Congress chose not to repeal or modify § 2255(e) when it enacted the AEDPA with its successor provisions. *See* 28 U.S.C. § 2255(h). Thus, the Savings Clause remains fully available where litigants can establish inadequacy of the § 2255 remedy.

Before addressing the specific claims for which Mr. Vialva seeks § 2241 review, the Government offers two general arguments as to why he cannot prove inadequacy or ineffectiveness here. One is that all cases in the Seventh Circuit finding § 2241 jurisdiction under the Savings Clause were wrongly decided. GR at 18 n.7. Because it is not the province of Mr. Vialva or this Court to disregard precedent, Mr. Vialva will not take time here to disprove that assertion.

The Government also argues Mr. Vialva's claims "do not fall within the narrow categories of habeas claims that the Seventh Circuit has concluded are permitted by the Savings Clause," GR at 17, pointing to three cases: *In re Davenport*, 147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (*en banc*). Section 2241 does not lend itself to such a mechanistic approach. The Savings Clause provides a remedy when § 2255 has proved inadequate or ineffective, an analysis that requires scrutiny of the specific facts and circumstances of a particular case.

The Government's reliance on applying "narrow categories" in assessing § 2241 petitions is neither appropriate nor consistent with Seventh Circuit precedent. In *Davenport*, the Seventh Circuit set out a three-part test to determine when § 2241 is available to inmates affected by changes to the Armed Career Criminal Act. 147 F.3d at 611-12. If this Court followed the Government's logic, *Davenport* established a "category" of habeas claims allowed by § 2241. But only three years later when *Garza* was decided, the Seventh Circuit did not reject it out of hand simply because it did

not fit the "narrow category" of *Davenport*. Instead, the court examined the particular circumstances of the case to determine whether the essential function of § 2255 was impaired. After determining that it was, the court crafted a remedy under § 2241 to address the inequity in Mr. Garza's case. 253 F.3d at 922-25.

Similarly, in the more recent case of *Webster*, the *en banc* Seventh Circuit did not merely dismiss Mr. Webster's arguments by rote application of the case "categories" in *Davenport* and *Garza*. Instead, it again examined the circumstances of the case before it to determine whether § 2255 was inadequate or ineffective. In fact, the Government in *Webster* tried to convince the Seventh Circuit of the same argument it is making before this Court but failed to persuade the circuit. *See Webster v. Caraway*, No. 14-1049 (7th Cir. Apr. 30, 2014), Dkt. 15 at 44 (section entitled "Webster's claim is unlike the narrow band of cases that satisfies the savings clause."). Savings Clause jurisprudence simply does not bear out the limitations the Government has tried to impose on it. *See, e.g., Brown v. Caraway*, 719 F.3d 583, 585 (7th Cir. 2013) (rejecting district court's reliance on *Davenport* to require showing of innocence to invoke § 2241 and finding jurisdiction on sentencing issue); *Beason v. Marske*, 926 F.3d 932, 935-38 (7th Cir. 2019) (describing the various ways in which § 2241 jurisdiction has been found); *Fulks v. Krueger*, No. 2:15-cv-00033, 2019 WL 4600210, at *14 (S.D. Ind. Sept. 20, 2019) ("The Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found.").

Access to the § 2241 remedy depends not on a petitioner raising the identical facts as a prior, differently situated litigant but on whether a petitioner has had "a reasonable opportunity to obtain a reliable judicial determination" of the legality of his conviction or sentence. *In re Davenport*, 147

F.3d at 609. The standard has been articulated in several ways in the Seventh Circuit, but the focal point has remained the same: Some structural problem, some "glitch," or some "lacuna" in the implementation of the § 2255 statute must have prevented the petitioner from securing meaningful review of the error. *See Webster*, 784 F.3d at 1136; *Beason*, 926 F.3d at 939.

Further, that Mr. Vialva's § 2241 petition includes claims previously presented in his § 2255 motion does not preclude his access to § 2241 now. Citing *Roundtree v. Krueger*, 910 F.3d 312, 313 (7th Cir. 2018), the Government argues "[a]bsent an intervening and retroactive change in governing law, a federal prisoner cannot relitigate a claim under § 2241 that was actually resolved in a proceeding under § 2255." GR at 20. But *Webster* makes clear the Government's argument based on *Roundtree* is not without exception. In *Webster*, the Seventh Circuit found the petitioner was permitted "to resort to petition under § 2241," despite that he had raised the same claim – exemption from the death penalty due to intellectual disability – in his § 2255 motion. *Webster*, 784 F.3d at 1138; *Webster v. United States*, No. 4:00-cv-1646, 2003 WL 23109787, at \*4, 14 (N.D. Tex. Sept. 30, 2003) (noting Mr. Webster's § 2255 motion alleged that "Webster is ineligible to be executed because he is mentally retarded," and denying such claim after applying *Atkins v. Virginia*, 536 U.S. 304 (2002)).

Mr. Vialva recognizes that "something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster*, 784 F.3d at 1136. Mr. Vialva's § 2241 petition demonstrates that the specific circumstances of his case deprived him of a meaningful opportunity to obtain review of the claims he presents.

As Mr. Vialva discussed in his petition, Judge Smith's misconduct and alcohol abuse during the period in which he presided over Mr. Vialva's trial and § 2255 proceedings precluded an

untainted opportunity for meaningful review of Mr. Vialva's claims.  Pet. at 6-9. *See Purkey v. United States*, 964 F.3d 603, 617 (7th Cir. 2020) ("The idea of an entitlement to *one* untainted opportunity to make one's case is deeply embedded in our law.").  In response to the numerous revelations about Judge Smith, the Government argues "there was no basis to infer that Judge Smith was unable to resolve the criminal-law questions presented in Vialva's § 2255 motions in 2012, 14 years after the judge engaged in unrelated misconduct and two years before the investigation into that misconduct began."  GR at 21.  The Government's argument ignores that the allegations of misconduct against Judge Smith dated from 1998, shortly before Mr. Vialva's capital trial, and persisted through 2015, a few years after Judge Smith summarily denied Mr. Vialva's § 2255 motion.  And these allegations went far beyond the "unrelated conduct" (GR at 21) of Judge Smith's unwanted sexual advances to a court employee in 1998; the judicial investigation discovered evidence that Judge Smith was intoxicated during the work day, that he was "not functioning," that he was "falling apart," and that he was not even able to get himself to the courthouse.  Pet. at 7.

The Government's argument is all the more inappropriate because the judicial disciplinary authorities acknowledged Judge Smith's misconduct was potentially part of a "pattern of practice" of unacceptable behavior.  60B cert pet ROA 3500-01. Those authorities were unable to confirm the full scope of Judge Smith's misconduct only because he retired and short-circuited the disciplinary process. *See* Letter from J. Duff, Dir., Admin. Off. U.S. Courts to Senators Grassley and Feinstein, (02/16/2018), https://www.judiciary.senate.gov/imo/media/doc/2018-02-16%20AOUSC%20to%20Grassley,%20Feinstein.pdf, at 10 ("Before the Committee could conduct hearings, Judge Smith retired from office under 28 U.S.C. § 371(a) on September 14, 2016. Following Judge Smith's retirement, the Judicial Council concluded.").  The existing record of

Judge Smith's misconduct casts a long shadow over Mr. Vialva's capital trial and § 2255 proceedings.

The impact of Judge Smith's incapacity with respect to Mr. Vialva's § 2255 proceedings is manifest. Despite the assertion of error based on his violation of the law and Judicial Conference policy, Judge Smith retained jurisdiction over the motion. He did not resolve any ancillary motions Mr. Vialva filed in connection with his § 2255 motion. After the § 2255 motion was pending for over eight years, he summarily denied the motion without allowing discovery or conducting an evidentiary hearing. And in his opinion denying Mr. Vialva's § 2255 motion, he resolved numerous factual issues against Mr. Vialva, despite Mr. Vialva's proffering extensive evidence in support of his claims and the Government's failure to proffer any evidence in support of its opposition.

The Government tries to sidestep the obvious impact of Judge Smith's incapacity on Mr. Vialva's § 2255 proceedings. *See* GR at 21 (characterizing the numerous allegations of ongoing misconduct and alcohol abuse as "events untethered to [Mr. Vialva's] own case"). This myopic view is insupportable in a capital case. The statute provided Mr. Vialva essentially one opportunity to present his substantive habeas arguments to the district court. Through no fault of Mr. Vialva, he was presenting his claims to a judicial officer whose capacity to recognize and respond appropriately to his own errors in judgment was demonstrably impaired. There is no evidence to the support the contention Judge Smith's impairments were "untethered" from the discharge of his duties. The prejudice to Mr. Vialva's rights is obvious. *See Lonchar v. Thomas*, 517 U.S. 314, 324 (1996) ("Dismissal of the *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty.").

Mr. Vialva has established he was denied "a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *See Webster*, 784 F.3d at 1136. Should this Court refuse to exercise jurisdiction under § 2241, it would result in an unconstitutional suspension of the Great Writ. *See* Pet. at 11-12.

II.     **MR. VIALVA IS ENTITLED TO § 2241 RELIEF BECAUSE HIS DEATH SENTENCES WERE BASED UPON CONSTITUTIONAL VIOLATIONS WHICH EVADED MEANINGFUL § 2255 REVIEW.**

A.     **The District Court Failed to Comply with the Statutory Procedure for Appointment of Counsel in Death-Eligible Prosecutions, Denying Mr. Vialva Access to Counsel Qualified to Defend Him in a Federal Prosecution.**

The Government does not dispute Mr. Vialva's claim the district court failed to comply with the requirements of federal law when appointing counsel for him. Instead, it asks this Court to ignore that lawless action and allow Mr. Vialva's conviction and sentence to stand. The Government is wrong.

There is no dispute among the parties to this action that consulting with the Federal Public Defender regarding whom to appoint as counsel in capital cases is mandatory. *See* GR at 32 (emphasis added) (acknowledging that "[w]hen assigning counsel under this section, § 3005 *requires* that the court 'consider the recommendation of the Federal Public Defender'"). The Government also correctly identifies the "purpose of securing the FPD's recommendation is to ensure high-quality representation necessary in capital cases." *Id.* Nonetheless, the Government argues that the district court's clear and unequivocal violation of law should not lead to relief for Mr. Vialva.

Quoting *United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976), the Government argues "[t]he failure to consult the FPD before appointing capital counsel is non-structural error [and] does not warrant vacatur absent a showing of prejudice." GR at 23. The Government is wrong

8

and selectively picks only one partial sentence from *Williams*, which it presents totally devoid of context. As Mr. Vialva demonstrates here, the district court's refusal to follow the mandatory language of § 3005 warrants habeas relief.

In *Williams,* the defendant was prosecuted for a first-degree murder arising from a homicide on a military reservation. The opinion does not state whether the United States sought the death penalty against Mr. Williams, who was ultimately convicted of second-degree murder. The defendant sought collateral review based on the alternative theories that the rights secured to him by § 3005 were denied when his requests for two counsel went unanswered, or if his requests were not found in the record, that his right to counsel was violated in the absence of an affirmative waiver. *Id.* at 1218. The Government focuses this Court's attention on a fragment of the Fourth Circuit's decision, but ignores the context:

> It is settled that a defendant in a capital case is entitled to the appointment of up to two counsel upon request. A failure to appoint two counsel under such a circumstance gives rise to an irrebuttable presumption of prejudice. *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973). This Court has recently held, however, that the right to two counsel granted by § 3005 does not embody a fundamental constitutional right of the sort which can be deemed waived only under the strict standard of *Johnson v. Zerbst*, 304 U.S. 458, 564, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *United States v. Blankenship*, 548 F.2d 1118 (4th Cir. 1976).

*Williams*, 544 F.2d at 1218. Respondent is apparently reading the third sentence in the quoted text as a conclusive holding that § 3005 does not implicate Constitutional concerns. This reading is not supported by the text of *Williams* or by the Fourth Circuit's subsequent reaffirmation of the "irrebuttable presumption of prejudice" recognized in *Watson. United States v. Boone*, 245 F.3d 352, 359 (4th Cir. 2001).

The intent of § 3005 and the guidance provided in the *Guide to Judiciary Policies and Procedures* is evident. Congress and the Judicial Conference of the United States intend that a

9

defendant charged with a capital offense by the United States will receive the effective assistance of counsel mandated by the Constitution and the Supreme Court. Far from being the minor technicality the Government paints it as, this error at the critical initial appointment stage implicated Mr. Vialva's Sixth Amendment rights. There is no language in the statute or the *Guide* suggesting the procedure is optional. In fact, the language of the statute is unambiguous in its direction that the court "shall consider" the recommendations for appointment of counsel. Section 3005 is integral to enforcing the Sixth Amendment. Failing to comply with a statute that enforces a Constitutional right is qualitatively different than failing to advise a defendant of the possible imposition of restitution as a condition of probation, or failing to ask a defendant who has objected to a presentence report whether he and his counsel have had an opportunity to read the report. At least within the facts of this case, failure to comply with § 3005 is a structural error implicating a death-sentenced defendant's Constitutional rights.

The Government's substantive argument essentially consists of bald assertions that no error occurred because Mr. Vialva received the assistance of qualified counsel, despite the Court's violation of § 3005. GR at 24 (noting "Vialva's trial was far from the first rodeo for either of his appointed counsel"). Of course, the Sixth Amendment does not guarantee a defendant will receive an experienced lawyer; what it guarantees is that a defendant will receive a Constitutionally effective one. And in the case of a defendant like Mr. Vialva, the law requires the appointment of two effective lawyers. Mr. Vialva received none.

Through the improvident suggestion of Mr. Schwieger, the district court appointed an attorney who had an actual conflict of interest that resulted in prejudice to Mr. Vialva. *See* Ground II.B. Trial counsel failed to marshal an adequate investigation of issues in the first stage, resulting

in a failure to subject the Government's case to appropriate adversarial testing, as well as a failure to present a coherent defense. Trial counsel's failures throughout the trial, individually and cumulatively, were of such significance there can be no confidence in the outcome of the proceedings. Trial counsel failed completely in their obligation to investigate, prepare, and present an effective defense to the death penalty during the second stage of trial. *See* Ground II.C. Trial counsel's pervasive ineffectiveness during both stages of this capital proceeding resulted in a Constitutionally defective process. The district court's initial departure from the statutory requirements of § 3005 was merely the first error in the process.[2]

> **B.** **Mr. Vialva's Sixth Amendment Right to Effective Assistance of Counsel Was Abridged When His Trial Counsel Applied for Employment with the United States Attorney's Office During the Pendency of Mr. Vialva's Trial Without Securing Consent Before the Conflict Arose or an Effective Waiver After the Conflict Had Occurred. The Conflict Caused an Adverse Effect on and/or Prejudice to the Outcome of Mr. Vialva's Trial and Sentencing.**

The Government fails to meaningfully engage with the record, ignores black-letter law, and relies on inapposite cases in its response to this claim.

> **1.** **This Conflict Requires Relief Under Any Standard of Review.**

In his Petition, Mr. Vialva argues the conflict at issue requires a presumption of harm and automatic reversal. Pet. at 41-42 (citing *Holloway v. Arkansas*, 435 U.S. 475 (1978) and *Glasser v. United States*, 315 U.S. 60 (1942)). The Government explains, "In the Fifth Circuit, the *Cuyler*

---

[2]In its effort to justify the district court's failure to follow the clear statutory mandate to consult with the Federal Public Defender, the Government notes "the FPD was headquartered 180 miles away in San Antonio and did not have any presence in the Waco Division." GP at 24 (citing ECF No. 373 at 6). Nothing in § 3005 limits the court's obligation to consult only when the FPD has an office in the same city as the court. If telephoning the Defender in San Antonio was too onerous, Judge Smith should have followed the statute's direction when there is no Defender organization in the district and "consider[ed] the recommendation . . . of the Administrative Office of the United States Courts." *See* § 3005. Unquestionably, the district court failed to follow § 3005.

11

standard governs conflicts that spring from multiple-client representation, while the *Strickland* standard governs all other conflicts." GR at 25 (citation omitted). As the Government also explains, there is no such limitation in the Seventh Circuit, which evaluates potential conflicts of interest under *Strickland* and actual conflicts of interest under *Cuyler.* GR at 25 (citations omitted). The Supreme Court has not yet spoken to this issue. *See Mickens v. Taylor*, 535 U.S. 162, 174, 176 (2002) (stating the only question at issue is the effect of a trial court's failure to inquire into a potential conflict and noting the application of the *Cuyler/Sullivan* standard to cases other than concurrent representation is an "open question"). Several circuits have correctly rejected limiting *Cuyler/Sullivan* to cases of concurrent representation. *Mickens*, 535 U.S. at 174 (collecting cases). In the event this Court limits the application of *Cuyler/Sullivan* to concurrent representation conflicts, Mr. Vialva objects to preserve the issue for further review.

### 2. Mr. Goains Had an Actual Conflict.

The Government does not dispute that Mr. Goains entered into specific discussions regarding employment with the United States Attorney's Office during his representation of Mr Vialva *before* consulting his client or the district court about the conflict. The Government does not dispute that Mr. Goains never told Mr. Vialva or the district court that he had interviewed for a job with the very office that was prosecuting Mr. Vialva. The Government does not dispute that Mr. Goains never told Mr. Vialva or the district court that his interview was conducted with the same United States Attorney who also attended Mr. Vialva's trial. The Government does not dispute that Mr. Vialva never received the benefit of advice from independent counsel to assist him in considering the impact of the conflict on his case. The Government does not dispute that Mr. Goains either lost or destroyed his records of Mr. Vialva's case. The Government does not dispute that Mr. Goains

12

willingly supplied the United States an affidavit regarding his conflict of interest, but that he was unwilling to provide Mr. Vialva's post-conviction counsel a statement under oath regarding his representation. These admitted facts establish the existence of a conflict.

It is black-letter law that the client's consent to a conflict, if it can be given at all, must be obtained *before* the conflict materializes. *See, e.g.*, *Job Negotiations with Adverse Firm or Party*, ABA Comm. on Ethics and Prof. Responsibility, Formal Op. 96-400, at *1 (1996) (establishing that conflict arises upon discussions of employment with an entity adverse to client unless consent to the discussions is first obtained). Absent that prior consent, the affected lawyer has an actual conflict. When Mr. Goains interviewed for a job with the United States Attorney's Office, he voluntarily entered into a situation in which his interests and that of his client were at odds. Mr. Goains had an actual conflict. *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) ("An actual conflict of interest occurs when a defense attorney places himself in a situation inherently conducive to divided loyalties.").

As Lawrence Fox explained, Mr. Goains had a conflict and "the conflict presented here is one of the most egregious one can imagine." *App. Ex. 9 at 6*. Mr. Fox's qualification to render an opinion on legal ethics and conflicts of interest are unimpeachable. Among other things, Mr. Fox is the former chair of the American Bar Association Committee on Ethics and Professional Responsibility. He participated in the ABA Commission reviewing the Model Rules of Professional Conduct. He is the author of textbooks on legal ethics. *See App. Ex. 9.* The Government fails to engage with or counter Mr. Fox's conclusion likely because it cannot: no reputable expert in legal ethics would reach a contrary conclusion.

The Government attempts to support its argument that no actual conflict existed by citing cases in which courts have concluded that accepting offers of employment with a prosecutorial office does not cause reversible error. However, the cases are profoundly distinguishable and inapposite to Mr. Vialva's.

In *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994), cited in GR at 25-26, the death penalty was not at issue, and the situation with regard to the lawyer's employment was not so extreme as it was in this case. In Mr. Garcia's case, his lawyer had accepted employment with the prosecutor's office. As Mr. Fox explains, confirmed employment presents a far less dangerous situation than that of Mr. Goains who still sought a much coveted and desired placement with the prosecutor's office. *See App. Ex. 9 at 5-6* (noting that this conflict is "even worse than the one that would have been created if Mr. Goains had already accepted an offer from the U.S. Attorney's office"). Moreover, Mr. Garcia engaged in an extended colloquy with the court and was granted five days in which to seek advice from family members and independent counsel – a protection not afforded Mr. Vialva. *Garcia,* 33 F.3d at 1196-97. In fact, it was that extended colloquy and the meaningful dialogue with the court that led the Ninth Circuit to conclude Mr. Garcia had effectively waived his right to conflict-free counsel when it found Mr. Garcia "received a longer continuance than he requested and, after the court explicitly discussed with him the possible conflict, was articulate and forthright in declaring his desire to proceed." *Id.* at 1197. No such conclusion can be drawn in this case. Mr. Vialva was not given the benefit of outside legal counsel. He was not given a continuance to consider his options. He did not engage in a colloquy with the district court. Instead, Mr. Vialva was asked leading questions and gave only monosyllabic answers from which no inference regarding his understanding of his rights can be made.

14

Like *Garcia, United States v. Horton*, 845 F.2d 1414 (7th Cir. 1988), cited in GR at 26, was not a death penalty case. Moreover, the court specifically distinguished the case as not "a high-publicity criminal prosecution in which there was public interest, or anything else that would attract the attention of those involved in the selection and confirmation process." *Id.* at 1420. In contrast, as the first death penalty prosecution in the Western District of Texas, this was a high profile, high-publicity case. Mr. Blagg, the United States Attorney with whom Mr. Goains had interviewed and from whom he hoped to secure employment, attended the trial and was introduced to the jury at trial.

In sum, none of the cases to which the Government cite squarely deal with the facts presented by this case: a high-profile, high-publicity capital trial, an indigent defendant, clear failure to disclose the magnitude of the conflict to the client and the court, no consultation with independent counsel, ineffective waiver, and proven harm.

### 3.       Mr. Vialva Did Not Waive His Right to Conflict-Free Counsel.

The Government claims the record reflects Mr. Vialva made a knowing waiver of his right to unconflicted counsel at the May 12, 2000, hearing. GR at 26-27. The Government is wrong.

As a threshold matter, it is important to recognize it was the prosecution, not the defendant or defendant's counsel who asked for a waiver in this case. Presumptions about the correctness of and the prejudice resulting from waivers of constitutional rights are particularly questionable when the waiver has been requested by the prosecution. *Cf. United States v. Diozzi*, 807 F.2d 10, 15-16 (1st Cir. 1986) (noting when the government seeks to compromise a defendant's Sixth Amendment rights, no prejudice need be shown).

But, even if it had been Mr. Goains who desired and sought the waiver, this was not a waivable conflict. For a conflict to be waivable, a lawyer must reasonably believe the representation

15

of his client will not be adversely affected.  *See* TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06 (c)(1) (Vernon Supp. 1999).  As Mr. Fox has opined, this conflict was not one which any reasonable lawyer would believe was waivable.  *See App. Ex. 9  at 10.*

However, even if this conflict could have been waived, it could only have been waived after Mr. Vialva had received full disclosure and the advice of independent counsel.  TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06, cmts. 7-11 (Vernon Supp. 1999).  The hearing record demonstrates Mr. Goains was not candid with either Mr. Vialva or the district court regarding the facts of the conflict.  No waiver that is based on less than a full understanding of the facts can ever be valid.

Even if Mr. Goains could have validly sought a waiver and had been candid, Mr. Vialva's status as an indigent defendant presents special concerns:

> While in most cases, compliance with the provisions of Texas Rules of Professional Conduct Rule 1.06(c) eliminates concerns about conflicts of interests, here Rule 1.06(c) provides no such relief. Even had [the defendant] affirmatively consented to [his lawyer's] continued representation, the [ethical] concerns would not have been laid to rest. A clear distinction exists between paying clients and indigent defendants. Because paying clients may contract for representation from the lawyer of their choice, they are free to accept or reject representation by a lawyer after having been informed of a conflict of interest. However, an indigent defendant is assigned the lawyer who will represent him. *The indigent defendant's consent to continued representation under Rule 1.06(c)(2) does not embody the same degree of free choice as that of the paying client. Therefore, for purposes of the sixth amendment right to conflict-free representation, the solution provided by Rule 1.06(c)(2) will not suffice to alleviate a conflict of interest where the defendant is indigent.*

*Haley v. Boles*, 824 S.W.2d 796, 798 (Tex. App. 1992) (emphasis added).  No care or consideration was taken of Mr. Vialva's indigent status, his vulnerability as the recipient of appointed counsel, his youth, his inexperience with the legal system, or his understanding of the consequences of his decision.

Not only was Mr. Vialva abandoned by his own lawyers, but he was also abandoned by the court which made a deficient inquiry into the conflict. A review of the transcript shows the district court failed to follow the express guidelines set out by the Fifth Circuit for trial court inquiry into conflicts:

> As in Rule 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

*United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975);[3] *Wheat v. United States*, 486 U.S. 153, 160 (1988) (When alerted as to the possible existence of a conflict of interest, the court must take proper steps to ascertain whether the conflicts warrant separate counsel.). There was no dialogue between the district court and Mr. Vialva. The district court did not assure Mr. Vialva he had the right to conflict-free representation and the right to consult independent counsel. The district court did not give Mr. Vialva time to think about his options. Rather, on the Friday before trial began on Monday, Mr. Vialva was forced to trade his right to unconflicted counsel with his right to have a purportedly death penalty qualified counsel. He should not have had to make that choice. *United States v. Johnson*, 555 F.2d 115, 120 (3d Cir. 1977) (commenting that "[a] defendant in a criminal proceeding is entitled to certain rights and protections which derive from a variety of sources. He

---

[3]*Abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984) (regarding immediate appealability of pre-trial disqualifications).

17

is entitled to all of them; he cannot be forced to barter one for another. When the exercise of one right is made contingent upon the forbearance of another, both rights are corrupted.").

In a factually similar situation, the Ninth Circuit held there can be no effective waiver when there is "no evidence that [the defendant] understood any of the specific ramifications of his waiver, since he did not seek the advice of outside counsel and had only a cursory discussion with the judge." *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (internal citations and quotations omitted). The Ninth Circuit reached this conclusion even though the defendant signed a written waiver, was advised to seek outside counsel, and was given general advice on the potential adverse effect of such the conflict. *Id.* If there was no waiver for Mr. Lewis, there can be no waiver in this case, in which Mr. Vialva had no such protections. Mr. Vialva was not advised to seek counsel from an independent unconflicted lawyer. Rather, he was pressured to make a decision on the eve of trial and, if he had dared to ask for an unconflicted lawyer, he was not given any assurance that one would have been appointed, or that new counsel would have been given adequate time to prepare for his trial.

This was a classic case of a summary and swift "waiver" on the eve of trial that should be treated with the utmost skepticism. Mr. Vialva did not waive his right to conflict-free counsel.

### 4.      Mr. Vialva Was Prejudiced by Counsel's Conflict.

Even if prejudice is not presumed based on the *Cuyler/Sullivan* standard of the showing of an actual conflict, prejudice is easily shown in this case, despite the Government's protestations otherwise. The Government suggests an analysis of prejudice at a capital trial requires the defendant to show that the result of the proceeding would have been different. *See* GR at 26 ("Nothing in the record substantiates Vialva's claim that . . . it changed the results of the trial."). The Government

is wrong. The analysis of prejudice does not focus on the outcome of a trial, but rather on whether the conflict, or other error, affects the adversarial balance of the trial. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). That task is particularly difficult when the conflict manifests itself primarily through "what the advocate finds himself compelled to *refrain* from doing." *Holloway*, 435 U.S. at 490-91. Consequently, the causal connection between the conflict and prejudice is proved circumstantially, through evidence that the lawyer did something detrimental or failed to do something advantageous to one client that protected another's interests. "[B]oth taking action and failing to take actions that are clearly suggested by the circumstances can indicate an adverse effect." *Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001) (*en banc*) (internal quotation omitted). Here, the defense waived cross examination of 26 witnesses in the guilt phase of the trial. Mr. Goains's inaction is inexplicable absent the effect of his conflict.

      **C.**     **Mr. Vialva Was Denied the Effective Assistance of Counsel Guaranteed to Him by the Sixth and Eighth Amendments During the Penalty Phase of His Trial. Trial Counsel's Failure to Obtain Adequate Funding Resulted in a Complete Failure to Develop and Present Readily Available Mitigating Evidence. Counsel Failed to Develop Information About Mr. Vialva's Mental State, Upbringing, Character, and Potential. Counsel Failed to Address the Government's Allegations About Mr. Vialva's "Future Dangerousness" and Failed to Preserve Error Arising from the Government's Presentation of This and Non-Statutory Aggravating Factors.**

            **1.**     **Specific Instances of Ineffective Assistance of Counsel.**

                    **a.**     **Counsel Failed to Secure Adequate Funding for Necessary Resources and to Devote Adequate Time and to Investigate, Prepare, and Present a Mitigation Case**.

The Government points out that "counsel obtained funding throughout Vialva's trial" and, for the penalty phase, "ultimately retained Tena Francis, an investigator and mitigation specialist who assisted in preparing Vialva's mitigation case," and "Dr. Mark Cunningham, a forensic

19

psychologist who provided a detailed scientific and statistical analysis to support Vialva's alleged mitigating factors and 'testified longer than any witness during the penalty phase.'" GR at 28 (citations omitted). The Government misses the salient point: Trial counsel failed to provide the district court with sufficient information on which to base its decisions regarding funding and continuances, resulting in insufficient time and resources for Ms. Francis to perform her services.[4] *See* Pet. at 49-54. Due to counsel's deficient performance in securing timely and sufficient funding, Ms. Francis "was able to accomplish little within the time constraints, and did not produce much information with which to supplement the preliminary investigation that had been completed. There was simply not enough time to complete the investigation at that point." *App. Ex. 17* Declaration of Tena Francis at ¶17. Counsel's failure to secure adequate, uninterrupted funding resulted in a "woefully inadequate" social history investigation. *Id.* at ¶20. In *Hinton v. Alabama*, 571 U.S. 263, 274 (2014), as here, counsel secured *some* funding for an expert; nevertheless, the Supreme Court found deficient performance because due to a mistake of law, counsel failed to secure the additional funding he needed.

The Government argues, "Vialva's counsel did not perform unreasonably in choosing to forgo seeking additional funding to introduce [additional] evidence." GR at 29. Under *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984), "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation." *See also Wiggins v. Smith,* 539 U.S. 510, 527-28 (2003). "The

---

[4]Counsel's failures regarding Dr. Cunningham are addressed in detail in the Petition at 62-76, and *infra* at 22-23. For the reasons explained there, that Dr. Cunningham "testified longer than any witness during the penalty phase" was to Mr. Vialva's detriment. GR at 28 (internal quotation marks omitted).

selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, *when made 'after thorough investigation of [the] law and facts'*, is 'virtually unchallengeable.'" *Hinton*, 571 U.S. at 275 (emphasis added) (citation omitted).  Here, counsel did not limit their investigative efforts based on "reasonable professional judgments."  *Strickland*, 466 U.S. at 691.

The Government does not challenge the qualifications, method, or expert opinions of Tena Francis (*App. Ex. 17*) and Dr. Daneen Milam (*App. Ex. 20*).  Their declarations establish trial counsel began their presentation for Mr. Vialva's life with a "woefully inadequate" social history. *App. Ex. 17*.  Because trial counsel did not have adequate information, their decision to rely on the testimony of Mr. Vialva's mother, his most recent stepfather, one of his childhood friends, and an expert whose testimony was more damaging than helpful cannot be deemed strategic.

The Government claims that "those who testified on Vialva's behalf–principally Cunningham and Vialva's friends and family members–conveyed the substance of the information that Vialva now claims . . . that his counsel overlooked."  GR at 28 (citations omitted).  However, none of the witnesses presented by trial counsel, including Dr. Cunningham, explained how the various components of Mr. Vialva's childhood illnesses and injuries, chaotic family life,  history of misdiagnosis and improper medication, mental age, emotional condition, intelligence, and positive character traits combined to militate against a sentence of death.  *See* Pet. at 54-62.

According to the Government, "Vialva also fails to establish how his counsel's reasonable decision not to pursue additional funding prejudiced him."  GR at 29 (citation omitted).  A compelling mitigation presentation could have been developed if trial counsel had obtained the necessary resources and used those resources effectively.  Without the critical omitted evidence, the jury had only fragments of disjointed information and no context or frame of reference for weighing

21

what little information was presented.  There is a reasonable probability the outcome of the penalty proceedings would have been different had the jury received a complete history of Mr. Vialva's nineteen years, with documentation and explanation from qualified experts.

          **b.**        **Counsel Failed to Adequately Prepare, Present, and Preserve Error in the Case Against Future Dangerousness.**

          **1.**        **Dr. Cunningham Should Never Have Been Presented to the Jury or, If Presented, His Testimony Should Have Been Limited to a Scientifically Valid Use of His Data.**

The Government claims "counsel's decision to call Cunningham in an effort to undermine the government's future dangerousness case 'was not ineffective because he presented strong mitigating evidence.'" GR at 30 (citation omitted).  On the contrary, Dr. Cunningham's testimony was affirmatively harmful, as he was called to demonstrate that Mr. Vialva posed only a slight risk of future dangerousness, but instead erroneously concluded Mr. Vialva was likely to be dangerous. *See* Pet. at 69-72.

The Government argues, "Vialva spends pages . . . second-guessing his counsel's considered decision to present Cunningham as a mitigation expert." GR at 30 (internal citation omitted).  Counsel's decision to present Dr. Cunningham cannot accurately be characterized as a "considered decision." *Id.*  Counsel hired Dr. Cunningham one month before the trial began, and Dr. Cunningham did not begin his work until after the trial began, leaving counsel insufficient time to become familiar with Dr. Cunningham's proposed testimony.  *See* Pet. at 64-66; *Hinton*, 571 U.S. at 273-75.  Had counsel merely read Dr. Cunningham's published papers, they would have known he would conclude that Mr. Vialva posed a higher than average risk of violence in prison.  *See* Pet. at 69-72.  Due to counsel's failure to investigate, this "so-called mitigating evidence . . . unwittingly aided the State's case in aggravation." *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020).

22

The Government claims, "During the penalty phase, Cunningham 'offered statistical models to counter the Government's testimony regarding future dangerousness.'" GR at 30 (citation omitted). The Government wholly ignores that Dr. Cunningham's methodology was scientifically invalid. *See* Pet. at 72-75. The Government likewise fails to address that defense counsel barred Dr. Cunningham from evaluating Mr. Vialva based on an uninformed and unreasonable concern that Dr. Cunningham would diagnose Mr. Vialva with antisocial personality disorder and, as a result, conclude Mr. Vialva was likely to be dangerous in the future. *See* Pet. at 66-69. In the absence of a personal interview and analysis, Dr. Cunningham's violence risk assessment was based on "actuarial" studies of violence in prisons that are erroneous and scientifically unfounded.

Finally, the Government fails entirely to address Mr. Vialva's argument that the presentation of Dr. Cunningham opened the door to government witnesses Dr. Richard Coons and Anthony Davis, who were highly damaging on the issue of future dangerousness. *See* Pet. at 76.

### 2. Defense Counsel Should Have Objected to the Presentation of Richard Coons's Testimony.

The Government devotes a single sentence to Mr. Vialva's argument that counsel were ineffective in failing to object to the presentation of Richard Coons's testimony. The entirety of the Government's response regarding this failure is: "[A]s Vialva concedes (Pet. 77), his counsel cross-examined Coons, inquiring both whether Coons had statistical data to support his conclusions and whether he was being paid to testify." GR at 30-31.

The Government is correct. Mr. Vialva argued:

> In the face of this devastating testimony that Mr. Vialva "would" be dangerous, the only questions defense counsel asked were whether Dr. Coons had statistical data to back up his conclusions, and whether he was he being paid to be at the trial. *O.R. Doc*. 318 Tr. Trial at 3164. Such a performance was woefully inadequate to reveal the highly significant errors in his analysis and the inadequate basis of his testimony.

*See* Pet. at 77.  The Government does not address Mr. Vialva's arguments regarding counsel's failure to question Dr. Coons to determine his qualifications to testify or the reliability or relevance of his testimony.  *See id.* at 76-79.  The Government fails to address that Dr. Coons, a psychiatrist, was not qualified to render an opinion on future dangerousness and his testimony was, therefore, irrelevant. *See id.* at 78-79.  The Government ignores Dr. Coons's failure to interview Mr. Vialva and use of a widely discredited, quasi-clinical method of analysis of future dangerousness.  *See id.* at 77-79.

The Government ignores counsel's failures to object to Dr. Coons's testimony, including his use of "remorse" as a factor in his dangerousness analysis – which the district court later deemed an improper characteristic of future dangerousness – and his use of a hypothetical that mirrored exactly the facts of this case.  *See id.*

### 3. Defense Counsel Should Have Objected to and Cross Examined the Testimony of Anthony Davis.

The Government's response regarding counsel's failure to object to and cross examine the testimony of Anthony Davis is similarly cursory. The entirety of the Government's response to this argument is: "Davis addressed prison gang membership but did not address Vialva specifically. Counsel's decision not to cross-examine him was reasonable under those circumstances." GR at 31 (citation omitted).

The Government fails to address Mr. Vialva's argument that defense counsel were ineffective in failing to object to Mr. Davis's testimony.  *See* Pet. at 79-80.  Mr. Davis's testimony was irrelevant since he knew nothing about the facts of Mr. Vialva's case or Mr. Vialva's alleged

24

"gang" involvement and had not evaluated the "gang" to which Mr. Vialva allegedly belonged.[5] The Government likewise ignores Mr. Vialva's argument that since "gang" membership was so important to the finding of dangerousness, counsel's failures were undoubtedly prejudicial. *See* Pet. at 80.

### 4. Defense Counsel Failed to Object to the Jury Special Verdict Form and the Prosecutor's Opening Statement.

In response to Mr. Vialva's argument that counsel were ineffective in failing to object to the special verdict form because it required a finding of future dangerousness when enumerated conditions were met, *see* Pet. at 80-81, the Government argues, "The instructions did not suggest that the jury was '*require[d]*' to find future dangerousness on that basis or absolve the jury of its obligation to conduct 'the individualized sentencing required by the Eighth Amendment.'" GR at 31 (citation omitted). On the contrary, based on the jury charge at issue, *O.R. Doc.* 325 Tr. Trial (Supp. Rec. on Appeal) at 17, anyone with a prior conviction for violent conduct would be found to have met the conditions for a finding of future dangerousness, in violation of the Eighth Amendment's requirement of individualized sentencing.

In response to Mr. Vialva's argument that counsel were ineffective in failing to object to the prosecution's reliance on "lack of remorse" in its opening statement, *see* Pet. at 81, the Government argues: "Vialva acknowledges that his counsel had already objected to evidence of lack of remorse and that the court later sustained that objection during trial. . . . Counsel wisely may have decided

---

[5]Counsel's failure to object to the testimony notwithstanding, there was no reasonable strategic reason for counsel's failure to cross examine Mr. Davis and thereby inform the jury of his lack of relevant knowledge. *See Burns v. Hompe*, No. 07-3820, 2009 WL 2233107, at *4 (7th Cir. 2009) (citing *Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006)) ("Failure to cross-examine a crucial government witness can be a ground for finding ineffective assistance.")

not to lodge a specific objection to the mention of lack of remorse during opening statements and risk focusing the jury on that concept." GR at 32 (citations omitted). Although the court later sustained the objection, it was too late. Without objection, the defense allowed the prosecutor to tell the jury that lack of remorse could be considered, and then allowed Dr. Coons to testify about his use of lack of remorse in his evaluation of future dangerousness. Although the district court ultimately agreed lack of remorse was an improper component of the future dangerousness aggravator, due to counsel's failure to object, remorse became an element of the prosecution's case.

### 5. Defense Counsel Failed to Preserve on Appeal Objections to the Inclusion of Non-Statutory Aggravators as Unconstitutional.

The Government argues that had counsel on appeal challenged the inclusion of non-statutory aggravators, "any such challenge would have been unavailing given the uniform determination of the federal courts before and after Vialva's sentencing that the government may submit aggravating factors beyond those necessary to establish a defendant's eligibility for a death sentence–including, specifically, future dangerousness." GR at 31 (citations omitted). However, at least one court has agreed that there is considerable doubt that a future dangerousness aggravator can be Constitutionally applied. *See United States v. Sampson*, 335 F.Supp.2d 166, 222-23 (D. Mass. 2004).

Counsel's failure was prejudicial. "Future dangerousness" is the only aggravator that encourages the jury to conclude the defendant is incorrigible and no mitigating factor offsets the risk of keeping him alive. There is a reasonable probability that without this aggravator, "at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 513.

### c. Defense Counsel Failed to Challenge the Indictment, Leading to an Unconstitutional Sentence. The Grand Jury Did Not

**Determine All of the Elements Essential to Establish Capital Murder. Mr. Vialva's Subsequent Convictions and Sentences of Death Were Imposed in Derogation of the Indictment Clause of the Fifth Amendment.**

The Government does not dispute the facts detailing the history of the charging documents or counsel's failure to raise the claim on direct appeal. The undisputed facts establish that the indictment on which Mr. Vialva proceeded to trial did not charge either the mental state elements enumerated in 18 U.S.C. § 3591(a) or the statutory aggravating factors enumerated in § 3592. It is undisputed the jury was required to find at least one of the predicate factors of § 3591 and at least one of the statutory aggravating factors of § 3592 beyond a reasonable doubt before Mr. Vialva was eligible for the death penalty. 18 U.S.C. § 3593(e).

The Government argues:

At the time of indictment and trial, the government was not required to allege in an indictment the aggravating factors that render a defendant eligible for death. . . . Vialva's counsel was not constitutionally ineffective for failing to raise a *Ring* claim on direct appeal. Such a claim would have failed for two reasons. First, it would not have satisfied plain-error review . . . . Second, the error . . . is harmless: the government's notice of intent to seek the death penalty provided Vialva "with fair notice of . . . each and every statutory and nonstatutory aggravating circumstance that the prosecutor intended to prove at trial," . . . and the petit jury's unanimous findings that the statutory aggravators existed beyond a reasonable doubt, and the overwhelming evidence supporting those factors, establishes that a grand jury would have at least found probable cause to allege those statutory aggravators in the indictment.

GR at 33-34 (citations omitted).

The failure of the United States to submit the mental state and statutory aggravating factors to the grand jury violated the rights secured to Mr. Vialva in the Indictment Clause of the Fifth Amendment. This requirement existed at the time of Mr. Vialva's prosecution. The Supreme Court expressly recognized the carjacking statute, which formed the basis of the capital prosecution,

27

enumerated distinct offenses with distinct degrees of punishment. *Jones v. United States,* 526 U.S. 227, 252 (1999). Mr. Vialva had an absolute right to have his case considered first by the grand jury. The failure of the United States to submit the qualifying mental state and statutory aggravating elements to the grand jury resulted in a failure to properly invoke the jurisdiction of the district court to conduct a capital sentencing proceeding.

The prejudice to Mr. Vialva is twofold. First, trial counsel's failure to challenge the indictment prejudiced Mr. Vialva by depriving him of his Fifth Amendment right to have this matter considered by a grand jury, whose members had not been subjected to procedures that established their willingness to impose the death penalty. A grand jury may have reached a different conclusion about the mental state and statutory aggravating factors, altering the manner in which this case was presented to the petit jury. Furthermore, trial and appellate counsel's combined and continuing failure to preserve this issue for appellate review prejudiced Mr. Vialva by depriving him of the right to a merits review of this claim. To presume, as the Government has, that a violation of a bedrock Constitutional protection in a capital case results in no prejudice when the accused is ultimately convicted and sentenced to death is without support in the Supreme Court's jurisprudence.

**D.** **The Enforcement of the Death Penalty on a Person Who, Because of His Mental Age, Lacks Adult Moral Culpability, Violates the Eighth Amendment's Prohibition Against the Imposition of Cruel and Unusual Punishment.**

The Government correctly claims, "The Supreme Court acknowledged in *Roper* that '[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18,' but nevertheless adopted a bright-line rule setting 18 as 'the age at which the line for death eligibility ought to rest' for purposes of the Eighth Amendment." GR at 36-37 (quoting *Roper v. Simmons*, 543 U.S. 551, 574 (2005)). The Government argues, "Vialva points to no research regarding brain

maturation that is substantially different from the research available when *Roper* was decided." GR

at 38 (citations omitted).

There have been important developments in the research since *Roper*. In *Miller v. Alabama*,

567 U.S. 460, 472 n.5 (2012), the Court explained:

> The evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger. *See*, *e.g.*, Brief for American Psychological Association et al. as *Amici Curiae* 3 ("[A]n ever-growing body of research in developmental psychology and neuroscience continues to confirm and strengthen the Court's conclusions"); *id.,* at 4 ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance"); Brief for J. Lawrence Aber et al. as *Amici Curiae* 12-28 (discussing post-*Graham* studies); *id.,* at 26-27 ("Numerous studies post-*Graham* indicate that exposure to deviant peers leads to increased deviant behavior and is a consistent predictor of adolescent delinquency" (footnote omitted)).

In December 2018, in a declaration filed in connection with litigation in Oregon seeking to

expand *Roper*'s categorical ban on the death penalty to people under 21 years old, the American

Academy of Pediatric Neuropsychology reported comprehensively on the findings of researchers

concerning young adults since the decision in *Roper*. Declaration on Behalf of the American

Academy of Pediatric Neuropsychology, by Robert J. McCaffrey, Ph.D., filed in *Guzek v. Kelly*, No.

17CV08248, Circuit Court for the State of Oregon, Marion County. The Academy noted that

"[i]ncremental yet profound advances in neuroscience and neuropsychology have emerged in the

13 years since the *Roper* decision, and especially in the last decade." *Id.* at 11. These advances "have

unequivocally demonstrated that significant brain development supporting greater complexity in

brain functions continues to take place well beyond the age of 18 years." *Id.* Summarizing the

relevant research, the Academy expanded critically on the Court's observation in *Roper* that "[t]he

qualities that distinguish juveniles from adults do not disappear when an individual turns 18." 543

U.S. at 574.

The Supreme Court has "adopted categorical bans on sentencing practices based on

mismatches between the culpability of a class of offenders and the severity of a penalty." *Miller*, 567

U.S. at 470 (citation omitted). These decisions by the Court have relied on scientific underpinnings.

Five years after *Roper*, in *Graham v. Florida*, 560 U.S. 48, 68 (2010) (barring life-without-parole

sentences for juveniles convicted of nonhomicide crimes), the Supreme Court explained that

"developments in psychology and brain science continue to show fundamental differences between

juvenile and adult minds."[6] Similarly emphasizing clinical underpinnings, the Court in *Atkins v.*

*Virginia*, 536 U.S. 304 (2002) categorically barred the execution of people with intellectual

disabilities; in *Hall v. Florida*, 572 U.S. 701, 720-21 (2014) (citations omitted) the Supreme Court

explained:

> *Atkins* itself not only cited clinical definitions for intellectual disability but also noted
> that the States' standards, on which the Court based its own conclusion, conformed
> to those definitions. In the words of *Atkins*, those persons who meet the "clinical
> definitions" of intellectual disability "by definition . . . have diminished capacities
> . . . ." . . . . Thus, they bear "diminish[ed] . . . personal culpability." . . . The clinical
> definitions of intellectual disability, which take into account that IQ scores represent
> a range, not a fixed number, were a fundamental premise of *Atkins*.

Here, too, the categorical exemption of juveniles from the death penalty must be based on science.

Just as "[t]he clinical definitions of intellectual disability, which take into account that IQ scores

represent a range, not a fixed number, were a fundamental premise of *Atkins*," *id.*, "there is no bright

---

[6]In *Miller* (barring mandatory life-without-parole sentences for those under 18), the Court
reiterated that *Roper* and *Graham* "rested . . . on science and social science." 567 U.S. at 471.

line regarding brain development nor is there neuroscience to indicate the brains of 18-year-olds differ in any significant way from those of 17-year-olds," Declaration of the Academy at 3.

The Government argues:

> [A]dditional evidence that Vialva exhibited qualities associated with youth would not likely have mattered in light of the strong evidence that those qualities did not affect his conduct on the night of the murders. *See* ECF No. 449 at 44, 59 (recounting evidence that Vialva was the leader and main driver of the plot to kidnap and murder the Bagleys and that he carried out the killings after substantial planning in order to prevent his future identification).

GR at 40. First, had trial counsel recognized Mr. Vialva's mental age was a factor that should have been presented to the jury, he could have challenged the Government's theory that Mr. Vialva was the "leader" of the group. *See App. Ex. 20 at ¶ 25* (describing "comments of [Mr. Vialva's] male peers who describe him as . . . 'a follower'"). Furthermore, contrary to the Government's characterization of "substantial planning," GR at 40, according to Dr. Milam, "A review of the sequence of events of the crime are consistent with a poorly planned and executed event where these four boys were responding as children to unfolding and unplanned occurrences." *App. Ex. 20 at ¶ 25*. Finally, even if the Court believes that Mr. Vialva was the "leader" and "carried out the killings after substantial planning," GR at 40, the *Roper* Court held, "The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." 543 U.S. at 570.

## III.     MR. VIALVA IS ENTITLED TO A STAY OF EXECUTION.

In his Petition, Mr. Vialva requested a stay in his prayer for relief, *see* Pet. at 102, with the intention of later briefing that request in a standalone Motion for Stay of Execution filed contemporaneously with his Reply to Respondents' Return to Order to Show Cause. *See, e.g., Lee*

*v. Warden*, Case No. 2:19-cv-468-JPH-DLP (S.D. Ind.), Dkt. 15, 17. As intended, Mr. Vialva now files a Motion for Stay of Execution contemporaneously with this Reply. Respondents' Return contains substantive arguments against Mr. Vialva's request for a stay. In his Motion for Stay of Execution, Mr. Vialva addresses those arguments, fully understanding that the Government will have an opportunity to respond separately to that motion. If necessary for preservation, Mr. Vialva incorporates here the arguments from such motion.

## **CONCLUSION**

For the reasons given above and in his Petition, Mr. Vialva respectfully requests this Court find he has satisfied the standard for pursuing relief under § 2241 and that he is entitled to a new capital-sentencing proceeding.

Respectfully submitted,


 /s/ Susan M. Otto
SUSAN M. OTTO
Federal Public Defender Western District of Oklahoma
215 Dean A. McGee Avenue   Suite 109
EMMA V. ROLLS
Assistant Federal Public Defender
Capital Habeas Unit   Suite 707
Oklahoma City, Oklahoma  73102
Telephone 405 609-5930      Telefacsimile 405 609-5932
Electronic Mail for Service: Susan_Otto@fd.org
Counsel for Christopher André Vialva

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2020, I electronically filed this document with the Clerk of the Court using the CM/ECF System which will send notification to:

Elizabeth Berenguer
United States Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
elizabeth.berenguer@usdog.gov

*Attorney for Respondents*


 /s/ Susan M. Otto
SUSAN M. OTTO